BONNETT, FAIRBOURN,
    FRIEDMAN & BALINT, P.C.
ANDREW S. FRIEDMAN (*to be admitted pro hac vice*)
ELAINE A. RYAN (*to be admitted pro hac vice*)
PATRICIA N. SYVERSON (CA 203111)
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone:     (602) 776-5925
Facsimile:     (602) 798-5825

BONNETT, FAIRBOURN,
    FRIEDMAN & BALINT, P.C.
TODD D. CARPENTER (CA 234464)
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone:     (619) 756-6978
Facsimile:     (602) 798-5860

HARRISON, PATTERSON & O'CONNOR LLP
JAMES R. PATTERSON (CA 211102)
ALISA A. MARTIN (CA 224037)
402 West Broadway, 29th Floor
San Diego, California 92101
Telephone: (619)756-6990
Facsimile: (619)756-6991

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAYNYOHOH DEE, on behalf of herself and all other Californians similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>BANK OF THE WEST, a California Corporation.<br><br>        Defendants. | Case No. _____<br><br>**PLAINTIFF'S CLASS ACTION COMPLAINT**<br><br>1. Violation of Unfair Competition Law, Business and Professions Code §17200;<br><br>2. Breach of the Implied Covenant of Good Faith & Fair Dealing;<br><br>3. Unconscionability;<br><br>4. Unjust Enrichment; and<br><br>5. Conversion |

1    Plaintiff Saynyohoh Dee, by and through her attorneys, brings this action on behalf of

2    herself and all others similarly situated against Defendant Bank of the West ("Bank of the

3    West"). Plaintiff hereby alleges, on information and belief, except for information based on

4    personal knowledge, which allegations are likely to have evidentiary support after further

5    investigation and discovery, as follows:

6                                 **NATURE OF THE ACTION**

7    1.    This is a civil action seeking monetary damages, restitution, and injunctive relief

8    from Defendant Bank of the West (referred to as "Bank of the West" or "Defendant) arising out

9    of its unfair and unconscionable assessment and collection of excessive overdraft fees.

10   2.    Bank of the West markets and provides banking services to tens of thousands of

11   consumers throughout the United States.

12   3.    In the era of electronic banking and the ubiquitous use of debit card transactions,

13   the assessment of overdraft fees has become a major profit center for many United States banks,

14   including Bank of the West.  For years, banks covered customers who occasionally bounced

15   checks and even did so for a time for customers using debit cards, without charging their

16   customers.  Since the early 1990's, however, banks have devised methods to provide overdraft

17   "protection" for customers and charge them in each instance.  A recent FDIC report estimated

18   that overdraft fees represent 74 percent of the total service charges that are imposed on deposit

19   accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can

20   carry an effective annualized interest rate that exceeds *3,500 percent*.    Nevertheless, the

21   Consumer Federation of America reports that five of the ten largest banks raised their overdraft

22   fees in the last year.

23   4.    In 2007, banks collected more than $17 billion in overdraft fees.  That number

24   nearly doubled in 2008, as more and more consumers struggled to maintain positive checking

25   account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion*

26   *in overdraft charges alone.*  Bank of the West is a beneficiary of these staggering charges.

27

28

5.     Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.     Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared after the groceries had been purchased.

7.     The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions made where accounts lack sufficient funds to execute the transaction.  Retail and service transactions could still be executed if customers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and consumers chose to proceed nevertheless.   In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.     Although it is possible to do so, Bank of the West does not alert its check card customers at the time a POS transaction or ATM withdrawal is made that the transaction will overdraft their account and cause them to incur fees.

9.     Instead of simply declining debit transactions when there are insufficient funds or warning its customers that an overdraft fee will be assessed if they proceed with the transaction. Bank of the West routinely processes such transactions and then charges its customers an

overdraft fee of $35—even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Bank of the West. Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Bank of the West fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

10.     In many instances, these overdraft fees cost Bank of the West account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

11.     Thus, it is through manipulation and alteration of customers' transaction records that Bank of the West maximizes overdraft penalties imposed on customers.

12.     This is a class action challenging Bank of the West's long term practice of re-sequencing the order of its customers' debit transactions solely to maximize the non-sufficient fund fees it can charge customers without properly disclosing its re-sequencing policy and practice to consumers and obtaining their informed consent. Rather than charge debits to customers' accounts in the order in which they were made, in accordance with the reasonable expectations of its customers, Bank of the West systematically re-orders the debits and withdraws them from its customers' checking accounts from "highest to lowest". By withdrawing the larger debit charges first, Bank of the West diminishes consumers' funds more rapidly, causing a greater frequency of overdrafts and resulting non-sufficient fund fees. By virtue of its re-sequencing, Bank of the West is able to charge non-sufficient fund fees to accounts which have sufficient funds to cover posted transactions.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), the Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and

costs, and the proposed class contains members who are residents of a different state than Bank of the West.

14.     Venue is proper in the Northern District of California, the district where this action was originally filed, pursuant to 20 U.S.C. § 1391(b)(2) because Bank of the West conducts business in the district and a substantial part of the events giving rise to the claims occurred in the district.

## THE PARTIES

15.     At all times relevant to the Complaint, Plaintiff Saynyohoh Dee resided in Contra Costa County, California.  During the Class period, she used her Bank of the West debit card, was charged multiple non-sufficient fund charges due to Bank of the West's  overdraft re-sequencing policy and suffered injury in fact and lost money and property as a result of the unlawful, unfair, misleading and deceptive overdraft re-sequencing practices described herein.

16.     Defendant Bank of the West, Inc., is a California corporation with its principal place of business located at 180 Montgomery Street, 25th Floor, San Francisco, California 94104.

17.     Bank of the West is a full-service commercial bank serving customers throughout the state of California and in several states throughout the United States with thousands of retail and commercial locations. Bank of the West is engaged in the business of marketing and providing banking and other financial services, issuing debit cards and maintaining customer accounts.  Bank of the West affirmatively markets debit card accounts to customers and provides services to and collects payments from those customers.  Bank of the West attracts customers through multimedia advertising ranging from print ads to television commercials and the Internet.

18.     Bank of the West serves customers in Arizona, California, Colorado, Idaho, Iowa, Kansas, Minnesota, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Utah, Washington, Wisconsin, and Wyoming through retail branch locations and commercial banking offices.

## DEFENDANT'S UNLAWFUL CONDUCT

### A. Bank of the West

19.     According to its website, Bank of the West is the third largest commercial bank based in the Western United States. The Bank offers a full range of business, trust, international and personal banking services.  The Bank currently operates more than 700 commercial and retail banking locations in 19 Western and Midwestern states.

20.     Bank of the West is in the business of providing its customers with a variety of banking services. One of the services provided by the Bank for customers who open a checking account is a debit card, also known as a check card or ATM card. After opening a Bank of the West checking account, Bank of the West customers receive a debit card. The debit feature is offered by Bank of the West in partnership with MasterCard and the card bears the MasterCard logo and is accepted everywhere MasterCard is accepted. Through the use of the debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at ATMs. Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically. As a result, the Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

21.     Bank of the West employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

22.     As a result of Bank of the West's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Bank of the West processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Banks would reorder the debits

1 from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100

2 transaction were debited last—consistent with the actual order of transactions—only one

3 overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008,

4 available at: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

5 **B.  Bank of the West's Relevant Customer Documents Regarding Overdrafts**

6 23. Plaintiffs and all members of the Class maintain or maintained a checking account

7 with Bank of the West.

8 24. The terms of Bank of the West's checking accounts are contained in standardized

9 account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and

10 imposed by Bank of the West, which was the party of vastly superior bargaining strength, and

11 thus constitute agreements of adhesion.   A representative copy of the "Deposit Account

12 Disclosure; For Personal Accounts," effective June 1, 2008 (the "Deposit Agreement" or

13 "Agreement"), covering all Bank of the West accounts, which is 27 pages long, single-spaced

14 and in small print, is attached as Exhibit "A".

15 25. The Deposit Agreement states that Bank of the West reserves the right to "pay, or

16 charge checks and other items presented against your account *in any order we select*." See

17 Exhibit "A".  (emphasis added)

18  It further provides:

19

20 We may adopt posting priorities. **We will generally pay items in the following order, unless otherwise required or prohibited by law: amounts due to us, certain electronic transactions, and then checks will be paid from highest to lowest dollar amounts.** If you have insufficient funds in your account to pay all of the checks and other items processed on any given day, this method will result in additional fees. We may change the order of paying checks and other items against your account at any time without notice to you.

24 Id. (emphasis added).

25

26

27

28

26.     The Deposit Agreement and related documents fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft schemes, although it is possible for them to opt out upon request.

27.     Missing is any disclosure that Bank of the West will re-sequence the customer's debit card charges in order from the largest to the smallest charge at the conclusion of each business day.

28.     Also missing is any disclosure that Bank of the West *will always* re-sequence debits for purposes of generating and maximizing its overdraft fee revenue.

29.     Further, on its website, Bank of the West advertises its debit cards as having the following advantages, including *"automatically"* deducting the purchase amount from the customer's checking account:

**Debit Cards**
**THE BANK OF THE WEST DEBIT CARD IS ACCEPTED AT MILLIONS OF LOCATIONS WORLDWIDE.**

Purchases and payments have never been easier, or more secure. Use your Bank of the West Debit Card in place of checks, cash or credit cards. Plus, you can use your Bank of the West Debit Card to get cash at merchants, any Bank of the West ATM, or at any ATM with the MasterCard® logo...

**PAY AS YOU GO**

Choose your Bank of the West Debit Card when it makes financial sense for you to pay as you go. ***Purchases and payments are automatically deducted from your checking account.***

*See*  https://www.bankofthewest.com/personal-banking/checking-accounts/debit-cards.html,  last viewed on March 3, 2010 (bold italics emphasis added).

30.     Additional representations appearing on Bank of the West's website include:

■ Monitor the details of your debit card transactions - including date, amount, payee name and location – on your checking account statement every month.

■ Accepted everywhere MasterCard symbols are displayed

■ Your Bank of the West Debit Card is more convenient than checks and safer than cash. No need to carry a bulky checkbook, or fill out a complete check,

1    simply swipe and sign. Plus enjoy the peace of mind that our Zero Liability policy
     provides for unauthorized purchases

2    ■ Improved online purchase security with MasterCard SecureCode™

3    *See* https://www.bankofthewest.com/personal-banking/checking-accounts/debit-cards.html, last

4    viewed on June 18, 2010) (bold italics emphasis added).

5    **C. Bank of the West's Re-Ordering of Checking Account Transactions**

6        31.     In an effort to maximize overdraft revenue, Bank of the West manipulates and

7    reorders debits from highest to lowest during given periods of time.  Bank of the West reorders

8    transactions for no reason other than to increase the number of exorbitant overdraft fees it can

9    charge.  This practice violates numerous consumer protection laws and the covenant of good

10   faith and fair dealing in the Bank's Deposit Agreement.

11       32.     When a customer uses his / her debit card, immediate payment is made to the

12   vendor, but the customer's account is not debited until the close of Bank of the West's accounts

13   for the day or until the close of Bank of the West's accounts on the day the creditor requests

14   payment.

15       33.     Bank of the West employs sophisticated software to automate its overdraft

16   system. Bank of the West's computer system tracks and records the date, time and amount of

17   each purchase at the point of sale.  However, instead of posting the debits in chronological order

18   (the order in which the customer engaged in transactions), Bank of the West has programmed its

19   computers to re-sequence the order in which the day's debits are posted to its customers'

20   accounts from the highest (dollar amount) debit to the lowest (dollar amount) debit in order to

21   maximize the amount of overdraft fees generated through the debit transactions.

22       34.     Charging the largest debits against available funds ahead of previously submitted

23   smaller ones results in more overdrafts, as available funds are used up in earlier transactions,

24   thereby generating millions of dollars in non-sufficient fund fees for Bank of the West.  Bank of

25   the West's re-sequencing policy is automated, carried out by processing systems designed and

26   pre-programmed to ensure that customer funds are depleted by as few transactions as possible for

27

28

the purpose of increasing the number of overdrafts and non-sufficient fund fees.  The policy is inherently unfair because it results in the charging of overdraft fees on purchases or transactions for which the customer has sufficient funds to cover, at the time of the purchase.

35.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Bank of the West's posting system, it fails to post charges in the order in which they are incurred or received.  Bank of the West's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

36.     Bank of the West refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Bank of the West is able to amass a number of charges on the account.  Subsequently, Bank of the West posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Bank of the West posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

37.     Bank of the West enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Bank of the West's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Bank of the West with substantially higher service fee revenues than it would otherwise achieve absent these practices.

38.     As a result, Plaintiffs and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover

1    those transactions. In addition, Bank of the West misleads its customers regarding its reordering

2    practices.  The statements in the Deposit Agreement are deceptive and unconscionable.  Bank of

3    the West fails to disclose that it maximizes its overdraft fees, at consumer expense, by grouping

4    together POS transactions that occurred on *subsequent* days with POS transactions that occurred

5    on earlier days, and reordering them so that higher debits that occurred on subsequent days are

6    posted to its customers' accounts before lower debits that occurred on *earlier* days, contrary to

7    the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.  Bank of

8    the West's practices violate the covenant of good faith and fair dealing implied in the Deposit

9    Agreement as well as the consumer protection laws of California.

10   **D.  Bank of the West's Cloaking of Accurate Balance Information**

11           39.     Bank of the West actively promotes the convenience of its debit cards and other

12   electronic debiting, but fails to provide customers with accurate balance information.  When

13   customers execute account transactions, they generally do not have access to an accurate balance

14   register or balance information.

15           40.     Bank of the West provides inaccurate balance information to its customers

16   through its electronic network.  In certain cases, Bank of the West informs its customers that they

17   have a positive balance when, in reality, they have a negative balance, despite the Bank's actual

18   knowledge of outstanding debits and transactions.

19           41.     Even when Bank of the West has actual knowledge of outstanding transactions

20   which have already created a negative balance in a customers' account, it encourages the

21   customer to incur more overdraft charges by approving—rather than prudently declining—

22   subsequent debit card purchases and other electronic transactions.

23           42.     Bank of the West also assesses overdraft fees at times when actual funds in the

24   customer account are sufficient to cover all debits that have been submitted to the Bank for

25   payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so,

26   Bank of the West charges overdraft fees where it faces no risk, because the cash balance in the

27   customer's account has not dropped below zero.

28

**E. Bank of the West's Failure to Notify Customers of Overdrafts or Allow Customers to Opt Out**

43.     At the time its debit cards are used in POS transactions or at ATMs, Bank of the West is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Bank of the West could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

44.     Notwithstanding its technological capabilities and actual knowledge, Bank of the West fails to provide notice to Plaintiffs and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Bank of the West's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

45.     Bank of the West fails to allow Class members to opt out of its overdraft scheme upon request and/or fails to inform Class members of that option.

**F. Bank of the West's Overdraft Policies are Contrary to Best Practices**

46.     By engaging in the conduct described herein, Bank of the West has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit "B".  These "best practice" recommendations include: "Provide election or opt-out of

service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

47.    According to rules proposed by the Agencies:  "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. … This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

48.    The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  Id.

49.    Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

50.    Bank of the West's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their

1    account.  For example, a consumer cannot know with any degree of certainty when funds from a

2    deposit or a credit for a returned purchase Bank will be made available."

3        51.     On October 6, 2009, the Center for Responsible Lending issued a report entitled

4    "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report,

5    attached hereto as Exhibit D, finds that it is now "standard procedure to automatically enroll

6    checking account customers in their most expensive overdraft loan program."  The report finds

7    that debit card transactions account for more overdraft fees than traditional checks or any other

8    type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily

9    be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to

10    2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27

11    million accounts incurring five or more overdraft fees.

12        52.     A chart from the research company Moebs Services shows that, in every year

13    since 1992, banks have gained increased revenues from overdraft fees:



**G. Bank of the West's Unconscionable Provisions and Policies**

53.     Bank of the West's overdraft policies and practices are unconscionable in the following respects, among others:

    a.     Bank of the West does not allow its customers to "opt out" of its overdraft scheme, and/or fails to reasonably disclose to its customers that they have that option;

    b.     Bank of the West does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

    c.     Bank of the West does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.     The Deposit Agreement is a contract of adhesion in that it is a standardized form, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, in a document not signed by the depositor; and

f.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Bank of the West always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

**G.    Bank of the West's Overdraft Practices Harmed Plaintiff and the Putative Class**

54.     Plaintiff's experience is typical and illustrative of how Bank of the West's re-sequencing policy works. On June 8, 2006, Plaintiff's checking account had an estimated available balance of $12.80[1].  *See* Exhibit E, "Checking Account Statement: 05/20/06 through 06/21/06." Plaintiff then engaged in the following transactions: a debit in the amount of $3.65; followed by a debit in the amount of $41.55. *See* Id.  Had these charges been applied to Plaintiff's account in the order in which they occurred, Plaintiff would have incurred only one overdraft charge, as demonstrated in the table below:

**PLAINTIFF'S ACCOUNT LEDGER:  CHRONOLOGICAL ORDER**

| Date | Transaction | Amount | Resulting Available Balance |
|------|-------------|--------|------------------------------|
| 06/08/06 | Beginning Bal. | | $12.80 |

[1] To arrive at the estimated available balance ($12.80) AT THE START OF BUSINESS ON JUNE 8, 2006 add the "Deposits" made TO THE account on 5/25 ($925.05), 5/31 ($63.64) AND 6/06 ($50.00) to the beginning balance on May 22, 2006 ($-41.34) = $997.35.  Then subtract the "withdrawals" made from 5/22 through 6/07 (totaling $984.55) from the account = $12.80 (AVAILABLE BALANCE AT THE START of business on JUNE 8, 2006). *See* Exhibit No. 1, Plaintiff's Bank of the West, "Statement of Accounts" for 05/20/06 through 06/21/06.

| 06/08/06 | Debit Purchase | $3.65 | $9.15 |
|----------|----------------|-------|-------|
| 06/08/06 | Debit Purchase | $41.55 | -$32.40 |
| 06/08/06 | One Overdraft | $30.00 | -$62.40 |
|          |                |       |       |

55.    Instead, Bank of the West "re-sequenced" the charges from highest to lowest, ensuring that Plaintiff's funds would be diminished more rapidly, resulting in at least two overdraft charges, as demonstrated in the table below[2]:

### PLAINTIFF'S ACCOUNT LEDGER: RE-SEQUENCED

| Date | Transaction | Amount | Resulting Available Balance |
|------|-------------|--------|------------------------------|
| 06/08/06 | Beginning Balance | | $12.80 |
| 06/08/06 | Debit Purchase | $41.55 | -$28.75 |
| 06/08/06 | Debit Purchase | $3.65 | -$32.40 |
| 06/08/06 | > Two overdrafts | -$90.00[1] | -$122.40 |

56.    Plaintiff has been repeatedly damaged by Defendant's "re-sequencing" practice throughout the proposed Class period, including on June 8, 2006 and on several subsequent occasions. Plaintiff's experience is typical of other Bank of the West customers and illustrates the impact that Bank of the West's policy and practice of re-sequencing debits from highest to lowest has on consumers.  Posting account debits in an order other than the order in which the purchases were made makes it virtually impossible for consumers to reliably organize their spending to avoid or minimize overdrafts and non-sufficient fund fees.

---

[2] It appears from the statement that Plaintiff inexplicably was charged $90.00 in overdraft fees; the equivalent of three (3) overdraft charges.

57.     Not only does Bank of the West fail to disclose its re-sequencing policy, it affirmatively conceals its re-sequencing by not listing *ALL* transactions in a sequential order on its customers' account statements.  Instead, it groups the transactions into separate categories, including: 1) Deposits; 2) Withdrawals; and 3) Checks.  By so doing, Bank of the West has made it exceptionally difficult for Plaintiff and Class members to understand their account balance on a daily basis.  The misleading account statements are designed to disguise Bank of the West's wrongful re-sequencing practice and leaves unsuspecting customers confused or unaware of how the overdraft fees were incurred.

58.     Further adding to the confusion are the misleading and deceptive representations Bank of the West makes about its debit cards.  Representations that "Bank of the West Debit Card...makes financial sense for you to *pay as you go*," and "purchases and payments *are automatically deducted from your checking account*," creates the expectation that account funds are depleted immediately by the amount of the purchase at the time of purchase.  Contrary to its representations, Bank of the West posts debits to the account at the end of the business day on which they are paid. If more than one purchase was made in a day, the order in which debits are offset against available funds is based on the amount of the debit, from highest to lowest, without regard to the chronological order of the actual purchases.

59.     The representation that funds are "automatically" withdrawn also creates an expectation that a transaction will not go through if there are non-sufficient funds to cover it, because if the account does not have sufficient funds at the time of purchase, the funds for the purchase cannot be deducted at that time. This expectation is reinforced by consumers' experience with credit cards where transactions are refused if the charge exceeds available credit or if the account is in default.

60.     Because of Bank of the West's policy and practice of re-sequencing debits from highest to lowest, the information consumers view online is misleading and results in overdrafts, rendering the advertised benefits untrue and deceptive.

61.     Bank of the West can readily post purchases to an account in real time. Bank of the West lacks any justifiable business reason to post debits to an account in any order other than chronological.

62.     Bank of the West also has the capability to inform consumers, at the time of an attempted purchase that the purchase may result in an overdraft.  Like a credit card, the Bank of the West debit card has a magnetic strip that is run through a reader at the time of purchase to link the transaction to the customer's account. Unlike credit card transactions, which are typically denied if the customer is over their credit limit, Bank of the West lets the transaction through automatically even if the available funds do not cover the purchase and even though its computers easily can determine whether the amount of the purchase exceeds the funds in the account.

63.     Bank of the West can, if it wishes, ensure that customers are never charged non-sufficient fund fees as a result of debit card transactions by simply denying the purchase at the point of sale.  Further, Bank of the West can, but chooses not to inform customers at the point of sale, that the purchase may result in a non-sufficient fund fee, in the same way that credit card companies inform a customer that their credit line is insufficient to cover the purchase. Instead, the merchant is immediately credited the funds. The customer, however, will find out later that the account has been overdrawn and that a non-sufficient fund fee has been assessed.

## PLAINTIFF'S EXPERIENCE

64.     Prior to opening her account, Plaintiff read the representations and the material provisions of the Bank of the West Account Holder's Agreement. Plaintiff relied on these provisions, including the representations set forth above, as well as others similar to them, found in the Agreement and as advertised online.

65.     Plaintiff also reviewed and relied on the accuracy of her available account balance as published by Bank of the West.

66.     Plaintiff did not know and had no reason to suspect that Bank of the West had a policy and practice of re-sequencing debit transactions on a daily basis rather than posting them in the order in which they were made.

67.     On June 8, 2006, Plaintiff's checking account had an available balance of $12.80[3]. See Exhibit No. 1, "Checking Account Statement: 05/20/06 through 06/21/06." That day, Plaintiff engaged in the following transactions:  a debit in the amount of $3.65, followed by a debit in the amount of $41.55. See Id.  Had these charges been applied to Plaintiff's account in the order in which they occurred, or from "lowest to highest", Plaintiff would have incurred only one overdraft charge. However, unbeknown to Plaintiff, instead of applying these debits to her available account balance in the order in which they occurred or in the order in which the number of non-sufficient fund fees charged to her account would be minimized, Bank of the West "re-sequenced" the charges from highest to lowest.

68.     The automatic re-sequencing of these charges by Bank of the West resulted in at least two overdraft fees being applied to Plaintiff's account, rather than one.

69.     On or about February 16, 2010, Plaintiff learned of Bank of the West's unlawful, unfair, misleading or deceptive practices concerning Bank of the West's policy and practice of re-sequencing debit transactions on a daily basis in order to maximize non-sufficient fund charges.

70.     Plaintiff has suffered injury in fact and lost money and property as a result of the alleged misconduct.  She has been injured in the amount of $30.00 to $60.00 - the additional non-sufficient fund fees she was improperly charged as a result of Bank of the West's re-sequencing policy.

---

[3] To arrive at the estimated available balance ($12.80) AT THE START OF BUSINESS ON JUNE 8, 2006 add the "Deposits" made TO THE account on 5/25 ($925.05), 5/31 ($63.64) AND 6/06 ($50.00) to the beginning balance on May 22, 2006 ($-41.34) = $997.35.  Then subtract the "withdrawals" made from 5/22 through 6/07 (totaling $984.55) from the account = $12.80 (AVAILABLE BALANCE AT THE START of business on JUNE 8, 2006). See Exhibit No. 1, Plaintiff's Bank of the West, "Statement of Accounts" for 05/20/06 through 06/21/06.

**EQUITABLE TOLLING**

71.     Bank of the West affirmatively and wrongfully concealed its unfair methods of competition and/or fraudulent, unfair or deceptive acts or practices from Plaintiff and Class members by, inter alia, failing to inform consumers about its policy and practice of re-sequencing debit card purchases from largest to smallest and grouping transactions into separate categories on customer account statements so that its re-sequencing practice is not easily discernable.

72.     Plaintiff and other Class members did not know and could not reasonably have known of Bank of the West's unfair methods of competition and/or fraudulent, unfair or deceptive acts or practices, nor could they have reasonably discovered the same.

73.     There is a substantial nexus between the wrongful conduct that has occurred within the statute of limitations and the misconduct prior to that time.   The same misrepresentations and material omissions regarding Bank of the West's overdraft charge practices were at issue.

74.     The statute of limitations applicable to any claim brought by Plaintiff and other Class members as a result of the conduct alleged herein has been tolled as a result of Bank of the West's concealment.

**CLASS ALLEGATIONS**

75.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

76.     The proposed Class are defined as:

> All Bank of the West customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Bank of the West's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

All Bank of the West customers having accounts at branches in the State of California, for the purpose of asserting claims under California's Unfair Competition Law (the "California Subclass") (*see* First Claim for Relief, *infra*).

The National Class and the California Subclass are collectively referred to as the "Class."

77.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

78.     Excluded from the Class are Bank of the West, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of the West has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

79.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Bank of the West's records.

80.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Bank of the West as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Bank of the West's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of Bank of the West's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

81.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

82.     Among the questions of law and fact common to the Class are whether Bank of the West:

a.    Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.    Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.    Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.    Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.    Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.    Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.    Fails to provide customers with accurate balance information;

h.    Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.    Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.    Breaches its covenant of good faith and fair dealing with Plaintiffs and the other members of the Class through its overdraft policies and practices;

k.    Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.    Converts moneys belonging to Plaintiffs and the other members of the Class through its overdraft policies and practices;

m.   Is unjustly enriched through its overdraft policies and practices; and

n.   Continues to commit wrongdoing through its overdraft policies and practices.

83.   Other questions of law and fact common to the Class include:

a.   The proper method or methods by which to measure damages, and

b.   The declaratory relief to which the Class are entitled.

84.   Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Bank of the West's account agreements.   Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

85.   Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.   Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

86.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Bank of the West, no Class member could afford to seek legal redress individually for the claims alleged herein.   Therefore, absent a class action, the Class members will continue to suffer losses and Bank of the West's misconduct will proceed without remedy.

87.   Even if Class members themselves could afford such individual litigation, the court system could not.   Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual

1  lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive

2  supervision by a single court.

3

4

5

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF UNFAIR COMPETITION LAW**
**BUS. & PROF. CODE § 17200, *ET SEQ***
**(On Behalf of the California Subclass)**

6

7

8      88.    Plaintiff incorporates by reference each of the preceding allegations as though

9  fully set forth herein.

10     89.    California Business & Professions Code §17200, *et seq*. prohibits acts of unfair

11  competition, which means and includes any "unlawful, unfair or fraudulent business act or

12  practice," or any "unfair, deceptive, untrue or misleading advertising."

13     90.    Bank of the West violated California Business & Professions Code §17200's

14  prohibition against engaging in "unlawful" business acts or practices, by, *inter alia*,

15  misrepresenting and failing to disclose on its website and in other marketing materials and media

16  its policy and practice of re-sequencing debit purchases from largest to smallest. Further, Bank of

17  the West breached its duty of good faith and fair dealing under its Agreements and violated Cal.

18  Com. Code §4304(b) by res-sequencing debit  charges that maximized its profits at the expense

19  of its customers. These policies and practices resulted in and continue to result in multiple non-

20  sufficient fund fees being charged to consumers in violation of Cal. Bus. & Prof. Code §17500,

21  Cal. Com. Code §4304(b) and common law.

22     91.    Bank of the West also violated California Business & Professions Code §17200's

23  prohibition against engaging in "unfair" business acts or practices by, *inter alia*, misrepresenting

24  on its website and in other marketing materials and media that customers' debit card purchases

25  would be made on a "pay as you go" basis and were "automatically" deducted from their

26  checking accounts without disclosing its policy and practice of re-sequencing debit purchases

27  from largest to smallest causing its customers to incur multiple non-sufficient fund fees.  Bank of

28

1   the West had discretion under its Agreement as to how to calculate and apply non-sufficient fund

2   fees and made the decision to implement overdraft charge policies that would adversely impact

3   its customers in favor of maximizing its profits in violation of its duties of good faith and fair

4   dealing and Cal. Com. Code §4304(b).   Bank of the West's re-sequencing policy was

5   unnecessary because Bank of the West *has* the ability to post the debit card transactions

6   immediately - in real time. Bank of the West's conduct caused and continues to cause substantial

7   injury to consumers.  The gravity of Bank of the West's alleged wrongful conduct outweighs any

8   purported benefits attributable to such conduct.

9        92.    The foregoing conduct also violates Business & Profession Code §17200's

10  prohibitions against "fraudulent" or deceptive business practices. Bank of the West's "pay as you

11  go", "automatic" deduction, and other representations on its website, in its marketing materials

12  and media misrepresented its debit charge posting practices. Bank of the West also failed to

13  disclose its policy and practice of re-sequencing debit purchases from largest to smallest.  Bank

14  of the West's debit charge re-sequencing policies and practices can result in multiple non-

15  sufficient fund fees being charged to consumers and are likely to and did deceive reasonable

16  consumers, including Plaintiff, into believing their debit card purchases were being

17  "automatically" and/or "immediately" deducted from their checking account at the time they

18  were made or deducted chronologically in a manner that would not result in specious,

19  unwarranted fees.

20       93.    Plaintiff reserves the right to allege other violations of law which constitute other

21  "unlawful, unfair or fraudulent business act[s] or practice[s]."

22       94.    Plaintiff has been actually injured by Bank of the West's unlawful, unfair,

23  deceptive and fraudulent business acts and practices.

24       95.    As a result of Bank of the West's violations of the UCL, Plaintiff and Class

25  members are entitled to equitable relief in the form of full restitution of all monies paid as a

26  result of Bank of the West's improper assessment of non-sufficient fund fees.

27

28

96.     Further, Plaintiff and Class members are entitled to an order enjoining Bank of the West from continuing to utilize its wrongful debit charge re-sequencing practices in the future.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(On Behalf of the National Class and California Subclass)**

97.     Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

98.     The Agreement entered into between Bank of the West and Plaintiff and members of the Class constitutes a contract.

99.     Plaintiff and Class members performed their end of the bargain, or were excused from non-performance by Bank of the West's misconduct as alleged herein.

100.    The Agreement established the manner in which Bank of the West promises to charge Plaintiff's and Class members' debit card accounts.  Among other things, Bank of the West impliedly promises to charge fees to customers, including Plaintiff, in accordance with principles of good faith and fair dealing.

101.    Bank of the West breached its duty of good faith and fair dealing to Plaintiff and Class members by re-sequencing customer accounts so as to maximize the number of overdrafts and resulting non-sufficient fund fees charged to customers. In doing so, Bank of the West failed to act in good faith and deal fairly with its customers choosing instead to maximize its profits at customers' expense.

102.    Plaintiff and Class members have been actually injured and have suffered an ascertainable loss of money proximately caused by Bank of the West's wrongful overdraft charge practices in the amount of non-sufficient fund fees Plaintiff and Class members paid based on Bank of the West's debit charge re-sequencing practices.

103.   Plaintiff and Class members therefore are entitled to actual damages in the amount of non-sufficient fund fees Plaintiff and Class members paid based on Bank of the West's re-sequencing practices.

104.   Plaintiff also is entitled to an award of attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF

### UNCONSCIONABILITY
### (On Behalf of the National Class and the California Subclass)

105.   Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

106.   Bank of the West's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.   Bank of the West does not allow its customers to "opt out" of the Bank's overdraft scheme, and/or fails to reasonably disclose to its customers that they have that option;

b.   Bank of the West does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.   Bank of the West does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.   The Deposit Agreement is a contract of adhesion in that they are standardized forms, imposed and drafted by Bank of the West, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.   The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is contained in the Deposit Agreement, which is not signed by the depositor; and

f.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Bank of the West always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for Bank of the West.

107.     Considering the great business acumen and experience of Bank of the West in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

108.     The imposition of overdraft charges which exceed the amount overdrawn (e.g., the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable. Such charges are not reasonably related to Bank of the West's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to Bank of the West's cost of returning the item unpaid (where Bank of the West does not pay the overdraft).

109.     Plaintiffs and members of the Class have sustained damages as a result of Bank of the West's unconscionable policies and practices as alleged herein.

## FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(On Behalf of the National and California Subclass)**

110.     Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

111.     Plaintiff and Class members conferred a benefit on Bank of the West by placing their accounts with Bank of the West and using Bank of the West's debit cards.

112.    Bank of the West appreciated and/or realized the benefits in the amount of the profits it earned from the non-sufficient fund fees it collected from Plaintiff and Class members resulting from its re-sequencing practices.

113.    Bank of the West has profited from its unlawful, unfair, misleading and deceptive debit charge re-sequencing practices at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for Bank of the West to be permitted to retain the benefit.

114.    Plaintiff and Class members do not have an adequate remedy at law against Bank of the West.

115.    Plaintiff and Class members are entitled to disgorgement of the profits derived from the Bank of the West's overdraft charge practices.

## FIFTH CLAIM FOR RELIEF

### CONVERSION
### (On Behalf of the National Class and the California Subclass)

116.    Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

117.    Bank of the West had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

118.    Bank of the West has wrongfully collected overdraft fees from Plaintiffs and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

119.    Bank of the West has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Class, without legal justification.

120.    Bank of the West continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Class.

1    121.    Bank of the West intends to permanently deprive Plaintiffs and the members of

2    the Class of these funds.

3    122.    These funds are properly owned by Plaintiffs and the members of the Class, not

4    Bank of the West, which now claims that it is entitled to their ownership, contrary to the rights of

5    Plaintiffs and the members of the Class.

6    123.    Plaintiffs and the members of the Class are entitled to the immediate possession

7    of these funds.

8    124.    Bank of the West has wrongfully converted these specific and readily identifiable

9    funds.

10   125.    Bank of the West's wrongful conduct is continuing.

11   126.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the

12   members of the Class have suffered and continue to suffer damages.

13   127.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to

14   recover from Bank of the West all damages and costs permitted by law, including all amounts

15   that Bank of the West has wrongfully converted.

16                                   **PRAYER FOR RELIEF**

17   WHEREFORE, Plaintiff prays for a judgment:

18   A.    Certifying this action as a Plaintiff class action as set forth above;

19   B.    Declaring Bank of the West's overdraft fee policies and practices to be wrongful;

20          unfair and unconscionable;

21   C.    Awarding equitable relief in the form of restitution of all non-sufficient fund fees

22          paid based on Defendant's debit charge re-sequencing practices;

23   D.    Awarding actual damages in the amount of non-sufficient fund fees paid based on

24          Defendant's debit charge re-sequencing practices;

25   E.    Awarding disgorgement of Defendant's profits from its debit charge re-

26          sequencing practices;

27

28

1   F.   Awarding injunctive relief enjoining Defendant from continuing to engage in its

2        wrongful debit charge re-sequencing practices;

3   G.   Awarding pre-judgment and post-judgment interest as provided by law;

4   H.   Awarding attorneys' fees and costs; and

5   I.   Awarding punitive and exemplary damages;

6   J.   Awarding such other and further relief as may be just and proper.

7                              **JURY DEMAND**

8   Plaintiff demands a trial by jury on all issues so triable.

9   DATED: June 22, 2010                    BONNET, FAIRBOURN, FRIEDMAN
                                            & BALINT, P.C.
10
11
12                                          Todd D. Carpenter
                                            600 W. Broadway, Suite 900
13                                          San Diego, California 92101
                                            Telephone: 619-756-6978
14                                          Facsimile: 602-798-5860

15                                          BONNETT, FAIRBOURN, FRIEDMAN
                                            & BALINT, P.C.
16                                          Andrew S. Friedman
                                            Elaine A. Ryan
17                                          Patricia N. Syverson
                                            2901 N. Central Avenue, Suite 1000
18                                          Phoenix, Arizona  85012-3311
                                            Telephone:  602-274-1100
19                                          Facsimile: 602-798-5825

20                                          HARRISON, PATTERSON & O'CONNOR LLP
                                            James R. Patterson
21                                          Alisa A. Martin
                                            402 West Broadway, 29th Floor
22                                          San Diego, California 92101
                                            Telephone: (619)756-6990
23                                          Facsimile: (619)756-6991

24                                          Attorneys for Plaintiff

25

26

27

28

**EXHIBIT A**

# Deposit Account Disclosure

## For Personal Accounts



# BANK OF THE WEST®

**Effective June 1, 2008**

# Table of Contents

General Information About Deposit Accounts ................................................................................................1

**Definitions**................................................................................................................................................1

Balances and Cut-off Times ............................................................................................................................2

Additional Cut-off Times ................................................................................................................................2

When you open your account ..........................................................................................................................2

Types of Account Ownership ..........................................................................................................................3

Individual..........................................................................................................................................................3

Joint Tenancy With Rights of Survivorship ....................................................................................................3

Tenancy in Common........................................................................................................................................3

Accounts Payable on Death ............................................................................................................................3

Deposits ..........................................................................................................................................................3

Remotely Created Checks. ............................................................................................................................3

Cashing Items ................................................................................................................................................4

Postdated and Void-Dated Checks ................................................................................................................4

Stale-Dated Checks ........................................................................................................................................4

Checks Drawn on Foreign Banks ....................................................................................................................4

Endorsements or Notations on Items ............................................................................................................4

Change in Signers ..........................................................................................................................................4

Change of Address ..........................................................................................................................................4

"Mechanized" and Facsimile Check Signatures................................................................................................5

Signature Requirements ..................................................................................................................................5

Returned Deposited Items ..............................................................................................................................5

Overdrawn Accounts/Non-Sufficient Funds ..................................................................................................5

Advance Notification of Item Being Returned ................................................................................................5

No Right of Privacy Among Co-Owners ..........................................................................................................6

Death or Incapacity..........................................................................................................................................6

Dormant Accounts and Escheat ......................................................................................................................6

Statements and Your Responsibility to Review..............................................................................................6

Check Safekeeping..........................................................................................................................................7

CheckScan® Statement ................................................................................................................................7

Combined Statements ....................................................................................................................................7

Notices ............................................................................................................................................................7

Privacy Policy..................................................................................................................................................7

Verification of Deposit ....................................................................................................................................7

Check Printing..................................................................................................................................................7

Interest Rates..................................................................................................................................................7

Closure of the Account....................................................................................................................................7

Reporting of Account Closure..........................................................................................................................7

Legal Processes ..............................................................................................................................................8

Right of Set-off and Security Interest..............................................................................................................8

Pledges and Security Interests in Favor of Others..........................................................................................8

Collection Actions............................................................................................................................................8

Preventing Fraud and Other Losses ..............................................................................................................8

Duty to Review Statements and Transactions ................................................................................................9

Bank Monitoring of ATM/Debit Card Transactions; Duty to Cooperate..........................................................9

Agents; Powers of Attorney ............................................................................................................................9

# Table of Contents (continued)

Instructions by Facsimile, Email or Voicemail .................................................................................................. 9
Authorized Debits .................................................................................................................................................. 9
Changes in Terms and Conditions ........................................................................................................................ 9
Conflicting Demands ............................................................................................................................................. 9
Investigative Freeze .............................................................................................................................................. 9
Enforcement ......................................................................................................................................................... 10
Pass-Through Insurance Disclosure .................................................................................................................... 10
Accounts Eligible for $250,000 Coverage ........................................................................................................... 10
Determination of Coverage .................................................................................................................................. 10
Governing Law ..................................................................................................................................................... 10
Limitation of Liability ........................................................................................................................................... 10
Our Relationship .................................................................................................................................................. 10
Reservation of Rights .......................................................................................................................................... 10
Severability ........................................................................................................................................................... 10
Funds Availability ................................................................................................................................................. 11
Holds on Other Funds (Check Cashing) .............................................................................................................. 11
Holds on Other Funds (Other Account) ............................................................................................................... 11
Longer Delays May Apply .................................................................................................................................... 11
Special Rules for New Accounts .......................................................................................................................... 11
Substitute Checks and Your Rights ..................................................................................................................... 11
What are my rights regarding substitute checks? ............................................................................................... 12
How do I make a claim for a refund? ................................................................................................................... 12
**Checking, Money Market and Savings Accounts** ......................................................................................... 12
Interest .................................................................................................................................................................. 12
Right to Advance Notice of Withdrawal ............................................................................................................... 12
Review of Drawer Signatures .............................................................................................................................. 13
Personal Account Usage ...................................................................................................................................... 13
Sub-Accounts ....................................................................................................................................................... 13
Savings Overdraft Protection ............................................................................................................................... 13
Money Market and Savings Transaction Limitations .......................................................................................... 13
Withdrawals .......................................................................................................................................................... 13
Order of Paying Checks and Other Items ........................................................................................................... 14
Stop Payment ....................................................................................................................................................... 14
Electronification of Checks .................................................................................................................................. 14
Merchant Capture Program .................................................................................................................................. 15
Transfer of Ownership ......................................................................................................................................... 15
**Certificate of Deposit and Retirement Accounts** .......................................................................................... 15
Deposits ................................................................................................................................................................ 15
Interest .................................................................................................................................................................. 15
Maturity ................................................................................................................................................................. 15
Withdrawals; Early Withdrawal Penalties ........................................................................................................... 15
**Retirement Plans** ............................................................................................................................................. 16
Retirement Plan Distributions .............................................................................................................................. 16
IRA Plan ............................................................................................................................................................... 16
**IRS Reporting** .................................................................................................................................................. 16
Interest Reporting ................................................................................................................................................. 16
Backup Withholding .............................................................................................................................................. 16

# Table of Contents (continued)

Notice to Canadian Non-Resident Aliens ..............................................................................................16
Reporting or Record Keeping Requirements ..........................................................................................17
**Funds Transfers** ...............................................................................................................................**17**
Notice of Receipt of Funds Transfer .....................................................................................................17
Funds Transfer's Reliance on Identification Numbers ............................................................................17
Transmitting and Recording Information About You in the Funds Transfer Payment Process ..................17
Transfers Received Through the Automated Clearing House ..................................................................17
Electronic Direct Deposits.....................................................................................................................17
**Electronic Funds Transfers** ..............................................................................................................**18**
Confidentiality.......................................................................................................................................18
Documentation .....................................................................................................................................18
Our Liability ..........................................................................................................................................18
Consumer Liability ................................................................................................................................19
Error Resolution ...................................................................................................................................19
Contact In Event of Unauthorized Transfer ...........................................................................................19
Fees (Refer to Schedule of Fees and Charges) ....................................................................................19
Non-Bank of the West ATM or Merchant Fees.......................................................................................19
Preauthorized Payments (ACH)............................................................................................................20
**ATM and Debit Card Services**...........................................................................................................**20**
General Information ..............................................................................................................................20
**Transaction Types and Limitations** .................................................................................................**20**
Bank of the West Automated Teller Machine (ATM) Account Access.......................................................20
Limitations on Frequency of Transactions at Bank of the West ATMs .....................................................20
Limitations on Dollar Amounts at Bank of the West ATM........................................................................21
Shared Network ATM Networks Account Access ....................................................................................21
Limitations on Frequency of Transactions at Shared Network ATMs .......................................................21
Limitations on Dollar Amounts of Transaction at Shared Network ATMs..................................................21
Point-of-Sale or POS Network Transactions Account Access ..................................................................21
Limitations on Frequency of POS Network Transactions.........................................................................21
Limitations on Dollar Amounts of POS Network Transactions..................................................................21
Foreign Transactions ............................................................................................................................21
ATM Card Liability and Debit Card Liability ............................................................................................22
MasterCard Debit Card Zero Liability Policy ..........................................................................................22
**Special Rules for Colorado Account Holders Only** ........................................................................**22**
**Special Rules for Minnesota Residents** ..........................................................................................**22**
**Special Rules for Wisconsin Residents**...........................................................................................**22**
**Special Rules for Kansas Accounts** .................................................................................................**23**
**ATM/Debit Card Security Measures**..................................................................................................**23**
**Telephone Banking Center** ...............................................................................................................**23**

Welcome to Bank of the West*, and thank you for opening an account. This Deposit Account Disclosure For Personal Accounts, together with your current signature card, the current rate sheet, and *Schedule of Fees and Charges for Personal Accounts*, as those documents are amended from time to time, and any schedules and addenda to those documents (collectively, the "Agreement"), form the agreement between you and Bank of the West as to your checking, money market, savings, certificate of deposit, and retirement accounts.

Throughout this booklet, the words "you," "your" and "yours" refer to the account holder. "We," "us," "our" and "the Bank" refer to Bank of the West.  Except where it is clearly inappropriate, words and phrases used in this Agreement should be interpreted so the singular includes the plural and the plural includes the singular.

For additional information, including charges on services other than those listed in our *Schedule of Fees and Charges*, please contact a Bank of the West representative. The information in this booklet applies to accounts primarily for personal, family, or household use.

# General Information
# About Deposit Accounts

## Definitions

**Account.**  The term "account" means any savings, money market, transactional (checking), and certificate of deposit that you have with us.

**Agent.**  The term "agent" shall mean any person that you authorize to act on your behalf.  We may continue to rely on the actions of an agent until such time as the account owner who authorized the agent dies and we receive notice of the death or the account owner notifies us, in writing, to end the agency and after we have had a reasonable opportunity to act on the notice.

**Automated Clearing House (ACH).** The ACH is a nationwide electronic fund transfer system that permits participating depository financial institutions to clear payments electronically.  ACH transactions are governed by clearing house operating rules and consumers are protected under Federal Regulation E. Using the ACH, originating financial institutions may cause payments, such as payroll, Social Security, or other government benefits, to be paid into your account.  Similarly, originating financial institutions may cause direct payments, such as mortgages, loans, utility bills, or insurance premiums, to be debited from your account.

**ATM Card.** The ATM Card issued by the Bank may be used at automated teller machines within the United States that display any of the logos on the Card.

*In South Dakota, Bank of the West operates under the name of Bank of the West California.*

**Authorized Debits.** If you voluntarily give information about your deposit account (such as our routing number and your account number) to a party ("vendor") who is seeking to sell you goods or services, and you do not physically deliver a check to the party, the vendor may initiate a debit, either in the form of a paper draft or by ACH, to debit your account, and we will deem the debit to be authorized.

**Business Day.** Our business days are Monday - Friday. Federal holidays are not included.

**Card.** As used in this Agreement, "Card" includes both the Bank of the West ATM Card and the Bank of the West Debit Card.

**Combined Accounts.** Some checking accounts allow money market, savings, and certificate of deposit balances to be used for the purpose of waiving the checking account monthly service charge.

**Debit Card.** The Card issued by the Bank, which may be used at automated teller machines, merchant point-of-sale terminals, and self-service point-of-sale terminals inside and outside the United States that display any of the logos on the Card.

**Direct Deposits.** Electronic deposits of periodic payments, such as salary, pension, Social Security, Supplemental Security Income (SSI) benefits, or other regular monthly income, that are made into your checking account through the Automated Clearing House (ACH) by your employer or other payer. Wire transfers, deposits you make, and transfers you make between your deposit accounts with us are not considered direct deposits.

**In-Store Transactions.** Transactions conducted at a mini-branch within a store location (e.g. grocery store, department store).

**Integrated Accounts.** A checking and savings account that have the same account number, cycle at the same time, and appear on the same statement.

**Item.** An "item" means any paper check or draft whether presented in paper form or electronic form.  If indicated in the context, it may include an ACH debit or credit, or any form of electronic presentment.

**Linked Accounts.** Deposit accounts that we link to the ATM Card or Debit Card so the accounts can be accessed via the Card at electronic terminals.

**Occurrence (For purposes of Overdrafts and Returned Items).** An Occurrence is each day in which your account does not have sufficient available funds to cover any one or all of the items presented for payment. For example, if you have three (3) items presented for payment in a single day and there are insufficient funds to cover any or all of the three items, that is considered to be one (1) "Occurrence." However, you will be charged for each of the three items. Occurrences are based on the number of Overdraft and Returned Item Occurrences in the current month plus the previous twelve (12) full months. In this section, an item includes, in addition to paper checks and drafts, any ACH or ATM / Debit Card transaction presented.

**Overdraft.** An Overdraft results from the Bank's payment of checks, drafts, ATM Card, or Debit Card transactions and any other items despite the lack of available funds. The Bank may assess an Overdraft Fee for this service.

**Point-of-Sale (POS).** A purchase transaction conducted at any merchant or self-service terminal where the Debit Card is accepted.

**Remotely Created Check.** A "remotely created check" is a check that is not created by the paying bank and bears a legend on the drawer's signature line, such as "Authorized by Drawer" or "No Signature Required" or words to that effect.

**Returned Item.** A check, draft, or other item that is presented against your account for payment but the Bank dishonors or rejects the payment due to the lack of sufficient available funds. The Bank may assess a Returned Item Fee for this service.

**Right of Set-off.** The Bank's debiting of any deposit account(s) you hold with the Bank (assets we owe you) to pay a debt you owe the Bank.

**Shared ATM Networks.** Any automated teller machine that displays any of the logos on your Card.

**Substitute Check.** To make check processing faster, federal law (Check 21) permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

**Terminal.** An automated teller machine, self-service terminal, or attended Point-of-Sale terminal; used interchangeably with either the phrase automated teller machine (ATM) or POS terminal.

**Tiered Rate Accounts.** An account that may have two (2) or more interest rates, determined by specified balance levels.

## Balances and Cut-off Times

Balances shown on statements, receipts, and records may not reflect transactions and charges made but not yet posted. Most transactions made before each branch's cut-off time will be posted on the business day they are presented. Cut-off times may vary by branch and by state. The earliest cut-off time in any Bank of the West branch is 2 p.m. (local time). The cut-off time may be as late as the branch closing time. Check with the branch for any exceptions. Additionally, in branches where the cut-off time is earlier than the branch closing time, your receipt will show the date of our next business day for transactions you make after the branch cut-off time. For example, if you conduct a transaction on a Friday, but after the branch's cut-off time, your receipt will reflect the next business day for the transaction (e.g. the following Monday).

Cut-off times that are standard in all states are as follows:

**ATM Transactions:**

All States: As posted but not earlier than 4 p.m. (Pacific Time) Monday – Friday

**eTimeBanker® Online Service:**

All States: 7 p.m. (Pacific Time) Monday – Friday

## Additional Cut-off Times

Any knowledge, notice, or stop payment order received by the Bank, or any legal process served upon the Bank comes too late to affect our right or duty to pay an item or charge your account for the item if the knowledge, notice, stop payment order, or legal process is received or served on the later of either 10 a.m. local time or one (1) hour after the opening of your branch of account the next business day after the business day on which we receive the item. If your branch of account opens after 9 a.m., then, for purposes of this provision, your branch of account shall be deemed to be our Telephone Banking Center with the stop payment cut-off time of 10 a.m. (local time of your branch of account). The cut-off time for the Bank to exercise right of set-off will be the close of the next business day after the business day on which we receive the item.

## When You Open Your Account

**Identification Requirements -** We require identification, including a Social Security Number, Taxpayer Identification Number, and/or certification of foreign status (non-resident alien), for each signer on a deposit account prior to opening an account. We may refuse to open, and we may close, any account for which you do not provide us with acceptable identification for any signer and/or if you do not provide a Taxpayer Identification Number, Social Security Number, or certification of foreign status.

2

**Account Opening Verification -** We may make any inquiries that we consider appropriate to determine if we should open and maintain your bank account. This may include obtaining information from financial institutions or other third parties about your checking, money market, or savings accounts or a credit report on you and/or any other signer on the account. If we decline to open an account or provide any services based on information we receive, we will provide you with the name and address of the company that provided the information. Upon request, you may obtain a free copy of the information by contacting the named company.

## Types of Account Ownership

You may open your account in your name only or jointly with another person. The following types of account ownership are available:

- **Individual**
  The account owner is the only person who has the right to withdraw from the account, unless we permit the account owner to designate an agent, attorney-in-fact, or other signer to the account. In most instances, on the death of the account owner, this account will pass through the estate of the account owner.

- **Joint Tenancy With Rights of Survivorship**
  If you open an account with one (1) or more other persons, we will assume it is a joint tenancy with rights of survivorship account unless the signature card clearly indicates otherwise. All account owners have equal ownership interest in the account during their lifetimes. If an account owner dies, ownership of the account will automatically pass to the surviving account owner(s).

- **Tenancy in Common**
  Each account owner has complete and separate access to the funds and withdrawal rights. Until we receive notice of the death of any account owner, any account owner will have complete withdrawal rights to the entire account balance. If more than one account owner survives the death of another account owner, such surviving account owners shall remain as tenants in common between them.

  Each account owner is presumed to "own" the funds in proportion to that person's net contribution to the account. Therefore, upon the death of an account owner, the Bank may refuse to honor any request or order concerning the account or any check drawn on the account until we receive either joint instructions from the representative of the deceased account owner and the remaining account owners or a court order.

- **Accounts Payable on Death**
  If you open an account which is payable on death to someone else (such as your child), the account will pass to the designated beneficiary upon your death or upon the death of the last of the account holders. (These accounts were formerly known as Totten Trust accounts, and may have had the words "in trust for" in the title but had no formal written trust document.) If there is more than one (1) beneficiary, each beneficiary will receive an equal share of the funds unless the Bank's records indicate a different allocation. (Note: If a beneficiary is a minor, depending on the size of the deposit, we may require that payment be made under a legal guardianship.) During your lifetime, you may exercise full control over the account. You may make deposits to and withdrawals from the account and close it if you choose. The death of a beneficiary prior to your death removes that person as a beneficiary. You can change or delete a beneficiary during your lifetime by contacting your branch of account.

## Deposits

We may accept deposits to your account from any source and need not question the authority of the depositor to make the deposit.

In accepting items for deposit, the Bank acts only as your collection agent and may refuse to accept any item. If the institution upon which an item is drawn does not honor the item or if an item is lost in transit, the Bank is authorized to reverse the deposit to the account (or debit your account for checks cashed) and to reverse any related interest without regard to the timeliness of the return of the item. The Bank reserves the right to accept items on a collection basis only. In this case, the item will be deposited to your account when payment of the item is received by the Bank. Any checks that the Bank is unable to collect may be returned to you by mail.

At our discretion, our fee may be netted from the proceeds of the collected item. In addition, institutions that pay items on collection typically remit the amount of the item less any fee they assess.

All deposits are subject to verification and collection. Coin or currency sent through the mail is done at your own risk.

In the unlikely event that your deposit is lost in transit, you will be asked to recreate the check portion of your deposit. When you deposit an item to your account, the Bank is acting only as your collection agent and reserves the right either not to credit your account or, if already credited, to charge your account for any items lost in transit. Therefore, you should maintain adequate records to permit identification of the drawer of any deposited item that is reported lost in the payment process and to provide that drawer with adequate information to take whatever action is appropriate for cancellation and/or replacement of that item to you. You agree that Bank of the West is not responsible for items lost while not in our possession.

## Remotely Created Checks

We may, at our sole discretion, accept or refuse to accept for deposit to your account remotely created checks. If we accept any remotely created checks for deposit, you represent that the remotely created check is authorized and that you are authorized to enforce the remotely created check. You agree to indemnify and hold us harmless against any and all claims, demands, losses, damages, liability, costs, and expenses which we may incur arising directly or indirectly from your deposit of remotely created checks. Your indemnification obligations under this provision shall survive any termination of your account.

3

## Cashing Items

We may require that you first deposit to your account any item you have requested be cashed. At our discretion, however, we may permit the negotiation of items payable to you for cash with or without your endorsement. If any cashed item is returned to us for any reason, we may charge the returned item to any of your accounts. A fee may also be assessed on your account. We may require that any check drawn on your account be presented for cashing at your branch of account. We may require such identification from the presenting party as we, in our sole discretion, deem appropriate. In addition, all payees or other persons presenting a check for encashment who do not have a checking, money market, savings, or certificate of deposit account with us may be required to leave a fingerprint on the check which they desire to cash. The inability or refusal to provide the fingerprint by any person presenting a check for cashing is grounds for us to refuse to cash the check. We shall have no liability, including, without limitation, for wrongful dishonor for our refusal to cash a check under these conditions.

## Postdated and Void-Dated Checks

If you write a postdated check, we may pay the check and charge it to your account even if it is presented for payment prior to the date written on it. If you put a void-date on your check (a date or number of days after which the check is not good) we may pay the check and charge it to your account even if it is presented for payment after the void-date. If you do not want us to pay a postdated or void-dated check, you must place a stop payment order on it and contact us on the date you want the postdated check to be paid and release the stop payment order.

## Stale-Dated Checks

If a check you write is presented to us for payment more than six (6) months after the date on the check, we may, at our sole discretion, still pay the check. A stale-dated check is a negotiable item. If you do not wish stale-dated checks to be paid by us, you should place and maintain a stop payment order on the check. See "Stop Payment."

## Checks Drawn on Foreign Banks

We may refuse to accept checks for deposit or collection if they are payable in a foreign currency. If we accept any check for deposit, we may assume that any check drawn on an institution outside the United States of America is payable in the currency of the country where the institution is located. If we accept a foreign check, you assume all risk of loss associated with currency value fluctuations and late returns. We may use our current buying or selling rate, as applicable, when processing foreign currency items and may recover from your account any loss incurred in connection with our processing of such items.

## Endorsements or Notations on Items

All items presented for deposit should be properly endorsed. If not endorsed, the Bank is authorized to endorse them for you or collect them for you without your endorsement. For all joint accounts, the Bank may cash or deposit all checks payable to any or all of you whether endorsed by any of you, and any one of you may endorse for the others. There may be, however, some instances in which the Bank may require your personal endorsement before accepting an item for deposit or encashment.

We may accept or pay items bearing restrictive endorsements or other notations, whether on the front or the back of the item. You agree that such restrictive endorsements and other notations shall have no effect on us. You agree to indemnify, defend, and hold us harmless from any and all costs, actions, damages, claims, and demands related to or arising out of our acceptance or payment of such items.

We reserve the right to refuse to cash or accept items bearing qualified endorsements (e.g. "without recourse" or "no protest"). If we agree to accept such items, you agree that such qualified endorsements shall have no effect on us.

We reserve the right to refuse to cash or accept for deposit items which bear more than one (1) endorsement or the endorsements of payees who are not known to us. If you wish to deposit or cash an item that has been endorsed by a payee who is not known to us, we reserve the right to require:

1  That all endorsers be present before we accept an item; or

2  That all endorsements be guaranteed by a financial institution.

## Change in Signers

The Bank must be notified of any change to the signers on your account. Any change will be effective upon the Bank's receipt and acceptance of the new signatures at the branch of account.

## Change of Address

You agree to notify us of any change of address, telephone number, or if you seek a change in your services.  We may change your address of record if we receive an address change notice from the U.S. Postal Service, or if we receive information from another person in the business of providing corrected address information that the address in our records no longer corresponds to your address.  Change of address requests may be subject to verification.  All communications from us to you will be sent to the last address shown in our records.

### "Mechanized" and Facsimile Check Signatures

If you use a procedure or mechanism that causes remotely created checks or any other type of check to be drawn on your account with a typed signature, facsimile signature, notation, mark, or other form of mechanical symbol (collectively, the "Mark") that is not the signature that is on the signature card that you signed when you opened your account, you are adopting the Mark as your signature and authorizing the Bank to pay checks on which the Mark appears or purports to appear. You should understand, however, that it is easier for someone to imitate, duplicate, or counterfeit a form of mechanical signature than it is for someone to imitate, duplicate, or counterfeit your own unique and distinctive signature. For this reason, by adopting a form of Mark, you are assuming all risk of loss resulting from the unauthorized use and/or forgery of the Mark, and are explicitly authorizing the Bank to pay any and all checks presented against your account which contain any mechanical signature which reasonably resembles the form you have adopted regardless of:

- Whether the Mark is actually that which you have adopted,
- How or by whom the Mark was affixed, and
- Whether the check which bears or purports to bear the Mark was, in fact, authorized by you.

You agree to indemnify and hold us and our correspondent banks harmless against any and all losses, damages, claims, liability, costs, and expenses which we or they may suffer arising directly or indirectly out of the misuse, unlawful, or unauthorized use of a facsimile signature by any person, including but not limited to, the payment of all checks, drafts, or other orders bearing, or purporting to bear, your authorized facsimile signature, even if the facsimile signature was affixed by copying or otherwise counterfeiting the facsimile signature. Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other items.

## Signature Requirements

If you indicate on your signature card or other account opening documents that more than one (1) signature is required for withdrawal, that indication is for your own internal procedures. It is not binding on us. We may pay out funds from your account if the check, item, or other withdrawal instruction is signed by any one of the persons authorized to sign on the account. We have no liability to you if we do this.

## Returned Deposited Items

If an item you deposit is returned to us for any reason, without regard to the timeliness of the return, the amount of the item and a fee will be charged to your account.

If we receive an affidavit or declaration under penalty of perjury or another form of certification stating, as to any item on which we, as depository bank, make a warranty, that an endorsement of an item deposited to your account is forged, unauthorized, or missing, that the item contains an alteration, or that an item is otherwise unauthorized so that we may have breached a warranty we make as a depository bank, we may rely on the truthfulness of the affidavit, declaration, or certification.

Without prior notice to you, the Bank reserves the right in its sole discretion to place a hold on the funds pending an investigation or to charge back to your account the amount of any item deposited to your account or cashed for you and which is later returned to us due to an allegedly forged, unauthorized, or missing endorsement, claim of alteration, encoding error or other problem which, in our judgment, justifies reversal of credit.  We reserve the right to deposit the funds at issue with an appropriate court.

## Overdrawn Accounts/Non-Sufficient Funds

If your account is overdrawn for any reason, including:

- The Bank cannot collect the funds from a deposit you have made; or
- The Bank has intentionally or unintentionally paid items for which you do not have the funds; or
- There were not sufficient funds to cover the amount of a service or other Bank charge,

then each account owner, jointly and severally, agrees to reimburse the Bank for the amount of the overdraft including any returned item or overdraft fees without regard to the signer on the item(s) that created the overdraft.

In the event your account does not have sufficient available funds to cover an electronic transaction conducted in any manner, including the ATM, or at a merchant either with or without a PIN, we reserve the right, in our sole discretion, to pay or dishonor the electronic transaction. If your account is overdrawn by reason of an electronic transaction, an overdraft/returned item fee may be charged to your account. Should we choose to honor your electronic transaction, you will not be advised or warned that the transaction is causing your account to become overdrawn and will not have the prior right to cancel the transaction. If your account is overdrawn by reason of an electronic transaction, an overdraft/returned item fee may be charged to your account. If your account is overdrawn in connection with a transaction, that transaction is included as an "occurrence" for purposes of determining the overdraft/returned item fee and you must promptly repay us.  Payment for an overdrawn account is due upon demand by the Bank.

It should also be understood that the Bank is under no obligation to pay any checks, drafts, electronic or other items you have authorized but which may overdraw your account.

## Advance Notification of Item Being Returned

If we receive advance notification that any item which you deposited is being returned by the drawee institution, we reserve the right to place a hold on your account for the amount of those funds. We will mail you a notice advising you of this action. Upon our actual receipt of the item, it may be charged to your account and, unless an overdraft is created, will be returned to you so you may take whatever action you deem appropriate.

## No Right of Privacy Among Co-Owners

Each owner of an account with multiple owners agrees that no individual owner has an expectation of privacy as to any information on the account. We may disclose any and all information concerning the account, including, without limitation, the information on the signature card, to any account owner or the agent of any account owner.

## Death or Incapacity

You agree to notify us immediately, in writing, about the death or incapacity of any account holder or authorized signer on your account. We may, at our sole discretion, freeze, set-off, refuse, and/or reverse any transaction (including but not limited to Federal or retirement benefits to the deceased) if any account holder dies or becomes incapacitated. We may also, at our sole discretion, continue to honor transactions by other authorized signers and account holders on the account until we receive written notice to the contrary.

## Dormant Accounts and Escheat

State laws generally require that any checking, money market, savings, or matured certificate of deposit be escheated or sent to the state indicated in your last known address if, after a certain amount of time, the owner has not conducted certain types of activity on the account, including:

- Increased or decreased the balance of the account, or
- Corresponded in writing with the Bank concerning the account, or
- Otherwise indicated an interest in the account as evidenced by a memorandum or other record on file with the Bank.

Note: Automatic transactions such as direct deposits or recurring transfers do not count as activity on the account.

If your account has none of the types of activity detailed above (or as detailed in the applicable state law), for a period of time, your account may be designated as "dormant." **Dormant accounts will not receive bank statements.** While dormant, the checking, money market or savings account will continue to be charged applicable service charges. Unless your account has a balance of under $10, we will attempt to notify you and to advise you how to reactivate your account. If your account becomes dormant, any attempted activity may be dishonored. For example, credits and debits initiated through the Automated Clearing House may be rejected, and checks presented against the account may be questioned and, if we believe it appropriate, dishonored.

Dormant accounts will escheat to the state unless they are re-activated. The specific length of time between the last activity or contact and escheatment to the state varies by state, but is generally between three (3) and seven (7) years. The time period begins whenever you do any of the activities above or when a certificate of deposit matures. For IRA holders, this period begins when you reach age 70 1/2.

Unless your account balance is less than $10, we will attempt to notify you by sending a letter to your last known address before your deposit may have to be sent to the state. If no response to the letter is received from the legal owner of the account, the funds will be sent to the state indicated in your last known address. Once this has occurred, you will have to file a claim for the return of these funds with the state. Further information may be obtained from the state.

The Bank may assess an Inactive Account Letter Fee for each communication sent to you regarding inactivity, dormancy, and escheat.

## Statements and Your Responsibility to Review

The Bank provides monthly statements to all checking account customers. These statements include all account activity for the statement period. It is important that you review each statement upon receipt and notify us in writing of:

- Any error, omission, alteration, unauthorized signature, or other irregularity in checks or statements;
- Any loss, theft, improper or unauthorized use of any instrument evidencing funds on deposit, or any banking forms relating to an account.

Any checks or statements that the Bank has mailed or delivered to you, or holds for you, must be promptly reviewed after you receive them. **If you do not report unauthorized transactions within thirty (30) days after the statement is mailed or made available, we will not be liable for payment of any forged or unauthorized items shown on the statement. In the event unauthorized or forged transactions are committed by the same person, the thirty (30) days begins on the date the first statement in which the first unauthorized transaction appears is mailed or made available.**

Reports of unauthorized transactions or incorrect activity not involving electronic funds transfers must be made in writing to the branch where your account is held. For claims of check forgery, you may initially contact your branch of account or call our Telephone Banking Center. However, you may be required to visit a branch to sign a claim of forgery in the presence of a Bank employee. You agree to cooperate in our investigation. We reserve the right to investigate your claims fully and we reserve a reasonable length of time for our investigation. Only if we are satisfied that the transaction was unauthorized and was reported in a timely manner will we re-credit your account. In this regard, we reserve the right to exercise all our legal defenses to your claim.

For unauthorized electronic funds transfers, you must notify the Bank within sixty (60) days of the statement date on which the unauthorized transfer(s) appeared in order to limit your liability for the amount of such unauthorized transactions. If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) business days. (See Electronic Funds Transfer section).

Reminder: Dormant accounts will not receive statements.

To request copies of any paid checks, contact your branch of account or call our Telephone Banking Center.

## Check Safekeeping

With our Check Safekeeping service, we keep copies of your deposit slips and canceled checks on microfilm or in another electronic form for seven (7) years rather than return the originals to you in your statement. To request copies of checks, contact your branch of account. When requesting a copy of a check, please provide the following information, which is shown on your account statement: account name, account number, check number, dollar amount of the check, and the posting date of the check. In most instances, we will mail the copy to you within two (2) business days. If you prefer, you may pick up the copy at your branch of account. If you request copies of more than two (2) items per statement period, there will be a fee.

## CheckScan® Statement

This service may be used in conjunction with Check Safekeeping. With this service, copies of the front of your paid checks are included with your monthly statement. They appear ten (10) on a 3-hole punched page for easy filing.

## Combined Statements

Multiple savings accounts and certificates of deposits can be combined with a checking account for the convenience of viewing account activity on one (1) statement. Money market accounts and IRA accounts cannot be combined with a checking account statement.

## Notices

Any written notice you give to the Bank is effective when it is actually received by the Bank and we have had a reasonable opportunity to act on it. Any written notice the Bank gives to you is effective when it is deposited in the U.S. Mail, postage prepaid, and addressed to you at your statement mailing address. Notice to any one (1) account owner is considered notice to all owners of the account.

## Privacy Policy

We will disclose your personal information only in accordance with our Privacy Policy. A copy of this policy will be sent to you annually, and you may request a copy at any time. You will receive a copy of our Privacy Policy whenever you establish a new personal account with us.

## Verification of Deposit

If you give a written Verification of Deposit to a third party that requests us to release your account-related information, we will assess a fee to the third party for this service.

## Check Printing

On most accounts, there will be a charge for check printing. The printing charge will vary according to the check design, style, and quantity you select.

## Interest Rates

When opening an interest-bearing account, depending on the type of account you choose, interest rates are either variable or fixed at the time the account is opened. Interest rates are determined periodically by Bank policy, current market conditions, and amount of deposit, except where otherwise noted. We reserve the right to change interest rates on any interest-bearing account at our discretion. Current interest rates and Annual Percentage Yields are available by telephoning or inquiring at any Bank office or at our Telephone Banking Center.

## Closure of the Account

The Bank reserves the right to close any account at any time, with or without cause. The Bank will advise you of this action. If the Bank closes the account, we will give or mail to you a cashier's check for the available balance remaining in the account, including accrued interest if applicable, subject to any agreement concerning maturity or the Bank's right of set-off.  Once all funds become available, the balance of the account will be sent to you.  If you close the account, accrued but unpaid interest will be forfeited. This includes account closings caused by legal process.

## Reporting of Account Closure

If you do not satisfactorily maintain your account or if we close your account for cause, information concerning your account including, without limitation, insufficient funds activity, fraud, or attempted fraud or criminal activity, may be reported to consumer reporting agencies. Information we report usually includes your name, address, Taxpayer Identification Number or Social Security Number, driver's license number, and the date and reason the account was closed. The consumer reporting agency may supply this information to others. Adverse information provided to a consumer reporting agency may affect your ability to open another deposit account at other financial institutions.

## Legal Processes

If we are served with any legal process (subpoena, restraining order, levy, search warrant, writ of attachment or execution, or similar order) which we believe to be valid and which we believe applies to your account or relationship with us, even if we are not a party, we may comply with such legal process. We may comply with any legal process without regard to the location served or the manner of service. The result is that we may accept legal processes in person, by mail, electronically, or by facsimile transmission at any branch or office, including locations other than the branch or office at which funds, property, or records are held. This means that, unless expressly prohibited by law, a legal process issued and served in one state may affect an account held at any of our branches in any other state. Legal process against one owner may reach accounts held by that owner jointly with others. It is the obligation of the affected owner or any owner who receives notice of the legal process to notify co-owners of the legal process. The Bank reserves the right to send only one notice of legal process to the account holder(s).

Unless prohibited by law, we may charge you a fee for each legal process. On subpoenas or other requests for information, unless prohibited by law, if we are not fully reimbursed for research and other handling costs by the party who served the process, we may charge those costs to your account. You agree to indemnify, defend, and hold us harmless from any and all actions, claims, liability, losses, costs, and damages associated with our compliance with any legal process that we believe to be valid. Accounts opened with trust or fiduciary designations, in particular, may be subject to legal processes.

Legal processes must be served before our cut-off hour of 10 a.m. Pacific Time to be effective against checks posted but not yet paid.

## Right of Set-off and Security Interest

We may set off against any of your accounts without prior notice to you. The Bank may debit funds held in an individual account, whether the debt is owed individually or jointly with another person or persons. The Bank may debit funds held in joint accounts for debts for which any one owner is liable. If the Bank debits funds from a certificate of deposit account, the funds withdrawn may be subject to an early withdrawal penalty. If you are a sole proprietor, the Bank may also debit any of your personal accounts. If your business is a partnership, the Bank may debit any personal account of any general partner. In all cases, the Bank will not be liable to you for dishonoring items where the set-off results in insufficient funds in your account to pay paper or electronic items presented against your account. You agree to hold the Bank harmless from claims arising from our utilizing our right of set-off.

In addition, you grant the Bank a security interest in all of your deposit accounts to secure any obligation you owe to the Bank.

## Pledges and Security Interests in Favor of Others

You cannot give a security interest or pledge your account to someone else without first getting the Bank's written consent.  We are not required to give consent to a security interest or pledge.

## Collection Actions

Negative information reflecting on your credit may be submitted to credit reporting agencies if:

- We initiate a collection activity against you for indebtedness arising out of your account relationship. Further, you shall be liable to us for interest, at the legal rate, for any and all indebtedness you incur based on your account activity from the date the indebtedness is incurred.
- You fail to fulfill the terms of your obligations with regard to your deposit account(s) with the Bank or,
- In the Bank's judgment, you misuse your account. This may occur whether or not the Bank incurs a loss in connection with your account.

## Preventing Fraud and Other Losses

**Duty to Review Statements and Transactions**

You have a duty to protect your account against abuse. You must promptly examine and reconcile your statement and, if applicable, any items, upon receipt. If you find that your records and ours disagree, or if you suspect that a check or endorsement is altered or forged, contact us immediately.

- Watch for out-of-sequence checks and checks made payable to cash or to a bank. Review your transaction activity often for unexpected fluctuations.
- Do not keep your PIN with or written on your ATM or Debit Card.
- Do a thorough background check on agents, bookkeepers, accountants, or other employees who may be handling any part of your banking and/or who have access to your confidential records.
- Never leave unused checks in the open or in an easily accessible location. Unused checks should be kept under lock and key and monitored for usage. Do not assume missing checks are not a problem. Destroy any checks that you do not intend to use. You agree to accept full responsibility for any failure to safeguard your blank checks.

If you fail to properly monitor your account or your account records, we may deny any claim you make for monetary loss due to forgery, alteration, or unauthorized checks. See also "Statements and Your Responsibility to Review."

## Bank Monitoring of ATM/Debit Card Transactions; Duty to Cooperate

Bank of the West reserves the right to monitor ATM and Debit Card transaction activity as a means to deter fraudulent transactions. If unusual transaction activity is detected, we will make every effort to contact you to confirm the authenticity of the activity. You owe us a duty to cooperate with us in our investigations of activity we believe is unusual and potentially fraudulent. However, if we are unable to contact you, we may, at our discretion, block your Card in an effort to prevent additional fraudulent transactions. In the event that you confirm the transaction activity as legitimate, we may, at our discretion, unblock your Card.

Bank of the West reserves the right to decline transactions at the point-of-sale (POS) to deter possible fraud.

Our right to monitor does not replace your responsibility to review your account activity or change your liability regarding reporting unauthorized activity to the Bank.

## Agents; Powers of Attorney

If you want to give another person access to your account, please talk to your branch of account well in advance of the date by which you wish to allow this access. The Bank makes available a durable power of attorney form that is limited to a specific deposit account as identified on the power of attorney form and which will remain valid notwithstanding the incapacity of the principal.

Each owner of your account is independently permitted to authorize someone else to access your account.

If you name an agent or an attorney-in-fact on a non-Bank form, we may require that the form naming the agent or attorney-in-fact be reviewed and approved.

If you have more than one power of attorney or agency appointment on file with the Bank, we will honor each one independently unless you tell us to do otherwise or one power of attorney clearly revokes all prior appointments. For example, if you have named two (2) different persons as attorneys-in-fact on separate powers of attorney, we will permit each to act in accordance with the information on the power of attorney on which they are named.

All agencies and powers of attorney will terminate (a) when the Bank has been given notice of the termination of the agency/power of attorney and has a reasonable opportunity to act on the notice; (b) with the death of the principal (grantor of the agency/power of attorney) and with the Bank's notice of the death of the principal.

We reserve the right to refuse attorneys-in-fact access to certain banking services which you may have, such as eTimeBanker® Online Service.

You understand and agree that we have no duty or responsibility to monitor the acts of your agent or attorney-in-fact, or to ensure that your agent/attorney-in-fact is acting for your benefit. You agree that we will not be liable to you for any loss or damage you incur as a result of actions by any agent/attorney-in-fact.

## Instructions by Facsimile, Email or Voicemail

Without prior notice to us and by our express agreement with you, we may disregard any instructions or requests made by email, facsimile machine, or voicemail (telephone recording device).

## Authorized Debits

If you voluntarily give information about your deposit account (such as our routing number and your account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to the party, any debit to your account initiated by the party to whom you gave the information is deemed authorized.

## Changes in Terms and Conditions

We may amend, add, or delete any provision of the terms and conditions detailed in these pages at any time. To the extent and in the manner and timeframes required by law, we will notify you in advance of any changes that affect your rights and obligations. You indicate that you accept a change we make by continuing your account relationship with us or, if the change affects your certificate of deposit, by allowing the certificate of deposit to renew after the change becomes effective.

## Conflicting Demands

In case of conflicting certifications or demands, a dispute about ownership of the account, ownership of any funds in the account, or any account holder's authority or capacity to act on the account, we may refuse to honor any request or order concerning your account or any check drawn on your account until we receive: 1) joint instructions regarding the account, or 2) a court order.

At our sole discretion, we may require the signatures of all account holders and/or all authorized signers to comply with a specific request or for the withdrawal of funds and/or closing of an account. In such event, we may also refuse to honor any further transactions and may return checks and other items. We reserve the right to interplead or deposit with the courts any disputed funds.

## Investigative Freeze

As part of our loss prevention program, when we suspect that irregular, unauthorized, or unlawful activities may be involved with your account, we may "freeze" (or place a hold on) the balance in your account (and in other accounts you maintain with us) pending an investigation of such suspected activities You will be notified of any investigative freeze. While your account is frozen, all withdrawals from the account are generally blocked.

## Enforcement

You agree to be liable to the Bank for any liability, loss, or expense, that the Bank incurs as a result of any dispute involving your account or services. You authorize the Bank to deduct any such liability, loss, or expense from any of your accounts without prior notice to you.

## Pass-Through Insurance Disclosure

The Regulations of the FDIC provide, in part, that "[A]ny deposits of an employee benefit plan in an insured depository institution shall be insured on a 'pass-through' basis in the amount of up to" $100,000 or $250,000, depending upon the type of retirement account, as described below, "for the noncontingent interest of each plan participant, provided the rules in § 330.5 [12 C.F.R. § 330.5] are satisfied." 12 C.F.R. § 330.14(a).

To satisfy the recordkeeping requirements referred to above, the records of your branch must specifically disclose that the depositor (each employee benefit plan or its trustee) holds the funds deposited in a fiduciary capacity.

Further, the details of the fiduciary relationship between the plan and its participants, and the participant's beneficial interest in the deposits, must be determinable from the records of the plan or the records of some person or entity that has agreed to maintain records for the plan. The records must be maintained in good faith and in the regular course of business.

## Accounts Eligible for $250,000 Coverage

As noted above, certain deposits are aggregated and insured in the amount of up to $250,000 per participant. All other accounts are insured in the amount of up to $100,000. The types of accounts that are insured up to $250,000 per participant are the following:

- Any individual retirement account described in section 408(a) of the Internal Revenue Code of 1986 (26 U.S.C. 408(a));
- Any eligible deferred compensation plan described in section 457 of the Internal Revenue Code of 1986 (26 U.S.C. 457); and
- Any individual account plan defined in section 3(34) of the Employee Retirement Income Security Act (ERISA) (29 U.S.C. 1002) and any plan described in section 401(d) of the Internal Revenue Code of 1986 (26 U.S.C. 401(d)), to the extent that participants and beneficiaries under such plans have the right to direct the investment of assets held in individual accounts maintained on their behalf by the plans.

## Determination of Coverage

If, when you opened your account with us, you indicated that the funds in the account are held by you in a fiduciary capacity for an employee benefit plan and our records reflect that fact and, if the records of your employee benefit plan are maintained in good faith and in the regular course of business so that each participant's beneficial interest is ascertainable from those records, then the funds deposited in your account should qualify for "pass-through" insurance coverage. You may wish to consult your legal counsel to determine if your employee benefit plan account is properly established and the records of the employee benefit plan are being properly maintained.

## Governing Law

This Agreement and your account shall be governed by the law of the state of the Bank's office in which your account was opened (or to which it is later transferred).

## Limitation of Liability

We shall not be liable for special or consequential damages to you which arise under this Agreement or by law with respect to your account, except as otherwise agreed in writing. Any loss is reduced by your recovery of funds or services from any other source.

## Our Relationship

Unless we agree otherwise in writing, our relationship with you shall be one of debtor and creditor; no fiduciary, quasi-fiduciary, or other special relationship exists between us.

## Reservation of Rights

We shall not be deemed to have waived any of the provisions contained in this Agreement by having waived the same or similar provisions at any other time. We reserve the right to close any account at any time without prior notice, with or without cause. We reserve the right to refuse to open any account, and also the right to change or discontinue the terms of any account after opening.

Examples used in this Agreement are not intended to be the only applications of the rule being explained. Examples are illustrative and not limiting.

## Severability

In the event that any part of this Agreement is held by a court to be invalid or unenforceable for any reason, the other paragraphs and portions of this Agreement shall not be invalid or unenforceable and will continue in full force and effect.

## Funds Availability

Electronic direct deposits and wire transfers will be available on the day we receive the deposit. Our policy is to make funds from most of your other deposits available to you on the first business day after the day we receive your deposit. Once they are available, you can withdraw the funds in cash, and we will use the funds to pay checks that you have written.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If your deposit is received on a business day and before the cut-off time for that branch (see cut-off times listed under "Balances and Cut-off Times"), we will consider that day to be the day of deposit. When a deposit is received on Saturday, after the branch or ATM cut-off time, or on a day that we are not open, we will consider that the deposit was made on the next business day we are open. Deposits made at our Night Drops are processed once a day. Please check with your branch to determine the cut-off time. Any deposit made before the cut-off time will be processed the same day. Any deposits made after the cut-off time will be processed the next business day.

## Holds on Other Funds (Check Cashing)

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

## Holds on Other Funds (Other Account)

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this Deposit Account Disclosure For Personal Accounts for the type of check that you deposited.

## Longer Delays May Apply

In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the fifth business day after the day of your deposit. However, the first $100 of your deposits will be available on the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. The Bank is under no obligation to pay any items you have authorized against funds that are not yet available. Such items will be treated as any other overdraft or non-sufficient-funds items.

If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice. If you will need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, some or all of the funds you deposit by check may be delayed for a longer period under the following circumstances:

- You have overdrawn your account repeatedly in the last six (6) months.
- The checks you deposited on this day exceed $5,000.
- We believe a check you deposit will not be paid.
- You are redepositing a check that has been returned unpaid.
- You are depositing to a new account.
- There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the eleventh business day after the day of your deposit.

## Special Rules for New Accounts

If you are a new customer, the following special rules will apply during the first thirty (30) days your account is open.

Funds from electronic deposits and wire transfers to your account will be available on the day we receive the deposit. Funds from deposits of cash, and the first $5,000 of a day's total deposit of cashier's, certified, teller's, travelers, and Federal, State, and local government checks will be available on the first business day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,000 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from all other check deposits will be available on the ninth business day after the day of deposit.

## Substitute Checks and Your Rights

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

## What are my rights regarding substitute checks?

In certain cases, Federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within ten (10) business days after we receive your claim and the remainder of your refund (plus interest if your account earns interest) not later than forty-five (45) calendar days after we receive your claim.

We may reverse the refund (including any interest on the refund) if we are able to demonstrate that the substitute check was correctly posted to your account.

## How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at our Telephone Banking Center at the numbers and location indicated at the end of this Deposit Account Disclosure For Personal Accounts. You must contact us within forty (40) calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include:

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect),
- An estimate of the amount of your loss,
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss, and
- A copy of the substitute check and/or any of the following information to help us identify the substitute check: (the check number, the name of the person to whom you wrote the check, the amount of the check).

# Checking, Money Market
# and Savings Accounts

## Interest

For all interest-earning checking accounts and money market accounts, interest is accrued and calculated on the daily collected ending balance. On savings accounts, interest is accrued and calculated on the daily ending balance. This method applies a daily periodic rate to the principal in the account each day. Interest rates are determined by Bank policy, market conditions and daily balance. Interest is paid and compounded monthly on interest-bearing checking accounts and money market accounts.   Interest is paid and compounded daily on savings accounts.  Collected funds balances are used in determining interest earned on interest-bearing checking accounts. Non-cash deposits are considered part of the collected funds balance when the Bank receives provisional credit for the items. Items drawn on other financial institutions usually take one (1) to three (3) business days before the Bank receives provisional credit for them.

Interest is available for withdrawal when it has been credited to your account. No interest will be paid on your account from one statement period to the next if you close the account within that period. You will not forfeit interest if your account closes because you are transferring it to another Bank of the West branch. The Bank may reverse interest that has been earned on any deposit that is reversed for any reason.

The annual percentage yield quoted for your account assumes that interest earned is reinvested in the account monthly, that all funds remain on deposit for one (1) year from the date of deposit, and that the interest rate does not change. Interest withdrawn will reduce the annual percentage yield earned.

Interest rates can change as frequently as daily. Rate change notices will not be sent; however, the current rate is available by telephoning any Bank of the West office or our Telephone Banking Center.

For tiered rate accounts, interest will be paid on the entire collected balance at the interest rate set for the tier into which the entire end-of-day collected balance falls.

## Right to Advance Notice of Withdrawal

On all money market accounts, savings accounts, and interest-bearing checking accounts, we reserve the right to require seven (7) days advance notice of a withdrawal.

## Review of Drawer Signatures

You agree that the Bank does not fail to exercise ordinary care in paying an item solely because our procedures do not provide for sight-review, provide for sight-review only for items above a threshold level, or provide for a site-review on a sample basis, at our discretion. The Bank reserves the right not to sight-review drawer signatures because we pay items on an automated basis to reduce costs for all customers.

## Personal Account Usage

Do not use a personal deposit account as a business account. A sole proprietorship is a business. If you elect to use your personal deposit account for business purposes, we reserve the right to change your personal deposit account to a business deposit account type. We will notify you prior to any change.

## Sub-Accounts

As part of our internal accounting procedures, our checking accounts consist of two (2) sub-accounts: 1) interest-bearing checking sub-account; and 2) a savings sub-account. From time to time, balances will be transferred between the two (2) sub-accounts, as we deem appropriate, subject to all applicable regulatory restrictions. These sub-accounts will occur on our books only, and will not affect the interest you are paid, your account balance, funds availability, fees, bank statement, or any other features of your account. As with all savings accounts, we reserve the right to require seven (7) days advance notice of a withdrawal on savings sub-accounts.

## Savings Overdraft Protection

For our personal checking accounts, we offer optional savings overdraft protection to help protect your checking account from overdrafts. This service is available if you have a personal savings account and any personal checking account. The owner(s) of the checking account must be the same as the owner(s) of the savings account.

If there are not sufficient funds in your checking account to cover the amount of items presented for payment, we will automatically transfer funds from the available balance in your savings account to your checking account. When each transfer is initiated, we charge a savings overdraft protection transfer fee We transfer funds in increments of $50 up to the amount of the overdraft, including other countable transactions such as a pre-authorized payment from your savings protection transfer fee, up to the amount of the available balance.

If your savings account does not have a balance of $50, but there are sufficient funds to cover the overdraft amount and the transfer fee, then the entire savings balance will be transferred into the checking account. If one (1) or more items are presented and there are not enough funds to cover the entire overdraft amount and transfer fee, no transfer will occur.

Each transfer counts as one (1) of the six (6) limited transactions you are allowed each calendar month from your savings account. If during any calendar month, you have already used the six (6) allotted transactions, the overdraft transfer will not occur.

Funds you deposit into your savings account may not be available immediately for savings overdraft protection. Savings overdraft protection is not available for bill pay transactions scheduled on eTimeBanker® Online Service.

## Money Market and Savings Transaction Limitations

All money market and savings accounts, are limited to a total of six (6) pre-authorized, automatic, or telephone transfers from the account for the applicable period (includes eTimeBanker® online transfers to another account) and no more than three (3) of the six (6) may be by check, draft, Debit Card, or similar order payable to third parties. The applicable period for savings accounts is a calendar month (even if your statement cycle is not a calendar-month cycle). The applicable period for money market accounts is your statement cycle.

Transfers from savings accounts through eTimeBanker® Online Service or through our Telephone Banking Center will be prevented if the limit of six (6) transactions for the calendar month has already been reached. However, other countable transactions such as a pre-authorized payment from your savings to a third party, outgoing wire transfer request, etc., that occur during the same calendar month will not be prevented and could cause you to exceed the six (6) transactions. Therefore, you are responsible for managing your account to stay within the six (6) transactions allowed per calendar month.

If you exceed six (6) transfers in the applicable period, the Bank will notify you and may transfer the account to another type for which you are eligible. Transfers and payments are counted as of the end of the day the funds are actually withdrawn to determine whether any transfer threshold has been exceeded.

## Withdrawals

On all money market and savings accounts, the Bank reserves the right to require seven (7) days advance notice of a withdrawal.

Withdrawals are permitted only by or as directed by owners or their agents or attorneys-in-fact. The Bank may honor all transactions authorized by you, including third-party drafts, point-of-sale transactions, electronic transfers, and automated teller machine (ATM) transfers and withdrawals, as previously arranged, from any savings account. This includes checks presented for payment prior to the date written on the check (postdated checks), unless you have placed a stop payment order with the date the check becomes payable.

For some accounts, the Bank may require you to surrender any certificate or other writing evidencing the funds on deposit. For other accounts, withdrawals may be made by those authorized without presenting registers or preprinted checks.

## Order of Paying Checks and Other Items

We may accept, pay, or charge checks and other items presented against your account in any order we select. We may adopt posting priorities. We will generally pay items in the following order, unless otherwise required or prohibited by law: amounts due to us, certain electronic transactions, and then checks will be paid from highest to lowest dollar amounts. If you have insufficient funds in your account to pay all of the checks and other items processed on any given day, this method may result in additional fees. We may change the order of paying checks and other items against your account at any time without notice to you.

## Stop Payment

Before we pay a check or third-party transfer, you have the right to place a stop payment order on the item, unless we are committed to honor the item as provided by the regulations regarding check processing. For cut-off times, see "Additional Cut-off Times."

- Each stop payment order ("Order") applies ONLY to the items that conform EXACTLY to the descriptions you provided on the Stop Payment Order. If any of the information concerning the item is not given or incorrect (including your failure to give the precise amount of the item, to the penny), the Bank may not be able to honor the Order.

- The Bank must receive each Order at a time and in a manner that allows the Bank a reasonable opportunity to act on the Order for the Order to be honored. Each Order shall not be effective if the Bank has already: 1) accepted or certified the item; 2) paid the item in cash; or 3) settled for the item without having to revoke the settlement under statute, clearing house rule, or agreement.

- Each Order will terminate at the earliest of the following: 1) thirteen (13) months from the date it is received by the Bank; 2) your closure of the account; or 3) in the case of ACH Stop Payment Orders, after the ACH item is returned one (1) time. Unless the Order is renewed at the fee applicable at the time, the item may be paid if it is presented for payment after the Order terminates. If the Order terminated as a result of you closing the account, a new Stop Payment Order must be placed at the fee applicable at that time if you later reopen the account.

- If the Bank is able to and does stop payment on the item, the payee or other holder of the item may be able to recover from you the amount of the item plus other appropriate damages.

- The Bank is authorized to deduct from your account the Bank's applicable stop payment fee.

- If more than one person is permitted to draw on your account, any of these persons may stop payment on the Item.

- You agree to indemnify and hold the Bank harmless from any and all costs, expenses, suits, and/or judgments that the Bank may either incur or be assessed due to honoring the Order. You authorize the Bank to debit your account for any such amount due the Bank.

- If the Bank re-credits your account after paying the item over a valid and timely Order, you agree to transfer to the Bank all of your rights against the payee or other holder of the item, and to assist the Bank in any later action taken against said payee or other holder.

## Electronification of Checks

Many transactions which are initiated with a paper check may be converted into an electronic funds transfer at some point in the payment process. This section describes four common industry practices that may affect your account. Your liability is limited for errors with regard to transactions where your check has been electronified. These limits are described later in the section of this Deposit Account Disclosure For Personal Accounts titled "Electronic Funds Transfers." The liability limits for electronification of check transactions apply only to: Transactions against your account that are initiated under the Point of Purchase Program or Accounts Receivable Truncated Checks or the Back Office Conversion as described below.

- **Point of Purchase Program (POP)** Merchants participating in the "Point of Purchase" program are able to take one (1) of your checks and scan it at the point of purchase thereby converting it into an electronic payment. Participating merchants are required to: 1) inform you of their participation in the program; 2) request your signature; 3) return your check to you marked "Void" or "Not Negotiable"; and 4) give you a receipt. This electronic transaction will be debited from the account on which the check was drawn and will appear on your statement with the details of the transaction including the check number.

  To participate in the Point of Purchase program, you must use a check with a preprinted check number on it. You may not use a check that you have previously used, whether or not it has been marked "Void" or "Not Negotiable."

  You may stop payment on these transactions before your account is debited if you notify us that the check was converted to a Point of Purchase electronic payment. If you fail to notify us of the conversion of your check into an electronic payment, we will not be liable for our failure to stop payment on the electronic payment.

- **Accounts Receivable Truncated Checks (ARC)** Some payees that you pay on a regular basis, such as utilities, credit card companies, and insurance companies, may convert the check you mail to them into an electronic debit from the account upon which the check was written. The debit will appear on your account statement with the check number, the payee's name and the indicator "Check Payment." The payee keeps the check and it will not be returned to you. When the payee participates in this program, the payee must notify you. You should review all statement messages and materials accompanying your bill closely for this notification. You may stop payment on these transactions as long as your stop payment request is received before the transaction is posted.

- **Back Office Conversion (BOC)** Merchants or manned bill payment locations participating in the "Back Office Conversion" program will accept your check for payment and later scan it in a back office environment converting it to an electronic payment. Participating merchants and bill payment locations are required to inform you of their participation in the program with conspicuous signage as well as provide notification on your receipt to include a phone number for questions. This electronic transaction will be debited from the account on which the check was drawn and will appear on your statement with the details of the transaction including the check number, payee information and date. You may stop payment on these transactions before your account is debited.

14

- **Represented Checks (RCK)** Some payees may convert a returned unpaid check into an electronic debit from the account upon which the check was written. The debit will appear on your account statement with the check number, the payee's name, and the indicator "Re-Deposited Check." The payee keeps the check and it will not be returned to you.

  When the payee participates in this program, the payee must notify you. You should review all signage and postings at merchant locations for this notification when writing a check. You may stop payment on these transactions as long as your stop payment request is received before the transaction is posted.

## Merchant Capture Program

Merchants may participate in a merchant capture program with their bank. This program allows merchants to electronically transmit checks to their bank for deposit to the merchant's account rather than physically deposit the checks at their bank. Merchants are not required to notify you when they are participating in a merchant capture program. When you write a check to a participating merchant, the merchant will retain and later destroy the check; the check will not be returned to you. The debit will appear on your account statement along with your other payments. You may stop payment on these transactions as long as your stop payment request is received before the transaction is posted. You may or may not receive a substitute check or image of the check in your statement.

## Transfer of Ownership

If an account is held by natural persons only (personal account), it is NOT TRANSFERABLE. Federal regulations exclude from the definition of transfer an account pledged as collateral for a loan or the passing of title upon death, divorce, marriage, incompetency, or by operation of law. Neither transfer between natural persons when made on the books at Bank of the West nor the addition or subtraction of names of other natural persons is regarded as a transfer.

# Certificate of Deposit
# and Retirement Accounts

## Deposits

Unless otherwise indicated, additional deposits of $100 or more can be made only within the ten (10) calendar day grace period (one [1] calendar day grace period for 7–31-day accounts) on automatically renewable certificates of deposits. Interest on the additional funds, both cash and non-cash, will begin to accrue on the business day you make your deposit and will be at the same rate as the renewed certificate of deposit. The additional deposit(s) will mature at the same time as the renewed certificate of deposit.

## Interest

We use the daily balance method to calculate the interest on your account based on a 365/366-day year and actual days. This method applies a daily periodic rate to the principal in the account each day. Interest is compounded monthly, except for those retirement accounts noted as compounding daily. The annual percentage yield quoted for your account assumes that interest earned is reinvested in the account monthly, that all funds remain on deposit for one (1) year from the date of deposit (even for shorter term deposits), and that the interest rate does not change. Interest withdrawn will reduce the annual percentage yield earned.

For certificates of deposits with terms of thirty-two (32) days or longer, you may choose the frequency of interest payments. Interest can be paid as frequently as monthly, but must be paid at least once a year. On certificates of deposits, interest may be reinvested into the account, credited to another checking, money market or savings account, or paid to you by check. For Individual Retirement Accounts, interest is reinvested until you establish a distribution plan or withdraw the funds.

Certificates of deposits with terms of 7–31 days will receive interest only at maturity. Interest may be reinvested into the certificate of deposit or deposited to a checking, money market or savings account.

## Maturity

Automatically renewable certificates of deposit renew at the rate in effect on the maturity date, for the same term and under the same conditions last disclosed (unless we tell you otherwise). We will mail a renewal notice approximately fifteen (15) days prior to the maturity date (except for 7–14-day terms). You have ten (10) days after the maturity date (one [1] calendar day grace period for 7–31-day accounts) to make changes to your certificate of deposit without penalty. The renewal notice will include a phone number you can call on the maturity date (or shortly after) to find out the interest rate and annual percentage yield on your renewed certificate of deposit.

A non-renewable certificate of deposit will not earn interest beyond the maturity date, and will not renew automatically at maturity. We will mail a maturity notice approximately fifteen (15) days prior to the maturity date (except for 7–14-day terms). The maturity notice will include a phone number you can call if you would like to open another certificate of deposit.

## Withdrawals; Early Withdrawal Penalties

Interest which has been reinvested may be withdrawn without penalty at any time, if the account term and interest rate have not changed since the reinvestment. Additional withdrawals without penalty are permitted at maturity for automatically renewable certificates of deposit, during the ten (10) calendar day grace period (one [1] calendar day grace period for 7–31-day terms), upon a depositor's death or mental incapacity, or for IRA account holders who are totally disabled or over 59. Withdrawals at any other time may be permitted at the Bank's discretion and may be subject to interest penalties. Accounts closed during the grace period will forfeit any interest that accrued during the grace period.

All penalties are calculated on a simple interest basis. The penalty assessed may reduce the principal balance remaining on your account after the withdrawal. The penalty is calculated at the interest rate in effect at the time the certificate of deposit was opened or last renewed.

The penalties on the amount withdrawn are:

- 7–31-day term: seven (7) days simple interest.
- 32 days – 1-year term: thirty (30) days simple interest.
- Over 1-year term: one hundred eighty (180) days simple interest.

IRA accounts closed within seven (7) calendar days of opening forfeit all interest earned to the date of closure. Withdrawals from IRA accounts may be subject to Federal and State tax penalties. Contact your tax advisor for further information.

# Retirement Plans

## Retirement Plan Distributions

You may elect to begin distribution on your Individual Retirement Account (IRA) account beginning at age 59½, or earlier if you are permanently disabled. IRA customers may choose to have Federal and State withholding taxes deducted from these distributions.

## IRA Plan

An "IRA Plan" is a tax-advantaged Individual Retirement Account (IRA) established pursuant to Internal Revenue Code Sections 408 (Traditional IRA) or 408A (Roth IRA) by completing a Bank of the West custodial or trust IRA agreement. At Bank of the West, customers may be able to open more than one (1) IRA Plan and fund each IRA Plan with more than one (1) deposit account. Depending on the nature of the IRA, customers may be required to open more than one (1) IRA Plan.

# IRS Reporting

## Interest Reporting

The Bank may have to report to you and to the Internal Revenue Service (IRS) any interest paid or credited when the Bank acts as:

- The party primarily liable to pay interest, or
- Custodian, fiduciary, nominee of a payee, trustee or a trust, collector of a payment for the payee, or
- Middleman between payor and payee.

Interest paid to any single Taxpayer Identification Number of $10 or more per calendar year generally will be reported to the IRS.

The Bank will send you a statement of the amount of interest reported for your records. Any questions regarding requirements should be directed to your tax advisor or the IRS.

## Backup Withholding

Under certain circumstances, Internal Revenue Service (IRS) regulations require the Bank to withhold a percentage of any interest payments made to you. The percentage withheld will be determined by the rate in effect under IRS regulations at the time backup withholding begins. To avoid backup withholding on your interest-bearing account, U.S. Citizens or other U.S. persons including Resident Alien individuals must provide the Bank with a Tax Identification Number and certify either on our signature card or on IRS Form W-9 that the number you have provided is correct and that either (a) you are exempt from backup withholding, or (b) that you have not been notified by the Internal Revenue Service that you are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the Internal Revenue Service has notified you that you are no longer subject to backup withholding. If you are a Non-Resident Alien, to avoid backup withholding you must certify your Non-Resident Alien status on an Internal Revenue Service Form W-8 Certificate of Foreign Status. Your Non-Resident Alien status must be re-certified on a new IRS Form W-8 every three (3) years to avoid backup withholding at the expiration of the current Form W-8 on file with the Bank. Backup withholding may also occur at any time upon any request served to the Bank by the Internal Revenue Service.

Withholding will occur at the time interest is paid. The amount of interest withheld will be reported to you and the IRS.

All account owners agree to be jointly and severally responsible for amounts that the Bank is required to withhold. You also agree that the Bank is permitted to remove funds from any account in any of your names for the amount of the backup withholding if it cannot be obtained from the account to which interest has been credited. The Bank will inform you if the funds are removed from any account other than the one to which interest was paid to pay the withholding.

Any questions regarding tax withholdings should be directed to the IRS.

## Notice to Canadian Non-Resident Aliens

IRS regulations require that we report to the IRS all deposit interest paid to accounts belonging to Canadian non-resident aliens, even if you provided us with a signed Certification of Foreign Status (W-8).

## Reporting or Record Keeping Requirements

The Bank Secrecy Act ("Act"), a Federal law, requires all financial institutions to report cash transactions of more than $10,000 to the Internal Revenue Service (IRS). In addition, we may report to the IRS multiple cash transactions which together total more than $10,000 in any one day. In order to better comply with the law, we may maintain a log of all cash sales of bank checks or drafts, cashier's checks, money orders, or travelers cheques. We may also report to the IRS or other government agencies transactions that may be structured to avoid the reporting requirements and other transactions which appear to involve illegal activity.

In order to satisfy the Act's requirements, we may, and, in many cases, must request certain information about the individual presenting the transaction, as well as the organization or individual for whom the transaction is being conducted. This includes the individual's/organization's full name, permanent street address, Social Security Number, identification number (such as a driver's license or passport), date of birth (if applicable), and business, occupation, or profession.

If you have questions about the Bank Secrecy Act, contact your local IRS office at www.irs.gov or FinCEN (Financial Crimes Enforcement Network) at www.fincen.gov.

# Funds Transfers

The next five paragraphs specifically relate the Uniform Commercial Code provision, Article UCC-4A as adopted in the applicable state. Generally, these are wire transfers or transfers through an Automated Clearing House, but other transactions may be covered. Additional agreements may exist between us regarding funds transfers. These paragraphs do not affect transactions covered by the Electronic Funds Transfer Act, such as direct deposit of payroll or Social Security payments into your account.

## Notice of Receipt of Funds Transfer

In the event we receive a funds transfer for your account, we are not responsible for notifying you of our receipt of the funds transfer. In some cases, typically for a funds transfer transmitted through the Federal Reserve Wire System, we will send you a notice of receipt of a funds transfer. In other instances, typically for a funds transfer transmitted through the Automated Clearing House network, we will not send you a notice of receipt of a funds transfer. In either case, the funds transfer will be reflected on your account statement for the applicable period. We shall not be liable for any damages, claims, or losses including, without limitation, loss of any interest incurred by you for any failure on our part to notify you of receipt of a funds transfer.

## Funds Transfer's Reliance on Identification Numbers

If a funds transfer order designates the beneficiary by both name and an identifying account number, we, or any bank receiving the funds transfer order, may pay the funds transfer order based upon the number alone, even if the account number does not belong to the named beneficiary. If a funds transfer order designates an intermediary bank or a beneficiary's bank by both name and an identifying number, we, or any bank receiving the funds transfer order, are entitled to rely on the identifying number alone, even if the number does not belong to the named bank.

## Transmitting and Recording Information About You in the Funds Transfer Payment Process

Any funds transfer (or payment order) executed by us is subject to rules and regulations applicable to funds transfers, including the Federal Bank Secrecy Act and its regulations. In order to comply with all applicable laws and regulations in executing any funds transfer, we may transmit information regarding you, such as your name, address, and account number, as part of the payment process. In addition, when we receive any funds transfer or payment order, we may require and record your name and account number and other information. By sending or receiving funds transfers through us, you agree that you will assist us in complying with the applicable laws and regulations and hold us harmless from any liability in connection with our compliance with the laws or regulations.

## Transfers Received Through the Automated Clearing House

If the Bank receives a credit entry on your behalf or for your account where the credit entry was transmitted through the Automated Clearing House and if the Bank does not receive payment for the credit entry from the financial institution originating the payment, the credit to your account may be reversed.

## Electronic Direct Deposits

We post electronic direct deposits on the effective date of the deposit.

# Electronic Funds Transfers

This information applies only to accounts of a consumer or natural person, as defined in the Electronic Funds Transfer Act and sets forth the terms of our Electronic Funds Transfer Agreement with you.

"Electronic Funds Transfers" means any transaction in funds (both deposits and withdrawals) affecting the deposit account of a consumer if the transaction is initiated through an electronic terminal, telephone, computer, or magnetic tape. This includes the direct deposit or withdrawal of funds, transactions at an ATM, transactions you conduct with a merchant, and checks that are converted to electronic transactions under the POP, ARC, and BOC programs (these programs are discussed earlier in this Agreement under the section titled "Electronification of Checks"). Excluded from "electronic funds transfers" are transactions originated by wire, check, or similar paper instrument, including checks that are converted to electronic debits after being rejected for payment due to insufficient or uncollected funds under a represented check (RCK) program.  The RCK program is also discussed under the section of this Agreement titled "Electronification of Checks."

The Electronic Funds Transfer Act establishes the basic rights, liabilities, and responsibilities of consumers who use electronic money transfer services and of financial institutions that offer these services.

The terms of this Electronic Funds Transfer Agreement may be amended by us in the same manner as other agreements we have with you. Use of your Card after your receipt of an amendment will indicate your acceptance thereof. Either you or Bank of the West may terminate this Agreement without written notice to the other. We may also terminate this Agreement without prior notice if we discover fraud or a breach of the Agreement.

If you use your Card for any illegal transaction, this Agreement also applies to such transaction, and you agree to pay any and all amounts related to such transaction pursuant to the terms of this Agreement. We may, in our sole discretion, restrict the use of or terminate your Card if we notice excessive use of your Card or other suspicious activities or if we reasonably believe the Card is or has been used for one or more illegal transactions.

## Confidentiality

We will disclose information to third parties about your account or the transfers you make:

* Where it is necessary for completing transfers, or
* In order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant, or
* In order to comply with government agency or court orders, or
* If you give us your written permission.

    Please also review our current Privacy Policy brochure.

## Documentation

**Terminal Transfers.** You can get a receipt at the time you make any transfer to or from your account using one of our automated teller machines.

**Preauthorized Credits.** If you have arranged to have direct deposits made to your account at least once every sixty (60) days from the same person or company, the person or company making the deposit will tell you every time they send us the money. You can contact our Telephone Banking Center to find out whether or not the deposit has been made.

**Periodic Statements.** You will get a monthly account statement (unless there are no transfers in a particular month). In any case, you will get the statement at least quarterly.

**Passbook Account.** (Where the only possible Electronic Fund Transfers are Preauthorized Credits). If you bring your passbook to us, we will record any electronic deposits that were made to your account since the last time you brought in your passbook.

## Our Liability

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

* If, through no fault of ours, you do not have enough money in your account to make the transfer.
* If the transfer would go over the credit limit on your overdraft line.
* If the automated teller machine where you are making the transfer does not have enough cash.
* If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.
* If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
* There may be other exceptions stated in our agreement with you.

## Consumer Liability

You are responsible for all transactions and charges incurred by your use of your ATM or Debit Card or its use by anyone authorized by you. You must take precautions to prevent unauthorized use of your Card or your PIN (Personal Identification Number). Your Card is not an extension of credit, nor is it overdraft protection. "Unauthorized use" means the use of the Card by a person other than you who does not have actual, implied, or apparent authority for such use and from whom you receive no benefit.

Generally, your electronic transactions will be limited by the amount on deposit and the amount of any applicable overdraft service. In some cases, however, your electronic transaction may not be rejected and an overdraft may occur. If your account is overdrawn by reason of an electronic transaction, an overdraft fee will be charged to your account.  If your account is overdrawn in connection with a transaction, you must promptly repay us. Your Card is property of Bank of the West, and we may revoke your Card and privileges to access electronic services at any time without notice. If your Card is revoked, you must return it to us.

Tell us AT ONCE if you believe your Card or PIN has been lost or stolen. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum overdraft line of credit).

## Error Resolution

In case of errors or questions about your electronic funds transfers, telephone us or write us at the numbers and locations indicated at the end of this Deposit Account Disclosure For Personal Accounts as soon as you can. If you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt, we must hear from you no later than sixty (60) days after we sent the FIRST statement on which the problem or error appeared.

- Tell us your name and account number.

- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

- Tell us the date and dollar amount of the suspected error.

- If you tell us orally, we may require that you send us your complaint or question in writing within ten (10) business days.

We will determine whether an error occurred within ten (10) business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to forty-five (45) days to investigate your complaint or question. If we decide to do this, we will provisionally credit your account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within ten (10) business days, we may not provisionally credit your account.

For errors involving new accounts, point-of-sale, or non U.S.-initiated transactions, we may take up to ninety (90) days to investigate your complaint or question. For new accounts, we may take up to twenty (20) business days to credit your account for the amount you think is in error.

We will tell you the results within three (3) business days after completing our investigation. If we decide that there was no error, we will send you a written explanation and will debit any provisional credit from your account. You may ask for copies of the documents that we used in our investigation.

## Contact In Event of Unauthorized Transfer

If you believe your Card or PIN has been lost or stolen or that someone has transferred or may transfer money from your account without your permission, call or write to us at the phone number or address provided at the end of this Deposit Account Disclosure For Personal Accounts.

### Fees (Refer to *Schedule of Fees and Charges*)

We may charge you:
- For each ATM withdrawal you make using a non-Bank of the West ATM.
- Each monthly statement cycle in which you use your Bank of the West ATM/Debit Card for purchases.
- Each time you obtain cash at a financial institution where the MasterCard® logo  is displayed.
- For using *eTimeBanker®* Online bill pay.
- Additional paper statement fee.
- For each ATM statement.

## Non-Bank of the West ATM or Merchant Fees.

When you use an ATM or make a purchase at a terminal not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

**Preauthorized Payments (ACH)**

- **Right to stop payment and procedure for doing so.** If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Call or write our Telephone Banking Center at the number/ address shown at the end of this Deposit Account Disclosure For Personal Accounts, in time for us to receive your request three (3) business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within fourteen (14) days after you call. We will charge you for each stop payment order you give.

- **Notice of varying amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, ten (10) days before each payment, when it will be made and how much it will be.

- **Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments three (3) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

# ATM and Debit Card Services

## General Information

You may link all your checking, money market and savings accounts to your Debit Card or ATM Card; you must however designate one account to be your primary funding account.  If you have more than one (1) checking account linked to your Debit Card or ATM Card, you may change your primary account designated for use by contacting our Telephone Banking Center at the number listed at the end of this Deposit Account Disclosure For Personal Accounts.

Your Card is property of Bank of the West, and we may revoke your Card and privileges to access electronic services at any time without notice. If your Card is revoked, you must return it to us.

When you use your Debit Card for POS purchases, you are making a withdrawal from your primary checking account. You must follow the procedures used by the merchant or financial institution for using your Debit Card or ATM Card. You may be asked to sign a sales slip or other document, or only to provide your account number. Some merchants may assess a fee for this type of transaction. We are not liable if a merchant or financial institution refuses to accept your Debit Card, ATM Card or Card number. Bank of the West will deduct the amount of your transaction, including any charge imposed by the merchant or financial institution, from the primary checking account that you designate for this service. We may debit your account or place a hold on your account for a transaction either on the day it is presented to us for payment or on the day we receive the notice of the transaction, whichever is earlier. If a merchant or other institution requests an authorization for a transaction you wish to conduct, we may place a hold on your deposit account.

For fee information, refer to our *Schedule of Fees and Charges for Personal Accounts*.

You may not stop payment on a purchase transaction. Settle directly with the merchant any disputes you have about goods and services for which you pay with your Debit Card or with the financial institution where you obtain cash with your Debit Card or ATM Card. Merchants are independent from us, and we are not responsible for representations made by merchants from which you choose to purchase goods and services with your Debit Card.

It is your responsibility to use the Card only for valid and lawful purposes.  If you use the Card for any other purpose or transaction, including, without limitation, unlawful gambling activity, you assume all responsibility and liability for all losses, costs, and expenses you or we incur as a result of such use.  We reserve the right to block and/or not approve any authorization request for use of the Card in any activity we believe is not lawful, including online gambling.

If you breach any of the terms and conditions of this Agreement, unless otherwise limited by law, you indemnify us for all resulting damages and liability.

# Transaction Types and Limitations

## Bank of the West Automated Teller Machine (ATM) Account Access

You may use your Card and PIN to:

- Withdraw cash from your linked checking, money market, or savings account(s).

- Make deposits to your linked checking, money market, or savings account(s).

- Transfer funds between your linked checking, money market, or savings account(s).

- Make any payments, such as loan payments, accepted by Bank of the West.

- Obtain a statement of the last ten (10) ATM transactions (where available).

- Obtain balances on your linked checking, money market, or savings account(s).

Some of these services may not be available at all terminals. The types of ATM transactions you may perform depend on the types of accounts you maintain with us and the type of terminal.

## Limitations on Frequency of Transactions at Bank of the West ATMs

You may make an unlimited number of cash withdrawals from our ATM machine terminals each day (subject to funds availability and daily dollar limit).

**Limitations on Dollar Amounts at Bank of the West ATMs**

Unless you are informed otherwise, you may withdraw up to $500 in cash each day, subject to funds availability

**Shared Network ATM Networks Account Access**

You may use your Card and PIN to:

- Withdraw cash from your primary checking, money market, or savings account(s) subject to funds availability and transaction limits.
- Transfer funds between your linked checking, money market, and savings accounts.
- Determine the available balance in your linked primary checking, money market, or savings account(s).

Some of these services may not be available at all terminals. The types of ATM transactions you may perform depend on the type of accounts you maintain with us. Your Bank of the West ATM Card cannot be used outside of the United States.

**Limitations on Frequency of Transactions at Shared Network ATMs**

You may make an unlimited number of cash withdrawals from any ATM network machine each day, subject to funds availability and daily dollar limits.

**Limitations on Dollar Amounts of Transactions at Shared Network ATMs**

Unless you are informed otherwise, you may withdraw up to $500 in cash each day, subject to funds availability.

Note: The dollar limitation includes the amount of any fee imposed by the owner of the ATM.

**Point-of-Sale or POS Network Transactions Account Access**

You may use your Debit Card to pay for purchases at merchants that have agreed to accept the Card.

**Limitations on Frequency of POS Network Transactions**

- You can make up to twenty (20) merchandise transactions per day, per Debit card. These transactions include PIN-based point-of-sale (POS), signature-based POS, phone, electronic payments, and Internet purchases each day, subject to funds availability.
- There may be limitations on the number of debit transactions payable to a third party from interest-bearing accounts. If you exceed this limit, you will be assessed a fee.

**Limitations on Dollar Amounts of POS Network Transactions**

- You may buy up to $3,500 worth of goods or services each day you use your Debit Card.
- You may withdraw up to $1,000 in cash each day when you use your Debit Card to obtain cash from other financial institutions using the MasterCard® Network.

Note: The dollar limitation includes the amount of any fee imposed by the merchant.  The dollar limitation is subject to funds availability.
We reserve the right to change these maximum daily limits on cash withdrawals and purchases, which we make based on periodic risk assessments, without notice.

**Foreign Transactions**

For any transactions conducted in a currency other than U.S. dollars, the merchant, network, or card association that processes the transaction may convert any related debit or credit into U.S. dollars in accordance with its then-current policies. MasterCard® currently uses a conversion rate that is either (a) selected from a range of rates available in the wholesale currency markets (note: this rate may be different from the rate MasterCard® itself receives), or (b) the government-mandated rate. The conversion rate may be different from the rate in effect on the date of your transaction and the date it is posted to your account.

We will pass on to you the charge imposed against us by MasterCard®. Specifically, your foreign currency transaction will incur a charge equal to 2% of the transaction amount (including credits and reversals) for each transaction (U.S. or foreign currency) that you conduct outside the 50 United States. The charge will be separately disclosed on your periodic statement. For example, if your international transaction resulted in a U.S. $100 charge, the total fee would be $2, and the statement would reflect a separate transaction fee amount of $1 MasterCard foreign transaction fee, and a $1 Bank of the West foreign transaction service fee; a U.S. $250 charge would incur a total fee of $5.00, and the statement would reflect a separate transaction fee of $2.50 MasterCard foreign transaction fee, and a $2.50 Bank of the West foreign transaction service fee.

### ATM Card Liability and Debit Card Liability

Your liability for unauthorized use of your ATM Card and Debit Card is as follows:

- If you tell us within two (2) business days, you can lose no more than $50 if someone used your Card or PIN without your permission.
- If you believe your Card or PIN has been lost or stolen, and you tell us within two (2) business days after you learn of the loss or theft, you can lose no more than $50 if someone used your Card or PIN without your permission.
- If you do NOT tell us within two (2) business days after you learn of the loss or theft of your Card or PIN, and we can prove we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows unauthorized electronic transfers, you must notify us at once.  If you do not tell us within sixty (60) calendar days after the statement was mailed to you, you may face unlimited liability.

If a good reason (such as a long trip or a hospital stay) kept you from informing us, we may extend the time periods.

### MasterCard Debit Card Zero Liability Policy

Your liability for unauthorized use of your Debit Card for debit transactions processed through the MasterCard® system (including all unauthorized transactions that do not require the use of your PIN) will be zero ($0) provided the following conditions are met: 1) you can demonstrate that you exercised reasonable care in safeguarding the Debit Card from risk of loss or theft; 2) you have not reported two (2) or more incidents of unauthorized use within the preceding twelve (12) months; and 3) your account is in good standing.

If the conditions set forth above are not met, your liability will revert to the liability conditions discussed directly above under "ATM Card Liability and Debit Card Liability" and will be no more than $50 for unauthorized use of your Debit Card.

## Special Rules for Colorado Account Holders Only

**Limitation of liability.** If your ATM/Debit Card is lost or stolen and subsequently used by any unauthorized person, you will only be liable for the lesser of $50 or the amount of money, goods, or services obtained by the unauthorized use prior to notifying the Bank of the theft or loss.  If unauthorized use occurs through no fault of the account holder, no liability will be imposed.

## Special Rules for Minnesota Residents

**Amendment and Termination.** The terms of this electronic fund transfer agreement may be amended by us in the same manner as other agreements we have with you. Use of your ATM/Debit Card after your receipt of an amendment will indicate your acceptance thereof. Either you or Bank of the West may terminate this agreement without prior notice to the other. We may also terminate this agreement without prior notice if we discover fraud or a breach of the agreement.

**Privacy.** To protect the privacy of customers using an ATM or POS terminal, including any supporting equipment, structures, or systems, information received by or processed through such terminals, supporting equipment, structures, or systems shall be treated and used only in accordance with applicable law relating to the dissemination and disclosure of such information. The person establishing and maintaining an ATM or POS terminal, including any supporting equipment, structures, or systems, shall take such steps as are reasonably necessary to restrict disclosure of information to that necessary to complete the transaction and to safeguard any information received or obtained about a customer or a customer's account from misuse by any person manning an electronic financial terminal, including any supporting equipment, structures, or systems.

**Civil Action.** You may bring a civil action against any person violating the consumer privacy and unauthorized withdrawal provisions of Minn. Stat. 47.61 to 47.74, and, if successful, recover, in addition to actual damages or $500, whichever is greater, punitive damages, court costs, and reasonable attorney's fees.

**Timing of Terminal Transactions.** ATM and POS transactions are generally completed immediately with the Bank.

**Reversal of Certain ATM/Debit Card Transactions.** POS transactions cannot be reversed. Payment of goods and services in this manner shall not affect any of the rights, protections, or liabilities in existing law concerning a cash or credit sale made by means other than through the use of a POS terminal.

**Liability for Unauthorized Transactions** (Withdrawals and Purchases). Bank of the West is liable for all unauthorized withdrawals unless the unauthorized withdrawal was due to the loss or theft of the ATM/Debit Card, in which case you will be liable, subject to a maximum of $50, for those unauthorized transactions made before we were notified of the loss or theft. This limitation of liability is effective only if we are notified of unauthorized charges contained in a bill within sixty (60) days of your receipt of the bill.

## Special Rules for Wisconsin Residents

Your liability for unauthorized use of your Card at terminals that are determined to be Customer Bank Communications Terminals under Wisconsin law, is limited to $50.

# Special Rules for Kansas Accounts

Your liability for unauthorized use of your ATM Card is as follows:

- If you tell us within four (4) business days, you can lose no more than $50 if someone used your Card without your permission.

- If you believe your Card or PIN has been lost or stolen, and you tell us within four (4) business days after you learn of the loss or theft, you can lose no more than $50 if someone used your Card or PIN without your permission.

- If you do NOT tell us within four (4) business days after you learn of the loss or theft of your Card or PIN, and we can prove we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $300.

# ATM/Debit Card Security Measures

We reserve the right to monitor ATM and Debit Card transaction activity as a means to deter fraudulent transactions.  If any transaction appears to be unusual activity, we will attempt to contact you to confirm the authenticity of the activity. However, if we are unable to contact you, we may, at our sole discretion, block your Card in an effort to prevent fraudulent transactions. In the event that you confirm the transaction activity as legitimate, we may, at our discretion, unblock your Card. We reserve the right to terminate all rights to use your Card if we have reason to believe that there has been an unauthorized use of your Card or PIN.

Bank of the West reserves the right to decline transactions at the point-of-sale (POS) to deter possible fraud. It is your responsibility to update Bank of the West of any change in contact information, name, address, and phone number(s) in a timely manner.

Our right to monitor your Card transaction activity does not replace your responsibility to review your account activity or change your liability regarding reporting unauthorized activity to us.  **You may not "opt out" of this process.**

It is your responsibility to update Bank of the West of any change in contact information, including address and phone number(s) in a timely manner.

# Telephone Banking Center

Call our Telephone Banking Center toll free at: 1-800-488-2265
TDD (text telephone) users only: 1-800-659-5495

Hours:
6 a.m. – 10 p.m. Monday – Friday
7 a.m. –10 p.m.  Saturday, Sunday, most holidays

Write our Telephone Banking Center:
Branch Service Center
13505 California Street
NE-BBP-02-A
Omaha, NE 68154

Calls may be randomly monitored or recorded to ensure quality service.

A courtesy copy of this document is available in Spanish.  For a copy of a Spanish translation of this document contact us at:   (800) 488-2265.

Please make sure that you understand all terms and conditions applicable to your account, whether those materials are provided in English or Spanish.  Not all information regarding products, such as applications, correspondence or statements, is available in Spanish.  Your acceptance of the product or service constitutes your acceptance of and agreement to be bound by all the terms and conditions including those presented only in English.

Como cortesia, tenemos disponible una copia en español de este documento. Para solicitar una copia, favor de llamar al (800) 488-2265.

Asegúrese de entender todos los términos y condiciones relacionados con su cuenta, ya sea que se presenten en español o en inglés. No toda la información acerca de los productos está disponible en español, como solicitudes, correspondencia o estados de cuenta. Al aceptar el producto o el servicio, usted conviene en, y se compromete a obligarse por, todos los términos y condiciones incluyendo los presentados solamente en inglés.

Form # 030-08500 (Rev. 6/08)   See our current rate sheet for additional information                                                                                Member FDIC.

23

**EXHIBIT B**

Attachment

Office of the Comptroller of the Currency<br>Board of Governors of the Federal Reserve System<br>Federal Deposit Insurance Corporation<br>National Credit Union Administration

Joint Guidance on Overdraft Protection Programs

February 18, 2005

The Office of the Comptroller of the Currency (OCC), Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance Corporation (FDIC), and National Credit Union Administration (NCUA), collectively "the Agencies," are issuing this joint guidance concerning a service offered by insured depository institutions that is commonly referred to as "bounced-check protection" or "overdraft protection." This credit service is sometimes offered on both consumer and small business transaction accounts as an alternative to traditional ways of covering overdrafts. This joint guidance is intended to assist insured depository institutions in the responsible disclosure and administration of overdraft protection services, particularly those that are marketed to consumers.[1]

### Introduction

To protect against account overdrafts, some consumers obtain an overdraft line of credit, which is subject to the disclosure requirements of the Truth in Lending Act (TILA). If a consumer does not have an overdraft line of credit, the institution may accommodate the consumer and pay overdrafts on a discretionary, ad-hoc basis. Regardless of whether the overdraft is paid, institutions typically have imposed a fee when an overdraft occurs, often referred to as a nonsufficient funds or "NSF" fee. Over the years, this accommodation has become automated by many institutions. Historically, institutions have not promoted this accommodation. This approach has not raised significant concerns.

More recently, some depository institutions have offered "overdraft protection" programs that, unlike the discretionary accommodation traditionally provided to those lacking a line of credit or other type of overdraft service (e.g., linked accounts), are marketed to

---

[1] Federal credit unions are already subject to certain regulatory requirements governing the establishment and maintenance of overdraft programs. 12 CFR § 701.21(c)(3). This regulation requires a federal credit union offering an overdraft program to adopt a written policy specifying the dollar amount of overdrafts that the credit union will honor (per member and overall); the time limits for a member to either deposit funds or obtain a loan to cover an overdraft; and the amount of the fee and interest rate, if any, that the credit union will charge for honoring overdrafts. This joint guidance supplements but does not change these regulatory requirements for federal credit unions.

consumers essentially as short-term credit facilities. These marketed programs typically provide consumers with an express overdraft "limit" that applies to their accounts.

While the specific details of overdraft protection programs vary from institution to institution, and also vary over time, those currently offered by institutions incorporate some or all of the following characteristics:

- Institutions inform consumers that overdraft protection is a feature of their accounts and promote the use of the service. Institutions also may inform consumers of their aggregate dollar limit under the overdraft protection program.

- Coverage is automatic for consumers who meet the institution's criteria (e.g., account has been open a certain number of days; deposits are made regularly). Typically, the institution performs no credit underwriting.

- Overdrafts generally are paid up to the aggregate limit set by the institution for the specific class of accounts, typically $100 to $500.

- Many program disclosures state that payment of an overdraft is discretionary on the part of the institution, and may disclaim any legal obligation of the institution to pay any overdraft.

- The service may extend to check transactions as well as other transactions, such as withdrawals at automated teller machines (ATMs), transactions using debit cards, pre-authorized automatic debits from a consumer's account, telephone-initiated funds transfers, and on-line banking transactions.[2]

- A flat fee is charged each time the service is triggered and an overdraft item is paid. Commonly, a fee in the same amount would be charged even if the overdraft item was not paid. A daily fee also may apply for each day the account remains overdrawn.

- Some institutions offer closed-end loans to consumers who do not bring their accounts to a positive balance within a specified time period. These repayment plans allow consumers to repay their overdrafts and fees in installments.

## Concerns

Aspects of the marketing, disclosure, and implementation of some overdraft protection programs, intended essentially as short-term credit facilities, are of concern to the Agencies. For example, some institutions have promoted this credit service in a manner that leads consumers to believe that it is a line of credit by informing consumers that their account includes an overdraft protection limit of a specified dollar amount without clearly

---

[2] Transaction accounts at credit unions are called share draft accounts. For purposes of this joint guidance, the use of the term "check" includes share drafts.

2

disclosing the terms and conditions of the service, including how fees reduce overdraft protection dollar limits, and how the service differs from a line of credit.

In addition, some institutions have adopted marketing practices that appear to encourage consumers to overdraw their accounts, such as by informing consumers that the service may be used to take an advance on their next paycheck, thereby potentially increasing the institutions' credit exposure with little or no analysis of the consumer's creditworthiness. These overdraft protection programs may be promoted in a manner that leads consumers to believe that overdrafts will always be paid when, in reality, the institution reserves the right not to pay some overdrafts. Some institutions may advertise accounts with overdraft protection coverage as "free" accounts, and thereby lead consumers to believe that there are no fees associated with the account or the overdraft protection program.

Furthermore, institutions may not clearly disclose that the program may cover instances when consumers overdraw their accounts by means other than check, such as at ATMs and point-of-sale (POS) terminals. Some institutions may include overdraft protection amounts in the sum that they disclose as the consumer's account "balance" (for example, at an ATM) without clearly distinguishing the funds that are available for withdrawal without overdrawing the account. Where the institution knows that the transaction will trigger an overdraft fee, such as at a proprietary ATM, institutions also may not alert the consumer prior to the completion of the transaction to allow the consumer to cancel the transaction before the fee is triggered.

Institutions should weigh carefully the risks presented by the programs including the credit, legal, reputation, safety and soundness, and other risks. Further, institutions should carefully review their programs to ensure that marketing and other communications concerning the programs do not mislead consumers to believe that the program is a traditional line of credit or that payment of overdrafts is guaranteed, do not mislead consumers about their account balance or the costs and scope of the overdraft protection offered, and do not encourage irresponsible consumer financial behavior that potentially may increase risk to the institution.

## Safety & Soundness Considerations

When overdrafts are paid, credit is extended. Overdraft protection programs may expose an institution to more credit risk (e.g., higher delinquencies and losses) than overdraft lines of credit and other traditional overdraft protection options to the extent these programs lack individual account underwriting. All overdrafts, whether or not subject to an overdraft protection program, are subject to the safety and soundness considerations contained in this section.

Institutions providing overdraft protection programs should adopt written policies and procedures adequate to address the credit, operational, and other risks associated with these types of programs. Prudent risk management practices include the establishment of express account eligibility standards and well-defined and properly documented dollar limit decision criteria. Institutions also should monitor these accounts on an ongoing

3

basis and be able to identify consumers who may represent an undue credit risk to the institution. Overdraft protection programs should be administered and adjusted, as needed, to ensure that credit risk remains in line with expectations. This may include, where appropriate, disqualification of a consumer from future overdraft protection. Reports sufficient to enable management to identify, measure, and manage overdraft volume, profitability, and credit performance should be provided to management on a regular basis.

Institutions also are expected to incorporate prudent risk management practices related to account repayment and suspension of overdraft protection services. These include the establishment of specific timeframes for when consumers must pay off their overdraft balances. For example, there should be established procedures for the suspension of overdraft services when the account holder no longer meets the eligibility criteria (such as when the account holder has declared bankruptcy or defaulted on another loan at the bank) as well as for when there is a lack of repayment of an overdraft. In addition, overdraft balances should generally be charged off when considered uncollectible, but no later than 60 days from the date first overdrawn.[3] In some cases, an institution may allow a consumer to cover an overdraft through an extended repayment plan when the consumer is unable to bring the account to a positive balance within the required time frames. The existence of the repayment plan, however, would not extend the charge-off determination period beyond 60 days (or shorter period if applicable) as measured from the date of the overdraft. Any payments received after the account is charged off (up to the amount charged off against allowance) should be reported as a recovery. Some overdrafts are rewritten as loan obligations in accordance with an institution's loan policy and supported by a documented assessment of that consumer's ability to repay. In those instances, the charge-off timeframes described in the Federal Financial Institutions Examination Council (FFIEC) Uniform Retail Credit Classification and Account Management Policy would apply.[4]

With respect to the reporting of income and loss recognition on overdraft protection programs, institutions should follow generally accepted accounting principles (GAAP) and the instructions for the Reports of Condition and Income (Call Report), and NCUA 5300 Call Report. Overdraft balances should be reported on regulatory reports as loans. Accordingly, overdraft losses should be charged off against the allowance for loan and lease losses. The Agencies expect all institutions to adopt rigorous loss estimation processes to ensure that overdraft fee income is accurately measured. Such methods may include providing loss allowances for uncollectible fees or, alternatively, only recognizing that portion of earned fees estimated to be collectible.[5] The procedures for estimating an adequate allowance should be documented in accordance with the Policy

---

[3] Federal credit unions are required by regulation to establish a time limit, not to exceed 45 calendar days, for a member to either deposit funds or obtain an approved loan from the credit union to cover each overdraft. 12 CFR § 701.21(c)(3).

[4] For federally insured credit unions, charge-off policy for booked loans is described in NCUA Letter to Credit Unions No. 03-CU-01, "Loan Charge-off Guidance," dated January 2003.

[5] Institutions may charge off uncollected overdraft fees against the allowance for loan and lease losses if such fees are recorded with overdraft balances as loans and estimated credit losses on the fees are provided for in the allowance for loan and lease losses.

Statement on the Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions.[6]

If an institution advises account holders of the available amount of overdraft protection, for example, when accounts are opened or on depositors' account statements or ATM receipts, the institution should report the available amount of overdraft protection with legally binding commitments for Call Report, and NCUA 5300 Call Report purposes. These available amounts, therefore, should be reported as "unused commitments" in regulatory reports.

The Agencies also expect proper risk-based capital treatment of outstanding overdrawn balances and unused commitments.[7]  Overdraft balances should be risk-weighted according to the obligor.  Under the federal banking agencies' risk-based capital guidelines, the capital charge on the unused portion of commitments generally is based on an off-balance sheet credit conversion factor and the risk weight appropriate to the obligor.  In general, these guidelines provide that the unused portion of a commitment is subject to a zero percent credit conversion factor if the commitment has an original maturity of one year or less, or a 50 percent credit conversion factor if the commitment has an original maturity over one year.  Under these guidelines, a zero percent conversion factor also applies to the unused portion of a "retail credit card line" or "related plan" if it is unconditionally cancelable by the institution in accordance with applicable law.[8]  The phrase "related plans" in these guidelines includes overdraft checking plans.  The Agencies believe that the overdraft protection programs discussed in this joint guidance fall within the meaning of "related plans" as a type of "overdraft checking plan" for the purposes of the federal banking agencies' risk-based capital guidelines.  Consequently, overdraft protection programs that are unconditionally cancelable by the institution in accordance with applicable law would qualify for a zero percent credit conversion factor.

Institutions entering into overdraft protection contracts with third-party vendors must conduct thorough due diligence reviews prior to signing a contract.  The interagency guidance contained in the November 2000 Risk Management of Outsourced Technology Services outlines the Agencies' expectations for prudent practices in this area.

**Legal Risks**

Overdraft protection programs must comply with all applicable federal laws and regulations, some of which are outlined below.  State laws also may be applicable, including usury and criminal laws, and laws on unfair or deceptive acts or practices.  It is important that institutions have their overdraft protection programs reviewed by counsel

---

[6] Issued by the Board, FDIC, OCC, and Office of Thrift Supervision.  The NCUA provided similar guidance to credit unions in Interpretive Ruling and Policy Statement 02-3, "Allowance for Loan and Lease Losses Methodologies and Documentation for Federally Insured Credit Unions," 67 FR 37445, May 29, 2002.
[7] Federally insured credit unions should calculate risk-based net worth in accordance with the rules contained in 12 CFR Part 702.
[8] See 12 CFR Part 3, Appendix A, Section 3 (b)(5) (OCC); 12 CFR Part 208, Appendix A, Section III.D.5 (Board); and 12 CFR Part 325, Appendix A, Section II.D.5 (FDIC).

for compliance with all applicable laws prior to implementation. Further, although the guidance below outlines federal laws and regulations as of the date this joint guidance is published, applicable laws and regulations are subject to amendment. Accordingly, institutions should monitor applicable laws and regulations for revisions and to ensure that their overdraft protection programs are fully compliant.

Federal Trade Commission Act / Advertising Rules

Section 5 of the Federal Trade Commission Act (FTC Act) prohibits unfair or deceptive acts or practices.[9] The banking agencies enforce this section pursuant to their authority in section 8 of the Federal Deposit Insurance Act, 12 U.S.C. § 1818.[10] An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. An act or practice is deceptive if, in general, it is a representation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances, and the representation, omission, or practice is material.

In addition, the NCUA has promulgated similar rules that prohibit federally insured credit unions from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered.[11] These regulations are broad enough to prohibit federally insured credit unions from making any false representations to the public regarding their deposit accounts.

Overdraft protection programs may raise issues under either the FTC Act or, in connection with federally insured credit unions, the NCUA's advertising rules, depending upon how the programs are marketed and implemented. To avoid engaging in deceptive, inaccurate, misrepresentative, or unfair practices, institutions should closely review all aspects of their overdraft protection programs, especially any materials that inform consumers about the programs.

Truth in Lending Act

TILA and Regulation Z require creditors to give cost disclosures for extensions of consumer credit.[12] TILA and the regulation apply to creditors that regularly extend consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments.[13]

Under Regulation Z, fees for paying overdraft items currently are not considered finance charges if the institution has not agreed in writing to pay overdrafts.[14] Even where the

---

[9] 15 U.S.C. § 45.
[10] See OCC Advisory Letter 2002-3 (March 2002); and joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks (March 11, 2004).
[11] 12 CFR § 740.2.
[12] 15 U.S.C. §§ 1601 et seq. TILA is implemented by Regulation Z, 12 CFR Part 226.
[13] See 15 U.S.C. § 1602(f) and 12 CFR 226.2(a)(17). Institutions should be aware that whether a written agreement exists is a matter of state law. See, e.g., 12 CFR § 226.5.
[14] See 12 CFR 226.4(c)(3). Traditional lines of credit, which generally are subject to a written agreement, do not fall under this exception.

institution agrees in writing to pay overdrafts as part of the deposit account agreement, fees assessed against a transaction account for overdraft protection services are finance charges only to the extent the fees exceed the charges imposed for paying or returning overdrafts on a similar transaction account that does not have overdraft protection.

Some financial institutions also offer overdraft repayment loans to consumers who are unable to repay their overdrafts and bring their accounts to a positive balance within a specified time period.[15]  These closed-end loans will trigger Regulation Z disclosures, for example, if the loan is payable by written agreement in more than four installments. Regulation Z will also be triggered where such closed-end loans are subject to a finance charge.[16]

Equal Credit Opportunity Act

Under the Equal Credit Opportunity Act (ECOA) and Regulation B, creditors are prohibited from discriminating against an applicant on a prohibited basis in any aspect of a credit transaction.[17]  This prohibition applies to overdraft protection programs.  Thus, steering or targeting certain consumers on a prohibited basis for overdraft protection programs while offering other consumers overdraft lines of credit or other more favorable credit products or overdraft services, will raise concerns under the ECOA.

In addition to the general prohibition against discrimination, the ECOA and Regulation B contain specific rules concerning procedures and notices for credit denials and other adverse action.  Regulation B defines the term "adverse action," and generally requires a creditor who takes adverse action to send a notice to the consumer providing, among other things, the reasons for the adverse action.[18]  Some actions taken by creditors under overdraft protection programs might constitute adverse action but would not require notice to the consumer if the credit is deemed to be "incidental credit" as defined in Regulation B.  "Incidental credit" includes consumer credit that is not subject to a finance charge, is not payable by agreement in more than four installments, and is not made pursuant to the terms of a credit card account.[19]  Overdraft protection programs that are not covered by TILA would generally qualify as incidental credit under Regulation B.

Truth in Savings Act

Under the Truth in Savings Act (TISA), deposit account disclosures must include the amount of any fee that may be imposed in connection with the account and the conditions

---

[15] For federal credit unions, this time period may not exceed 45 calendar days.  12 CFR § 701.21(c)(3).

[16] See 12 CFR 226.4.

[17] 15 U.S.C. §§ 1691 et seq.  The ECOA is implemented by Regulation B, 12 CFR Part 202.  The ECOA prohibits discrimination on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to contract), the fact that all or part of the applicant's income derives from a public assistance program, and the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

[18] See 12 CFR §§ 202.2(c) and 9.

[19] See 12 CFR § 202.3(c).

under which the fee may be imposed.[20]   In addition, institutions must give advance notice to affected consumers of any change in a term that was required to be disclosed if the change may reduce the annual percentage yield or adversely affect the consumer.

When overdraft protection services are added to an existing deposit account, advance notice to the account holder may be required, for example, if the fee for the service exceeds the fee for accounts that do not have the service.[21]   In addition, TISA prohibits institutions from making any advertisement, announcement, or solicitation relating to a deposit account that is inaccurate or misleading or that misrepresents their deposit contracts.

Since these automated and marketed overdraft protection programs did not exist when most of the implementing regulations were issued, the regulations may be reevaluated.

<u>Electronic Fund Transfer Act</u>
The Electronic Fund Transfer Act (EFTA) and Regulation E require an institution to provide consumers with account-opening disclosures and to send a periodic statement for each monthly cycle in which an electronic fund transfer (EFT) has occurred and at least quarterly if no transfer has occurred.[22]   If, under an overdraft protection program, a consumer could overdraw an account by means of an ATM withdrawal or POS debit card transaction, both are EFTs subject to EFTA and Regulation E.  As such, periodic statements must be readily understandable and accurate regarding debits made, current balances, and fees charged.  Terminal receipts also must be readily understandable and accurate regarding the amount of the transfer.  Moreover, readily understandable and accurate statements and receipts will help reduce the number of alleged errors that the institution must investigate under Regulation E, which can be time-consuming and costly to institutions.

**Best Practices**

Clear disclosures and explanations to consumers of the operation, costs, and limitations of an overdraft protection program and appropriate management oversight of the program are fundamental to enabling responsible use of overdraft protection.  Such disclosures and oversight can also minimize potential consumer confusion and complaints, foster good customer relations, and reduce credit, legal, and other potential risks to the institution.  Institutions that establish overdraft protection programs should, as applicable, take into consideration the following best practices, many of which have been recommended or implemented by financial institutions and others, as well as practices that may otherwise be required by applicable law.  While the Agencies are concerned about promoted overdraft protection programs, the best practices may also be useful for

---

[20] 12 U.S.C. §§ 4301 <u>et seq</u>.  TISA is implemented by Regulation DD at 12 CFR Part 230 for banks and savings associations, and by NCUA's TISA regulation at 12 CFR Part 707 for federally insured credit unions.
[21] An advance change in terms notice would not be required if the consumer's account disclosures stated that their overdraft check may or may not be paid and the same fee would apply.
[22] 15 U.S.C. §§ 1693 <u>et seq</u>.  The EFTA is implemented by Regulation E, 12 CFR Part 205.

other methods of covering overdrafts. These best practices currently observed in or recommended by the industry include:

<u>Marketing and Communications with Consumers</u>

- **Avoid promoting poor account management.** Institutions should not market the program in a manner that encourages routine or intentional overdrafts. Institutions should instead present the program as a customer service that may cover inadvertent consumer overdrafts.

- **Fairly represent overdraft protection programs and alternatives.** When informing consumers about an overdraft protection program, inform consumers generally of other overdraft services and credit products, if any, that are available at the institution and how the terms, including fees, for these services and products differ. Identify for consumers the consequences of extensively using the overdraft protection program.

- **Train staff to explain program features and other choices.** Train customer service or consumer complaint processing staff to explain their overdraft protection program's features, costs, and terms, including how to opt out of the service. Staff also should be able to explain other available overdraft products offered by the institution and how consumers may qualify for them.

- **Clearly explain discretionary nature of program.** If payment of an overdraft is discretionary, make this clear. Institutions should not represent that the payment of overdrafts is guaranteed or assured if the institution retains discretion not to pay an overdraft.

- **Distinguish overdraft protection services from "free" account features.** Institutions should not promote "free" accounts and overdraft protection programs in the same advertisement in a manner that suggests the overdraft protection program is free of charges.

- **Clearly disclose program fees.** In communications about overdraft protection programs, clearly disclose the dollar amount of the fee for each overdraft and any interest rate or other fees that may apply. For example, rather than merely stating that the institution's standard NSF fee will apply, institutions should restate the dollar amount of any applicable fee or interest charge.

- **Clarify that fees count against the disclosed overdraft protection dollar limit.** Consumers should be alerted that the fees charged for covering overdrafts, as well as the amount of the overdraft item, will be subtracted from any overdraft protection limit disclosed.

- **Demonstrate when multiple fees will be charged.** If promoting an overdraft protection program, clearly disclose, where applicable, that more than one overdraft

fee may be charged against the account per day, depending on the number of checks presented on, and other withdrawals made from, the consumer's account.

- **Explain impact of transaction clearing policies.** Clearly explain to consumers that transactions may not be processed in the order in which they occurred, and that the order in which transactions are received by the institution and processed can affect the total amount of overdraft fees incurred by the consumer.

- **Illustrate the type of transactions covered.** Clearly disclose that overdraft fees may be imposed on transactions such as ATM withdrawals, debit card transactions, preauthorized automatic debits, telephone-initiated transfers or other electronic transfers, if applicable, to avoid implying that check transactions are the only transactions covered.

Program Features and Operation

- **Provide election or opt-out of service.** Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to "opt out" of the overdraft program and provide a clear consumer disclosure of this option.

- **Alert consumers before a transaction triggers any fees.** When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees (for example, it presently may be feasible at a branch teller window). This notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice. If this is not feasible, then post notices (e.g., on proprietary ATMs) explaining that transactions may be approved that overdraw the account and fees may be incurred. Institutions should consider making access to the overdraft protection program unavailable through means other than check transactions, if feasible.

- **Prominently distinguish balances from overdraft protection funds availability.** When disclosing a single balance for an account by any means, institutions should not include overdraft protection funds in that account balance. The disclosure should instead represent the consumer's own funds available without the overdraft protection funds included. If more than one balance is provided, separately (and prominently) identify the balance without the inclusion of overdraft protection.

- **Promptly notify consumers of overdraft protection program usage each time used.** Promptly notify consumers when overdraft protection has been accessed, for example, by sending a notice to consumers the day the overdraft protection program has been accessed. The notification should identify the date of the transaction, the type of transaction, the overdraft amount, the fee associated with the overdraft, the amount necessary to return the account to a positive balance, the amount of time consumers have to return their accounts to a positive balance, and the consequences

10

of not returning the account to a positive balance within the given timeframe.  Notify consumers if the institution terminates or suspends the consumer's access to the service, for example, if the consumer is no longer in good standing.

- **Consider daily limits on the consumer's costs.**  Consider imposing a cap on consumers' potential daily costs from the overdraft program.  For example, consider limiting daily costs from the program by providing a numerical limit on the total overdraft transactions that will be subject to a fee per day or by providing a dollar limit on the total fees that will be imposed per day.

- **Monitor overdraft protection program usage.**  Monitor excessive consumer usage, which may indicate a need for alternative credit arrangements or other services, and inform consumers of these available options.

- **Fairly report program usage.**  Institutions should not report negative information to consumer reporting agencies when the overdrafts are paid under the terms of overdraft protection programs that have been promoted by the institutions.

This concludes the text of the final Joint Guidance on Overdraft Protection Programs.

## BIBLIOGRAPHY

Berenson, Alex. "Some Banks Encourage Overdrafts, Reaping Profit." *New York Times*, 22 January 2003, A1.

Board of Governors of the Federal Reserve System. *Annual Report to the Congress on Retail Fees and Services of Depository Institutions*. June 2002.

Consumer Federation of America and National Consumer Law Center. "Bounce Protection: How Banks Turn Rubber Into Gold by Enticing Consumers to Write Bad Checks." 27 Jan. 2003, http://www.consumerfed.org/bounceappendix012803.pdf, 17 September 2003.

Colton, Roger D. "Determining the Cost Effectiveness of Utility Late Payment Charges." July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf, 17 September 2003.

Feddis, Nessa Eileen. "Will We Kill a Useful Service?" *ABA Banking Journal*, April 2003, 38-42.

Ferguson, Ken. Letter to Bank CEOs from the ABA Chairman-Elect. 21 March 2003.

Office of the Comptroller of the Currency. *Interpretive Letter #914*. 16 USC 1691, 12 CFR 215, 12 CFR 226, SBJ CONS, September 2001.

Raddon Financial Group. "Consumer Trends in Checking Accounts." Spring 2002.

"Some Second Thoughts on CDs." *Business Week*, 20 May 1961, 138.

**EXHIBIT C**



# Overdraft Protection
## A Guide for Bankers

Overdraft Protection   A Guide for Bankers

## Table of Contents

A Guide for Bankers                                                              7

How Formalized Overdraft Protection Programs Work                              10

Why Are More Bankers Considering Formalized Overdraft Protection?             12

Common Concerns                                                                13

Addressing the Regulatory Concerns                                             16

Recommended Best Practice "Do's and Don'ts"                                   18

Concluding Remarks                                                            21

Appendix                                                                      22

# OVERDRAFT PROTECTION
# A GUIDE FOR BANKERS

Opinions abound about overdraft services – those formalized systems handling Non Sufficient Funds (NSFs) presented on a customer's account. Nessa Feddis, Senior Federal Counsel of the ABA, offers her insights in a recent article stating "the basics of bounce protection are sound."[1]  At the same time, the Consumer Federation of America asserts that financial organizations are deliberately enticing consumers to write bad checks.[2]  Vendors of overdraft programs extol their "customer-oriented" virtues, while the news media present overdraft users as pictures of despair.  CEOs of some financial organizations tout the benefits to their customers, while others disparage the practice.  Some banking organizations sign deals with vendors to endorse the programs, while a few publish negative opinions about them.

With this wide range of opinions, it is no wonder that many, inside the industry and out, question the practice and/or the methods of overdraft services.  As a financial executive, how are you to approach overdraft services in order to best serve your customers, shareholders, and the public welfare?

Offering an overdraft protection program is a decision unique to each executive and organization.  However, sometimes lost in the heat of the debate is the clarity created from a common set of facts.  Concerns and fears grow in the absence of facts.  Legitimate questions exist about overdraft services, and they deserve an analytical answer.  Why has the overdraft issue arisen so fervently now and not 20 years ago?  What are the benefits or reasons for a formalized overdraft program at your financial institution?  What are the regulatory compliance components?  What are recommended best practices, and what practices should be more cautiously considered or even avoided?  Furthermore, concerns of the media and consumer groups alike have made it clear that there are definitely potential risks associated with overdraft programs, in the event the bank makes a mistake or "over-reaches" in the implementation.

Before making a decision, each bank should review any program being considered with a critical eye towards what is "right" for the customer and the bank.  We hope that this guide will equip you with the background and knowledge you need to make the right decision for your bank.

[1] Nessa Eileen Feddis, "Will We Kill a Useful Service?" ABA Banking Journal, April 2003, 42.
[2] Consumer Federation of America and National Consumer Law Center, "Bounce Protection: How Banks Turn Rubber into Gold by Enticing Consumers to Write Bad Checks," 27 Jan. 2003, <http://www.consumerfed.org/bouncepprotddd012003.pdf> (17 September 2003), Section B.

## The Origins of the "Late Payment" Choice

Overall, consumer perceptions about debt and late payments are changing. A few years ago, some consumers counted on "float" to carry them through times when they might have been low on funds between paychecks. Over the past few years, float has been considerably decreased due to improved automation of processing systems, the increased usage of Internet banking, and the requirements of the Expedited Funds Availability Act. The increased time to clear a check that so many counted on before is no longer there.

Currently, on most of the bills that consumers pay on a monthly basis, the recipient is given the opportunity to pay the bill on time for one amount and late for a different (higher) amount. Consumers who choose to utilize the late payment option are aware of the late fee they will pay for this service. While one could certainly argue that this is financially imprudent, it is a choice that many make on a monthly basis.

Utility companies such as phone, gas, water, cable, and electric providers made this adjustment towards late payments in their policies in the 1980s. Prior to their change in approach, these industries often faced customer and public policy embarrassments when they discontinued service due to lack of payment. In order to meet customers' payment needs, they changed their approach, finding ways to serve customers who happened to be strapped for cash between paychecks. Below is a sample disclosure statement from a utility company that allows customers to pay their bills at a later date for an additional charge.

---

**Sample Water Utility Policy Statement**

**Payments:**
Utility payments are due by the 15th of the month.
Utility payments can be deposited in the drop slot located in the door of the City Office.

**Late Payments:**
Payments received after the 15th of the month are considered late.
A late charge of $25.00 will be added to any bill not paid by the 15th.

**Disconnect:**
Utilities will be disconnected if payment is not received by the last day of the month.

Reconnect fee is $25.00.

---

Page 5

Overdraft Protection  A Guide for Bankers

To address customer needs, vendors today supply what is now well recognized by consumers: an invoice, similar to the one above, which offers one payment if paid by a certain date, and a higher amount if paid by a later date. In defining why customers paid late fees, one utility study found that a significant segment did so even though they have sufficient financial resources.[9]

Bankers may want to consider the way they communicate with their customers regarding overdrawn accounts. Compare the sample utility bill referenced above with the method financial institutions commonly use to communicate with their customers. Non-bank companies typically inform the consumer of their methods of handling their account in the event the consumer does not meet their obligations on time, and they communicate the fee associated with this. They do not actively entice customers to pay their bills late, but they communicate how the account will be handled should the consumer pay late. Contrast this with the communication sent out by the bank. When an item is presented to an account with insufficient funds to pay the check, the bank generally sends out a terse notice indicating that the customer did not have the funds in their account to cover the check. The communication usually indicates that, although the bank may have paid the check, the practice of falling below the minimum balance in the account is not something the bank encourages.

### The New Dynamics of Checking Accounts and Customer Communication

As new payment options have flourished over the past several years, the methods and means in which consumers use checking accounts have also changed. Rather than having only checks flow through their checking account, consumers now have many ways to access their funds, such as Internet access, ATM access, etc.

A by-product of having multiple delivery channels is that consumers now need better, more specific communication from financial institutions regarding use of these accounts. Financial institutions should be aware that in regard to consumers' attitudes toward late payments, the environment is changing. Banks need to be able to clearly articulate polices so that consumers can make

[9] Roger D. Colton, "Determining the Cost Effectiveness of Utility Late Payment Charges," July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf (17 September 2003).

informed decisions as well as understand the bank's policy regarding NSF fees when a customer mistakenly overdraws.

## The Dilemma

Many bankers believe that a response that discourages overdrafts is the accepted course of action: They believe that overdrafting a checking account is simply "wrong." They believe that banks should actively discourage overdrafts and they view NSF fees as "punitive" fees that are designed to discourage the activity.

Other bankers believe that most of their customers are good customers that will ultimately clear up their accounts, and that paying an insufficient item is better for the customer than returning it. While not encouraging overdrafts, these bankers believe that they are actually helping their customers avoid other fees and providing them a valuable service when they pay overdrawn items..

**Which view is appropriate?  Or more precisely, which view is appropriate for your bank?**

In many cases, these two views are not mutually exclusive. Bankers do not want to actively encourage overdrafts, but they do want to provide good customer service whenever and wherever prudent.

## HOW FORMALIZED OVERDRAFT
## PROTECTION PROGRAMS WORK

The first question you might ask is, "How do these programs work?" An example may help illustrate the programs' underlying concepts.

*John Smith is a customer at ABC Bank. John sits down to pay his bills on the 9th of the month.  He gets to his credit card bill and he notices that the payment is due on the 15th, or he can wait and pay it on the 1st of the following month, in which case he will be charged a $35 late fee. He decides to wait and pay the credit card bill late because he has an unexpected emergency expense that he needs to pay immediately. John understands "the deal" with the credit card company – they have communicated this to him with every bill. John*

Overdraft Protection   A Guide for Bankers

understands that he will incur the late fee, but in spite of this, he makes the decision to defer the payment.

John isn't sure how ABC Bank would generally handle it if he were to present an NSF check. In the past he has presented checks that were paid when funds were not available, but he has also presented some that were returned. The bank's communication in both cases was very short and did not inform John how they made their decision. As a result, John has no comfort at all as to how the bank might handle the next check he presents.

ABC Bank decides to begin offering a formal overdraft program. Through a variety of techniques, the bank communicates clearly with John and generally makes him aware of their decision-making process. When John is next faced with making the decision of whether or not to pay the credit card bill, he now considers his options. He can continue to pay the bill late as he has on occasion in the past, or he can go ahead and write the check to the credit card company today and have some comfort that the bank will probably pay it. He would pay the bank $20 (their NSF fee) vs. paying the credit card company $36.

## The Informed Consumer Effect

By communicating with customers, banks that offer formalized overdraft protection programs achieve the "Informed Consumer Effect," helping participants to make an informed decision on how to utilize this service, should the need arise. Because John is given some comfort on how his check will be handled, he shifts a fee from the credit card company to the bank and pays less in fees.

Just how does a bank communicate with a customer? This is an area where bankers should proceed with caution. A non-recommended method of communicating with customers is to market the service aggressively. A few banks put up billboards, take out radio ads, and do regular monthly statement stuffers. But as the Office of the Comptroller of the Currency pointed out in Interpretive Letter 914 (IL914), this could have the appearance that the bank is attempting to entice customers to overdraw their accounts, an activity that at best is "frowned upon" by consumer groups, and at worst could be considered an unsafe practice. At a typical bank, 60% to 70% of the customer base never (or rarely) present an insufficient item, and marketing to them is wasteful.

However, an efficient, fair, and consistent process could also be considered an opportunity for clear communication to customers – a way to enhance a customer relationship. Customers are often confused by the NSF decision-making process in those banks that do not have a formalized program, since there is often inconsistency in payment of NSF items. Banks that offer a formalized overdraft program have the opportunity to establish consistent guidelines for paying NSF items and to inform and educate customers who use the service.

## WHY ARE MORE BANKERS CONSIDERING FORMALIZED OVERDRAFT PROTECTION?

As of January 2003, the Consumer Federation of America estimated that more than 1,000 banks in the United States use formalized overdraft protection programs, and that number is steadily growing.[4] Why are more bankers considering these programs?

### 1. A New Definition of Customer Service
One of the most common complaints by consumer groups about overdraft protection services is that banks with these programs are providing "bad" customer service. Some consumer groups equate the paying of overdrafts with "payday" lending. They believe that paying an overdraft item is equivalent to taking advantage of an uninformed customer.

However, this seems to be an oversimplification of a much broader issue. Think about it from the perspective of your customers – would they consider it better customer service if the bank paid their check or returned it?

Bank employees also benefit from a consistent overdraft program that offers them guidance on how and when to cover overdraft items. Since they can now define their overdraft policy and explain it to the customer, they can offer better customer service. Defined overdraft program guidelines eliminate banker and customer confusion and lead to improved customer service.

### 2. A Way to Avoid Discriminatory Practices
Organized overdraft protection programs formalize a process that has been han-

---

[4] Consumer Federation of America, "Bounce Protection," Section 2.

died informally and in a discretionary manner in the past, making it more equitable and consistent.  In general, banks have historically paid items for some customers and not paid them for others, based mostly on a variety of factors, including account history and the relationships the customer has with the personal bankers or CSRs' working in the branch.  By using overdraft protection software and more efficient automation, the banks that implement these programs state that they are attempting to treat all customers more fairly.

### 3.  Increased Opportunity

When banks formalize their programs and disclose them, they learn that some customers find this to be a valuable service.  These customers choose to write a check a few days before a deposit and pay the NSF fee rather than pay a late fee to the check recipient.  They choose the bank option because the costs are generally lower than those imposed by the merchant or other payee, and it presents less of a hassle.  Financial institutions that formalize their process and disclose it to customers allow their customers to make informed decisions for themselves.

## COMMON CONCERNS

Bankers need to address a number of concerns before they decide to implement such a formal overdraft program.  Questions raised by the media and consumers groups alike have spawned a variety of concerns.

### Perceptions of "Abusing" the Customer

Media and consumer groups have voiced concerns that some overdraft protection programs are by nature deceptive and designed to take advantage of consumers.  Other media reports discuss cases in which banks have allowed customers to overdraw with their ATM or debit card, at either the ATM or the point of sale, without notification that they were overdrawing the account or that they would be charged a fee. (Reg DD requires fee disclosure at account opening and on periodic statements.)

It is interesting to note that in most overdraft discussions the media and consumer groups often gloss over individual consumer responsibility.  Banks only charge these fees to consumers that present NSF items.  Overdrawing is a dis-

cretionary activity and is completely avoidable, much like the decision to use a foreign ATM. In both cases, the service provided is merely responding to customer need and behavior.

Although the ultimate responsibility lies with the consumer, situations may arise in which a customer becomes overextended and is unable to pay back the overdrawn amount and subsequent fees. As customer service organizations, banks should be aware of these situations and work with the customer to resolve the issue. Any program allowing chronic overdrafts that put the customer in difficult financial circumstances may seem to take advantage of a customer and, of course, should be avoided. Banks should communicate clearly and frequently with their customers regarding the status of their account balance. The bank may then offer the overextended customer a repayment plan, perhaps at a low interest rate, or reduced NSF fees to help the customer recover from the situation. The checking account could be left open and available, as long as the customer meets their repayment obligations.

## Appearance of Violating Credit Laws

One recent article charged that banks are "skirting" credit laws when they pay overdrafts. The reasoning applied was that an overdraft is a short-term loan and the NSF fee imposed is interest. Some consumer advocates have stated that overdrafts amount to loans with very high interest rates, sometimes exceeding 1,000%.

These allegations ignore the fact that many banks charge the same fee whether the item is paid or returned, and there is no differential for overdrawing the account. More specifically, at most banks customers do not pay any additional fee for overdrawing their accounts – they are only charged a fee for presenting an insufficient item and the bank subsequently handling the item.

Credit laws apply when a bank extends credit to a consumer. According to the Truth in Lending Act, 15 USC 1601 et seq. (TILA) and its implementing Federal Reserve Regulation Z, 12 CFR Part 226, "Credit means the right to defer payment of a debt or to incur debt and defer its payment." The bank does not grant a "right" to overdraw; it is a discretionary activity on the part of

Overdraft Protection: A Guide for Bankers

the bank. Credit laws have not applied to bank overdraft fees in the past, and it is unlikely that they will in the future.

As stated in the American Bankers Association letter from ABA Chairman-Elect Ken Fergeson, dated March 21, 2003, "Overdraft protection has been around for a long time, but has evolved over the years. Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer. The feature is typically available to all those eligible to open an account. There is no creditworthiness test as there is for an overdraft line of credit. A flat fee is charged for the overdraft, regardless of the amount."

Several bankers have shown hesitancy toward overdraft protection programs because of potential changes to Regulation Z (Truth in Lending), which would cause an overdraft to be considered a loan and related charges to be interest for APR purposes. For decades, under the terms of Regulation Z, regulators have not generally considered overdraft fees to be a loan when the item is paid. Prior history with other regulations has shown that the Federal Reserve changes them only after careful consideration.

Moreover, any change in regulation would likely impact the payment of all NSF items, not just those items at banks with formal overdraft programs. It would be a very detrimental change to consumers for the regulators to alter regulations in such a manner that banks could effectively no longer pay any overdrafts.

## Incurring Too Much Risk

It may appear upon initial review that paying overdrafts would increase the overall risk levels of a bank. After all, the customer is typically not required to complete any type of application for the service. Most banks do not subject customers to a formal underwriting process prior to allowing the customer to overdraw their account. The bank typically does not obtain credit scores.

Prudent bankers must approach an overdraft program as they would any other new product or service offering. Analysis of the particular program must be performed with the bank's overall risk tolerance in mind. Acceptable levels of risk must be determined prior to entering any program and monitored after implementation.

Most bankers who have implemented a formal overdraft program indicate that charge-offs do, in fact, increase. However, they also indicate that the overall level of charge-offs is within acceptable levels of risk and the benefits of the overdraft program outweigh the increase in charge-offs.

## ADDRESSING THE REGULATORY CONCERNS

Regulators have expressed concerns when reviewing overdraft protection programs, and all bankers considering this service should take care to address them. Some of the main issues are delineated in OCC Interpretive Letter 914 and further defined in the ABA letter dated March 21, 2003, from Ken Ferguson, ABA Chairman-Elect. IL914 outlines three types of regulatory concerns with respect to one particular overdraft protection program. They include: 1) Compliance Issues, 2) Supervisory Concerns, and 3) Policy Issues. We recommend studying IL914 in depth and reviewing the concerns of the OCC with legal counsel. However, there are basic steps bankers can take to be proactive in addressing these regulatory concerns.

**Define the Process Specifically.**
For many years banks have paid checks on an inconsistent basis, often times lacking universal guidelines that employees could follow. Often, banks did not have a formal policy in place to guide bankers on how and when to cover an overdraft. Defining the process specifically will help to alleviate compliance concerns. Due to simple human nature, when paying or returning an overdraft using only personal discretion as a guide, inconsistencies will result. By applying consistent criteria across the board, the entire process should become consistently implemented with all customers.

Overdraft Protection  A Guide for Bankers

**Use Detailed Reporting and Tracking.**
As part of the bank's formal process, the bank should use detailed reporting and tracking of accounts in the overdraft protection program. This will ensure that all levels of management remain apprised of the program, and that potential abusers of the service can be spotted and addressed appropriately, including being removed from the program.

**Avoid Statements that Seem Like Commitments.**
In all written communication to customers, be certain to stay away from statements that sound like absolute commitments to pay overdrafts (e.g., "never incur a merchant charge again"). The Office of the Comptroller of the Currency in its Interpretive Letter 914 (IL914) points out that the Federal Trade Commission Act prohibits deceptive acts or practices, including representations or omissions that are likely to mislead reasonable consumers. Carefully word all the bank's customer communications to explain the overdraft process clearly and directly. Be sure to acknowledge that the process to pay NSFs is completely discretionary and that all overdrafts will not be paid automatically.

**Avoid "Enticing" Customers to Begin Presenting NSFs.**
Studies have shown that most customers do not overdraw their accounts, nor do they want to. In 2002, Raddon Financial Group estimated that nearly 60% of customers have little or no interest in NSF services. Heavy marketing of an overdraft protection program could give the appearance that the bank is attempting to entice customers who currently do not overdraw accounts to begin overdrawing them. Aggressive marketing can potentially backfire, even though the intent may simply be to inform the customer of a helpful, new service that is now available. Instead, establish sound, customer-service response-oriented policies for customers who overdraw their accounts. Above all, do not state that overdrawing is an acceptable practice; offer alternatives. The bank should also provide appropriate disclosures at the ATM and teller window if customers are allowed to overdraw their accounts at those channels.

**Use the Same Fee for Both Paying and Returning.**
One of the "tests" offered in IL914 for determining if an overdraft fee is a finance charge or not, as stated under Regulation Z, is whether an NSF fee is the same regardless of whether a check is paid or returned. By charging the same fee in both instances, the fee is unlikely to be considered a "finance charge."

**Utilize Effective Risk Management Techniques.**
Banks that monitor customer behavior can contact those customers who exhibit excessive or abusive usage and inform them of bank programs that can help them manage their account balances. This practice should identify customers who show a serious lack of account management so that bank management can make decisions on the customer's continued involvement in the bank's overdraft program.

## RECOMMENDED BEST PRACTICE "DO'S AND DON'TS"

In addition to taking proactive steps to address regulatory concerns, adhering to certain "best practices" will help ensure that an overdraft protection program takes the right approach. The main best practices that all bankers should know include:

### Best Practice "Do's"

1. Do inform customers that the bank has other ways to handle overdrafts, such as lines of credit and automatic transfers. Clear communication will give customers all the information they need to make an informed decision. Let your customers know that the bank has other, potentially less expensive ways to handle overdrafts.

2. Do proactively offer an "opt-out" giving the customers a choice. Some customers may not want to have their items paid, and they should be given this choice. By sending each qualified customer a letter with an opt-out clause *before the program is implemented*, bankers are ensuring that all customers are duly informed and are aware of their alternatives.

3. Do monitor customer activity, and don't let customers abuse the service. Utilize software tools to generate detailed reports that will allow the bank to track customers who may be abusing the privilege. Consider contacting and notifying frequent overdrafters of the cost of these services, and suggest a meeting with bank officers to consider other alternatives to overdrafting.

Overdraft Protection: A Guide for Bankers

4. Do apply good risk management techniques, using software to monitor usage. IL914 notes that overdraft protection programs could increase a bank's credit risk profile (e.g., higher delinquency and loss rates) by extending credit to borrowers who may not have normally qualified for payment of overdrafts or overdraft protection. By utilizing software tools with robust reporting capabilities, you should be able to minimize this risk and manage it accordingly.

5. Do communicate with customers often, using multiple channels (i.e., letters, phone calls, email). It is imperative that bankers notify customers as overdrafts are presented and then continue to communicate with the customer while they are overdrawn. As ABA Senior Federal Counsel Nessa Feddis states in an April 2003 *ABA Banking Journal* article, "A consumer understanding of bank practices in this matter is absolutely critical to avoid charges of unfair play."[5]  Communication and education of customers will help to dispel the mystery of the process and enhance the overall customer relationship as well.

### Best Practice "Don'ts"

1. Don't use aggressive marketing.  One of the biggest red flags for regulators and consumer groups alike is a program that tries to achieve increased revenue through aggressive marketing techniques. This kind of customer communication also makes it seem as if the bank is attempting to encourage customers who have not presented NSFs to begin presenting them.

2. Don't step over the line from a compliance perspective.  Regulators may question programs that give the wrong impression about the scope of protection offered by the program and in turn oversell its benefits. When communicating with customers, it is important to use clear, precise, and accurate language that does not attempt to oversell the customer. Keep in mind that this service is discretionary, and therefore avoid promises or words that sound like commitments to customers. Claims of "no more charges from retailers for insufficient checks," "make a mistake – you're covered," and "write a check or use an ATM for more than you have in the bank – you're covered" are overly broad statements, given the limitations of these programs.

---

Feddis, 40.

3. Don't allow customers the opportunity to access funds that will put their account into a negative balance at the ATM, through POS, or teller window without customer knowledge. Banks should communicate clearly with their customers and disclose all fees and charges associated with transactions that will result in an overdraft status on the account. If bankers make the decision to allow customers to overdraw their account balance at the ATM, through POS, or teller window, if technically feasible the bank should inform the customer at the time of the transaction that they will incur an additional fee for overdrawing under the circumstances. If this is not technically feasible, the bank should place notices at the ATM or have a policy in place that does not allow the customer to overdraw the account at the ATM.

Banks should not mislead their customers as to the actual balance in their account and they should clearly present balances to their customers in a format that is easy to understand. For example, if the overdraft limit is included in an "available balance," the text on the ATM screen and receipt should specifically state that the balance includes the overdraft limit. Mistakes are easily made if this information is not communicated to the customer clearly at the time of the transaction. Additionally, banks should consider waiving any initial NSF fees for customers who inadvertently overdraw their checking account due to any type of confusion at electronic channels.

4. Don't leave out effective risk management. Given the loss history of bank overdraft programs, bank management should develop reasonable loss recognition guidelines and establish loan loss reserve methodologies to ensure timely loss recognition and estimated loss coverage. This is imperative. Strict loss-recognition programs and tracking are recommended.

Overdraft Protection: A Guide for Bankers

## CONCLUDING REMARKS

With the wide range of opinions and heartfelt emotions concerning overdraft programs, it is no wonder that many inside and outside the industry question either the practice or the methods of overdraft services. In sorting through the facts and opinions, history can be an excellent guide. In the May 20, 1981, issue of *Business Week*, the headline read, "With the Fed showing no signs of easing its regulations, banks are doubting the wisdom of offering certificates of deposit."[a] Believe it or not, this statement was made concerning negotiable CDs!

Even the most pedestrian of bank products today, certificates of deposit, were once the subject of much debate and concern. Consumer needs often are ahead of regulatory management and public policy. Such may be the case with formalized overdraft programs. Bankers, however, must carefully consider all sides of the formalized overdraft option to make the best decision for their banks.

[a] "Some Second Thoughts to CDs," *Business Week*, 20 May 1981, 134.

Page 81

Overdraft Protection  A Guide for Bankers

**APPENDIX**
Letter to Bank CEOs from the ABA Chairman-Elect.

Date: March 21, 2003
To: Bank CEOs
From: Ken Fergeson, ABA Chairman-Elect

Hundreds of banks are offering automated bounce protection on checking accounts, a new version of bankers' traditional practice of paying overdrafts. Many other banks are considering it. That's why I'm writing. As ABA's Chairman-Elect and a community banker, I'm hearing a lot of concern about this product and the consequences of offering and promoting it.

All bankers want a fair return. But bankers also have a responsibility to treat customers fairly and provide them with clear, conspicuous disclosures. One misleading phrase or questionable ad can destroy your customers' trust in a heartbeat, an awfully high price to pay. As one compliance officer wrote about paying interest on investable balances, "It's cute. It's legal. Don't do it!" When put under a spotlight, that practice led Congress to enact the Truth-In-Savings Act and the Fed to issue Reg DD. That example could be a preview of coming attractions if bankers don't look carefully before they leap into this.

Consumers like overdraft protection. It can save them returned-check fees from creditors or merchants and avoid tarnishing their credit rating in credit bureaus and databases. But some of these products have drawn fire from the regulators and in the media—and litigation won't be far behind, as customers start complaining about unfair treatment.

Overdraft protection has been around for a long time, but has evolved over the years. Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer. The feature is typically available to all those eligible to open an account. There is no creditworthiness test as there is for an overdraft line of credit. A flat fee is charged for the overdraft, regardless of the amount.

Page 22

Before you offer a bounce protection product, decide if you'd want to defend the one you're considering in your local newspaper or to your regulator. To protect yourself and your institution's reputation, you should, at a minimum:

- Disclose, disclose, disclose. Disclose costs and terms in the agreement fully and conspicuously, including treatment of debit card overdrafts. And disclose charges prominently in statements.

- Make clear that the bank is not promising to pay checks, even if the consumer meets the criteria for paying an overdraft.

- Do not encourage overdrafts in your marketing materials, advertising or communications. Some customers have bounced checks because, on balance inquiries, their bank adds the amount of their overdraft protection to their true balance, leading them to believe they have more than they do. Some bank messages encourage them to use the product anytime.

- Monitor the account for frequent use of the service. Customers may not understand how to use it appropriately.

All of these efforts may still not be enough. Done carefully, automated bounce protection programs can be good for your customers and for the banks. But without understanding how your program will be seen and judged in your community, in the agencies and in court, it could become your worst nightmare. If you offer one, proceed with caution and make sure you do it right.

If you have any questions or concerns, please contact ABA Regulatory Director Jim McLaughlin, at 1-800-BANKERS.

**EXHIBIT D**



# Overdraft Explosion:

## Bank fees for overdrafts increase 35% in two years

Leslie Parrish
Center for Responsible Lending

October 6, 2009



CENTER FOR
RESPONSIBLE
LENDING

www.responsiblelending.org

## *TABLE OF CONTENTS*

Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Conclusion & Policy Recommendations . . . . . . . . . . . . . . . . . . . . . . 7

Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

---

**Summary Findings:**

Finding 1:   Over 50 million Americans overdrew their checking account at least once over a 12-month period, with 27 million accountholders incurring five or more overdraft or non-sufficient funds (NSF) fees.

Finding 2:   Banks and credit unions collected nearly $24 billion in overdraft fees in 2008.

Finding 3:   Overdraft fee income for banks and credit unions rose 35 percent from 2006 to 2008.

---

## OVERVIEW

*I*t is now standard practice for most banks and credit unions to automatically enroll checking account customers in their most expensive overdraft loan program—one in which the financial institution generally approves transactions when the accountholder does not have enough funds to cover them, in return for a fee of around $34 per overdraft.

Banks contend that this type of overdraft protection is a service to their customers, helping them to avoid bouncing checks. They further claim that the alternative would be to return the check unpaid, with the customer incurring an NSF fee from the bank and, potentially, a bad check fee from a merchant or a late fee from a landlord or utility company.

*Overdraft fees are most typically triggered not by checks, but by debit card transactions and ATM withdrawals that could easily be denied for no fee.*

However, the reality is far different than the scenario painted by banks. Overdraft fees are most typically triggered not by checks, but by debit card transactions and ATM withdrawals that could easily be denied for no fee.[1] In addition, common banking practices—such as re-ordering transactions from largest to smallest—increase the number of overdraft fees paid by customers rather than helping them avoid charges.[2] Institutions also generally place no meaningful limits on how many fees a customer can incur within a given period.[3] Finally, because banks generally charge a fixed overdraft fee regardless of the size of the transaction covered, the fee bears no relationship to the actual cost to the institution of covering the overdraft. In fact, previous CRL research found that consumers paid about $2 in fees for every $1 in credit extended if they overdrew their account using a debit card at a checkout counter.[4]

These practices are especially alarming given that institutions automatically enroll consumers into this type of program, even when lower-cost forms of overdraft protection—such as a formal overdraft line of credit or a link to a savings account—are usually available. Several CRL surveys have found that an overwhelming majority of respondents, including those who have recently overdrawn their account, want a choice about what—if any—form of overdraft program to enroll in and prefer that debit card overdrafts not be covered.[5]

This report quantifies the number of Americans that have overdrawn their account and are potentially affected by the abusive practices typical of today's overdraft loan programs. It also updates previous CRL estimates of the resulting costs incurred by consumers. To this end, we utilize results from a recent FDIC study to estimate the number of Americans whose accounts become overdrawn in a given year, with a focus on those accountholders with five or more incidents per year. In addition, we also update our 2006 estimate of the total cost consumers pay annually in overdraft fees and evaluate the dramatic increase in fees over a two-year period.

## FINDINGS

### Finding 1: Over 50 million Americans overdrew their checking account at least once over a 12-month period, with 27 million accountholders incurring five or more overdraft or non-sufficient funds (NSF) fees.

A recent survey of 39 FDIC-regulated banks holding 6.5 million accounts found that about one of every four checking accounts became overdrawn at some point over a twelve-month period, and about one out of seven checking accounts was overdrawn five or more times.[6]

If we assume one checking account per adult (excluding those who lack a bank account entirely), an estimated 51 million Americans overdrew their account—and were therefore assessed either an overdraft or NSF fee—over the past 12 months. Perhaps more troubling, over half of those— 27 million Americans in all—incurred five or more overdraft incidents during the same time period. To put this number into perspective, more Americans overdrew their account at least five times than live in the state of Texas. A majority of accountholders in this category significantly exceeded five overdrafts; nearly two-thirds of these 27 million had ten or more incidents within a one-year period. Table 1 and Figure 1 below detail our calculations.

**Figure 1: Share of total checking accounts that become overdrawn during a year and total accountholders affected**



| | At least once | Five or more | Ten or more |
|---|---|---|---|
| Adults impacted (in millions) ▆ | 51 | 27 | 18 |
| Share of accounts ▬■▬ | 25.7% | 13.9% | 8.9% |

Number of times overdrawn annually

**Table 1: Number of adults affected by overdrawn accounts annually**

| | |
|---|---|
| (A) Total population age 18 and over* | 225 million |
| (B) Population without a bank account** | 28 million |
| (C) Total adults with a bank account (C=A-B) | 197 million |
| (D) Adults impacted by at least one overdraft incident (C*25.7%) | 51 million |
| (E) Adults impacted by at least five overdraft incidents (C*13.9%) | 27 million |
| (F) Adults impacted by ten or more overdraft incidents (C*8.9%) | 18 million |

*2008 Current Population Survey, U.S. Census Bureau

**The FDIC's Alliance for Economic Inclusion estimates that as many as 28 million people in the United States are unbanked.

In previous research, CRL found that consumers who repeatedly overdraw their account are more likely to be low-income, single, non-white, and renters.[7] In its analysis of the income and age of accountholders with overdrawn accounts, the FDIC found that lower-income groups and young adults age 18-25 were the most likely to incur an overdraft or NSF fee.[8]

## Finding 2: Banks and credit unions collected nearly $24 billion in overdraft fees in 2008.

These millions of Americans who overdraw their accounts represent an increasingly significant source of fee income for financial institutions. Banks and credit unions are not required to directly report their total income related to overdraft and NSF fees; however, the FDIC found that nearly three-quarters of its banks' service charge income was the result of overdraft and NSF fees.[9] Using this breakdown, we estimate that banks and credit unions assessed their customers $34.3 billion in fees when their accounts became overdrawn in 2008. We estimate that 69 percent of this $34.3 billion, or $23.7 billion, is comprised of overdraft fees alone.[10]

**Table 2: Total overdraft fees collected by banks and credit unions**

| | | |
|---|---|---|
| (A) Service charge income (Banks)* | | $39.5 billion |
| (B) Fee income (Credit Unions)** | | $6.8 billion |
| (C) Total service charge/fee income, all banks and credit unions (A+B) | | $46.3 billion |
| (D) Estimated share of (B) and (C) generated by overdraft and NSF fees*** | 74% | |
| (E) Estimated total overdraft and NSF fees collected (C*D) | | $34.3 billion |
| (F) Estimated share of (E) attributable to overdraft fees alone | 69% | |
| (G) Estimated total overdraft fees alone (E*F) | | $23.7 billion |

*Service charge income as reported in FDIC call report data for 2008.

**Fee income (the equivalent of service charge income for credit unions) as reported by the National Credit Union Administration for 2008.

***Based on findings from the 2008 FDIC Study of Bank Overdraft Programs.

These fees are likely to be even higher in 2009. One leading analyst of bank and credit union fees projects that $38.5 billion in overdraft and NSF fees will be collected this year.[11] If our current assumptions hold, overdraft loan fees will comprise nearly $27 billion of this total amount.[12]

---

[5] Overdraft Explosion: Bank fees for overdrafts increase 35% in two years

**Finding 3: Overdraft fee income for banks and credit unions rose 35 percent from 2006 to 2008.**

Our new estimate that consumers paid $23.7 billion in overdraft fees in 2008 represents a 35 percent increase since our last estimate in 2006. In absolute terms, overdraft fees increased $6.2 billion in two years—part of a continuing trend that we have observed since our first estimate in 2004, and which we expect to continue through 2009.

**Figure 2: Increase in overdraft fees over time**



Rising overdraft fees have several underlying sources. First, many financial institutions have increased the fee per overdraft incident and are more frequently charging additional fees if a customer's account remains overdrawn for several days.[13] In addition, some banks no longer employ caps on the total fees incurred per day, heightening the chances that someone with multiple transactions will pay hundreds of dollars in fees before even knowing their account is overdrawn.[14]

Second, consumers are using debit cards—the most common trigger of overdrafts—both more frequently than in the past and for increasingly small transaction amounts. Today, nearly three-quarters of checking account customers have a debit card, with active card users averaging 17 debit card transactions per month.[15] As a result, debit card usage has exceeded credit card usage since 2005.[16] At the same time, the average debit card transaction size has decreased by about four percent per year, with more than a quarter of all debit card transactions now conducted for purchases of less than $10.[17] As an analyst from the First Manhattan Consulting Group has noted, "the wide adoption of debit cards had

> *"[T]he wide adoption of debit cards had two multiplicative effects: it increased the possibility of a mistake that would take an account negative, and it also increased the number of overdraft events while the customer was unaware he had crossed the line."*
>
> –analyst, First Manhattan Consulting Group

two multiplicative effects: it increased the possibility of a mistake that would take an account negative, and it also increased the number of overdraft events while the customer was unaware he had crossed the line."[18]

As a result of these trends, service charge income, of which overdraft and NSF fees play an increasingly large part, has steadily increased.

**Table 3: Change in overdraft fees collected, 2006–2008**

|  | 2006 | 2008 |
|---|---|---|
| (A) Service charge/fee income | $42.2 billion | $46.3 billion |
| (B) Share of (A) generated by overdraft and NSF fees | 60% | 74% |
| (C) Total overdraft and NSF fees collected | $25.3 billion | $34.3 billion |
| (D) Share of (C) attributable to overdraft fees alone | 69% | 69% |
| Total attributable to overdraft fees alone | $17.5 billion | $23.7 billion |

## DISCUSSION

Overdraft fees eat into the already-strained budgets of working families, with Americans now spending far more on overdraft fees annually than they do on common household items such as books, cereal or postage stamps. Americans spend about the same amount on overdraft fees as they do on fresh vegetables every year, and only a little less than they do on fresh fruit.[19]

**Figure 3: Annual fees resulting from overdrafts, as compared to common household expenditures**



Annual expenditures (in billions)

Overdraft fees are charged to people who typically are enrolled in an overdraft program without their consent. In most cases—particularly if they are using debit card—survey results show that consumers would rather have their transaction denied than be approved in exchange for a $34 fee.[20]

---

Overdraft Explosion: Bank fees for overdrafts increase 35% in two years

**Table 4: Share of respondents who would prefer their transaction be denied at the checkout counter, if account overdrawn, among those with a preference**[21]

| | Would prefer to be declined |
|---|---|
| $5 transaction | 80% |
| $20 transaction* | 79% |
| $40 transaction | 77% |

*The average debit card transaction triggering an overdraft fee is $20.

Overdraft fees triggered by small dollar transactions, most typically occurring when a debit card is used, are especially pernicious because the credit extended to cover the shortfall is often far smaller than the overdraft fee charged. In previous research we found that, even when accounting for overdrafts caused by checks and other triggers, the overall overdraft fees charged exceed the credit extended.[22] For 2008, we estimate that checking account holders receive only $21.3 billion in credit for the $23.7 they pay in overdraft loan fees.[23] Put another way, consumers were obligated to repay $45 billion for $21.3 billion in extremely short-term credit.[24]

> *For 2008, consumers were obligated to repay $45 billion for $21.3 billion in extremely short-term credit.*

The Federal Reserve is currently considering whether—and how—to provide better consumer choice about enrollment in bank overdraft programs.[25] As described in our policy recommendations below, however, regulators must go further to curb existing abuses. In addition, Congress is considering larger-scale reforms to overdraft loan programs.[26]

## CONCLUSION & POLICY RECOMMENDATIONS

Each year, over 50 million Americans overdraw their checking account, paying nearly $24 billion in overdraft fees. Twenty-seven million Americans pay five or more overdraft or NSF fees each year. The most common triggers of these fees are small debit card transactions that could easily be denied for no fee.

Financial institutions engage in abusive practices that maximize overdraft fee revenue. They approve debit card transactions that they could deny for no fee; they charge exorbitant fees that bear no relationship to the cost of covering an overdraft; they charge excessive numbers of overdraft fees over the course of a day, month, or year; and they automatically enroll customers in the most expensive overdraft option available.

> *Financial institutions approve debit card transactions that they could deny for no fee; they charge exorbitant fees that bear no relationship to the cost of covering an overdraft; they charge excessive numbers of overdraft fees over the course of a day, month, or year; and they automatically enroll customers in the most expensive overdraft option available.*

As more transactions are conducted through debit cards and banks find new ways to increase their overdraft charges, the cost to accountholders will climb further Policymakers and regulators can help protect consumers from abusive features of overdraft loan programs by adopting the following recommendations:

Prohibit overdraft fees on debit card purchases and ATM withdrawals. As a limited exception, a fee could be allowed only if the customer were provided a real-time warning and an opportunity to cancel the transaction. Overdraft fees triggered by debit cards could be denied for no fee—the outcome consumers overwhelmingly prefer. As recently as 2004, 80 percent of all institutions denied debit card overdrafts, and at least one large bank and a number of smaller institutions continue to decline debit card transactions that would otherwise result in an overdraft.[37] Moreover, the typically small transaction size of debit card transactions means that accountholders often pay more in fees than they receive in credit. Overdraft fees on debit card purchases and ATM withdrawals should either be prohibited altogether, or they should only be allowed if consumers are provided a real-time warning notifying them that the transaction will result in an overdraft and telling them the amount of the overdraft fee. Once this warning is given, the consumer should be given an opportunity to cancel the transaction or use another method of payment.

> *Overdraft fees triggered by debit cards could be denied for no fee—the outcome consumers overwhelmingly prefer.*

Require that overdraft fees be reasonable and proportional to the actual cost to the financial institution of covering the overdraft. On average, overdraft fees exceed the amount of credit extended, which is particularly troubling given the short time period until repayment—usually only a few days.[38] Since banks are able to repay themselves out of the accountholder's next deposit, these loans carry a low default risk relative to their high cost. Overdraft fees should be proportional to the actual cost to the institution of covering the overdraft, taking into account the cost of funds, default risk, and a reasonable profit margin. Indeed, a product designed to be proportional to the cost to the institution of covering the overdraft already exists—an overdraft line of credit at a reasonable interest rate.

Limit excessive overdraft fees. Consumers who overdraw their accounts frequently may find that overdraft fees beget more overdraft fees, driving them further into debt and ultimately making them less able to meet essential expenses. Once a customer has paid an excessive number of overdraft fees within a 12-month period, the financial institution should be required to provide the customer a longer-term, lower-cost alternative, such as an overdraft line of credit, in order to continue charging the customer for overdrafts. Policymakers should determine what constitutes an excessive number of fees, but it should be no more than six fees per year.

> *Policymakers should determine what constitutes an excessive number of fees, but it should be no more than six fees per year.*

Prohibit overdraft fees unless the customer has affirmatively consented, or "opted in," to the institution's overdraft loan program. CRL surveys have found that nearly 90 percent of accountholders want to choose whether or not to be enrolled in an overdraft loan program." Financial institutions should be prohibited from charging an overdraft fee unless the customer has affirmatively agreed to be enrolled.

Require banks and credit unions to comply with the Truth in Lending Act for overdraft loans by disclosing their cost in terms of an annual percentage rate. When a financial institution covers a transaction when there are insufficient funds in an account, they are extending credit to that customer. Regulators should clarify that overdraft fees are finance charges under the Truth in Lending Act and require appropriate disclosures to help consumers compare the cost of borrowing through fee-based overdraft with other alternatives, such as an overdraft line of credit.

Create a Consumer Financial Protection Agency (CFPA) to protect consumers against unfair practices in the financial services industry. While federal regulators have recognized problems with overdraft loan practices since the early 2000s, meaningful reforms have yet to be required. The creation of a new agency focused on consumer protection would provide much needed oversight of products offered throughout the financial services industry, and the CFPA could prohibit abusive banking practices such as those related to overdraft loans.

## NOTES

1 Debit card transactions (either at the point of sale or ATM) cause 46 percent of total overdrafts, while checks trigger just 27 percent. See Eric Halperin, Lisa James, & Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

2 For an example of how transaction re-ordering can generate more overdraft fees, see Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf at page 5.

3 While some financial institutions have recently lowered the number of overdraft fees per day a customer can be charged, these fees can be well in excess of $100 daily.

4 In an analysis of a large database of checking account transactions, CRL found that the median overdraft resulting from a debit card transaction cost the consumer $1.94 per $1 borrowed. See Eric Halperin, Lisa James, & Peter Smith, *Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts*, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

5 See survey findings in Leslie Parrish, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-convam-survey-4-16-08.pdf and *Overdraft Fees and Opting In: A survey of consumer preferences*, Center for Responsible Lending (March 2009) available at http://www.responsiblelending.org/overdraft-loans/research-analysis/consumer-preference-opt-in.pdf. In the 2008 survey, 88 percent of respondents reported wanting a choice as to whether their debit card overdrafts would be covered, and more than three-quarters preferred debit card transactions resulting in an overdraft be declined.

6 *FDIC Study of Bank Overdraft Programs*, Federal Deposit Insurance Corporation (November 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf. Calculations based on findings in Table IX-11 at page 76.

7 Lisa James & Peter Smith, *Overdraft Loans: Survey finds growing problem for consumers*, Center for Responsible Lending (April 24, 2006), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/ip013-Overdraft_Survey-0405.pdf.

8 See pages 77-80 of *FDIC Study of Bank Overdraft Programs*, Federal Deposit Insurance Corporation, (November, 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf.

9 The FDIC found that, among the financial institutions it regulates that participated in its survey, overdraft and NSF fees made up 74 percent of all service charge income. While the FDIC cautions that this breakdown may not be applicable to all banks and credit unions, several industry analysts, including Bretton Woods and Moebs Services, have found similar results across financial institutions. See *FDIC Study of Bank Overdraft Programs*, Federal Deposit Insurance Corporation (November 2008), available at http://www.fdic.gov/bank/analytical/overdraft/FDIC138_Report_Final_v508.pdf.

10 In an analysis of a large database of checking account transactions, we found that overdraft fees were assessed 69 percent of the time when a consumer overdrew their account, while NSF fees were incurred only 31percent of the time. See Eric Halperin & Peter Smith, *Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans*, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf.

11 Mike Moebs of Moebs Services, Inc. projects $38.5 billion in overdraft and NSF fees will be collected in 2009, with roughly 70 percent, or $27 billion attributable to overdraft fees alone. See Ron Lieber & Andrew Martin, *Overspending on Debit Cards is a Boon for Banks*, The New York Times (September 8, 2009).

12 Using our current assumption that overdraft fees alone comprise 69 percent of total overdraft and NSF fees, we project $26.6 billion in overdraft fees for 2009 based on Mike Moebs' projection ($38.5 billion * 69% = $26.6 billion), which approximates Moebs' own projection of $27 billion.

13 Jean Ann Fox, *Fees for Unauthorized Overdraft Loans Keep Going Up at Largest Banks: Consumers need better protections to safeguard bank accounts*, Consumer Federation of America (July 31, 2009), available at http://www.consumerfed.org/pdfs/OD_CFA_bank_fee_survey_release_2009_final.pdf.

14 Jean Ann Fox, *Fees for Unauthorized Overdraft Loans Keep Going Up at Largest Banks: Consumers need better protections to safeguard bank accounts*, Consumer Federation of America (July 31, 2009), available at http://www.consumerfed.org/pdfs/OD_CFA_bank_fee_survey_release_2009_final.pdf.

15 *Despite Recession, Card Issuers Expect Debit Growth in 2009: 2009 Debit Issuer Study*, commissioned by PULSE, reveals greater PIN debit use and lower fraud losses, Pulse Network (June 4, 2009), available at https://www.pulsenetwork.com/public/upload/storage/file250/file/2009-Debit-Issuer_Study_Release.pdf.

16 In 2005, there were 26 billion debit card transactions, compared to 22 billion credit card transactions. Debit card usage is expected to increasingly exceed that of credit cards, with a projected 46 billion debit card transactions compared to 30 billion credit card transactions by 2012. Data from The Nilson Report, November 2008, Issue 914.

17 According to the 2007 Federal Reserve Payments Study, the average value per signature debit card transaction decreased by 4.3 percent per year in constant dollars from 2003 to 2006, and the average value per PIN debit card transaction decreased by 3.9 percent per year during this same time period. See The 2007 Federal Reserve Payments Study: *Noncash payment trends in the United States, 2003-2006*, Federal Reserve System

(December 10, 2007), available at http://www.fibservices.org/files/communications/pdf/research/2007_payments_study.pdf. The 2009 Debit Issuer Study found that 27 percent of debit card transactions in 2008 were for less than $10. See Despite Recession, Card Issuers Expect Debit Growth in 2009: 2009 Debit Issuer Study, commissioned by PULSE, reveals greater PIN use and lower fraud losses, Pulse Network (June 4, 2009), available at https://www.pulsenetwork.com/public/upload/storage/file250/file/2009-Debit_Issuer_Study_Release.pdf.

18  Recrafting the Checking Account Product Line: Responding to the Unhappily Unbanked, First Manhattan Consulting Group (2009).

19  The 2007 Consumer Expenditure Survey conducted by the Bureau of Labor Statistics finds that households spend, on average, $118 on reading materials, $143 on cereal, $152 on postage and stationery, $190 on fresh vegetables, $202 on fresh fruits, and $231 on major appliances. To calculate the total consumer expenditures, we multiply these amounts by the 120,171,000 U.S. households. For more information, see http://www.bls.gov/cex/. A similar analysis was performed by consulting firm Oliver Wyman, see Aaron Fine, Andrew Dresner, & David Goldberg, Insufficient Funds: The outlook for deposit fees and implications for banking institutions, Oliver Wyman (2009).

20  See survey findings in Leslie Parrish, Consumers Want Informed Choice on Overdraft Fees and Banking Options, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf.

21  Leslie Parrish, Consumers Want Informed Choice on Overdraft Fees and Banking Options, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf.

22  CRL found that banks and credit unions collected $17.5 billion in overdraft fees in 2006, while only extending $15.8 billion in credit. See Eric Halperin & Peter Smith, Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans, Center for Responsible Lending, (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf.

23  In our 2006 study, we found that credit extended equated to 90.1 percent of total overdraft fees. Using these same assumptions for 2008, banks and credit unions collecting $23.7 billion in overdraft fees would extend only $21.3 billion in credit ($23.7 billion * 90.1% = $23.7 billion). See the appendix of Eric Halperin & Peter Smith, Out of Balance: Consumers pay $17.5 billion per year in fees for abusive overdraft loans, Center for Responsible Lending (July 11, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/out-of-balance-report-7-10-final.pdf for methodology.

24  Consumers who overdraw their accounts must repay the amount of credit extended in order to bring their account balance back above zero as well as the fees incurred. This equates to $45 billion dollars ($21.3 billion in credit + $23.7 billion in fees).

25  The Federal Reserve is considering changes to Regulation E which would impact overdraft loan programs, see http://edocket.access.gpo.gov/2009/pdf/E8-31184.pdf.

26  Reforms to overdraft loan programs have been introduced by Rep. Carolyn Maloney (D-NY) as HR 1456, the Consumer Overdraft Protection Fair Practices Act.

27  For example, in most circumstances, Citigroup will not approve a debit card transaction or charge an overdraft fee if the transaction if the customer lacks adequate funds.

28  Previous CRL research has found that consumers pay their overdraft fees and bring their accounts back above zero within 2-5 days, on average. See Eric Halperin, Lisa James, & Peter Smith, Debit Card Danger: Banks offer little warning and few choices as customers pay a high price for debit card overdrafts, Center for Responsible Lending (January 25, 2007), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/Debit-Card-Danger-report.pdf.

29  Leslie Parrish, Consumers Want Informed Choice on Overdraft Fees and Banking Options, Center for Responsible Lending (April 16, 2008), available at http://www.responsiblelending.org/overdraft-loans/research-analysis/final-caravan-survey-4-16-08.pdf and Overdraft Fees and Opting In: A survey of consumer preferences, Center for Responsible Lending (March 2009) available at http://www.responsiblelending.org/overdraft-loans/research-analysis/consumer-preference-opt-in.pdf.

*About the Center for Responsible Lending*

The Center for Responsible Lending is a nonprofit, nonpartisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. CRL is affiliated with Self-Help, one of the nation's largest community development financial institutions.

Visit our website at **www.responsiblelending.org.**

**North Carolina**
302 West Main Street
Durham, NC 27701
Ph (919) 313-8500
Fax (919) 313-8595

**California**
1330 Broadway
Suite 604
Oakland, CA 94612
Ph (510) 379-5500
Fax (510) 893-9300

**District of Columbia**
910 17th Street NW
Suite 500
Washington, DC 20006
Ph (202) 349-1850
Fax (202) 289-9009

© Copyright 2009

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV10- 2469 R (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box, if you are representing yourself ☐)
BETTY ORALLO, on Behalf of Herself and All Others Similarly Situated

**DEFENDANTS**
BANK OF THE WEST

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Douglas D. Winter, Esq.
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90024 / 310-446-6148

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only**
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No          ☒ MONEY DEMANDED IN COMPLAINT: $ 5,000,000 +

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §§ 1332(d)(2) and (6)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:** Case Number: _____ CV 10-2767

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                CIVIL COVER SHEET                Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a).  IDENTICAL CASES: Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No   ☐ Yes
If yes, list case number(s): _____

VIII(b).  RELATED CASES: Have any cases been previously filed in this court that are related to the present case?  ☒ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE:  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Joaquin |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Francisco |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note:  In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Joaquin |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X  SIGNATURE OF ATTORNEY (OR PRO PER):   _____   Date  April 5, 2010

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended, plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

ORIGINAL

Name & Address:
Douglas D. Winter
THE BALL LAW FIRM, LLP
10866 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90024
(310)446-6148

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BETTY ORALLO, on Behalf of Herself and All
Others Similarly Situated,

PLAINTIFF(S)

v.

BANK OF THE WEST,

DEFENDANT(S).

CASE NUMBER

CV10 - 2469 R (mmx)

**SUMMONS**

TO:   DEFENDANT(S): Bank of the West, by serving its Registered Agent: CT Corporation System,
818 West Seventh Street, Los Angeles, CA 90017

A lawsuit has been filed against you.

Within ___ 21 days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer
or motion must be served on the plaintiff's attorney, Douglas D. Winter, Esq. _____, whose address is
10866 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90024 _____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint. You also must file
your answer or motion with the court.

Clerk, U.S. District Court

Dated: April 5, 2010 _____   By: _____

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed
60 days by Rule 12(a)(3)].*

CV-01A (12/07)                               SUMMONS

**EXHIBIT E**



# BANK OF THE WEST®

## STATEMENT

PAGE   1 OF   3

CONCORD OFFICE
1969 DIAMOND BLVD.
CONCORD CA 94520 800-488-2265

STATEMENT PERIOD
05/20/06 THROUGH 06/21/06

SAYNYONOH DEE                    132
4106 SACRAMENTO ST
CONCORD CA  94521 1806

132-065244          0 ITEMS ENCLOSED

------------------------------------------------------------
        THANK YOU FOR DOING BUSINESS WITH US.
        WE LOOK FORWARD TO CONTINUING TO
        SERVE ALL YOUR BANKING NEEDS.
------------------------------------------------------------
        PERSONAL CHECK PLAN ACCOUNT NUMBER 132-065244

| | | | |
|---|---|---|---|
| BEGINNING BALANCE............41.34- | AVERAGE DAILY BALANCE.....................136.00 |
| 1 DEPOSITS..................50.00 | LOW BALANCE...............................196.34- |
| 4 CREDITS...............1,961.46 | YEAR-TO-DATE INTEREST PAID................0.00 |
| 40 WITHDRAWALS............1,680.79 | YEAR-TO-DATE TAX WITHHELD.................0.00 |
| 2 CHECKS..................336.84 | ANNUAL PERCENTAGE YIELD EARNED............0.00 |
| ENDING BALANCE..............47.51- | INTEREST ACCRUED THIS STATEMENT..........0.00 |

DEPOSITS
DATE........AMOUNT.TRANSACTION DESCRIPTION
05/25     925.05 ELECTRONIC DEP    HARRIS & ASSOCIA PAYROLL   052506 HAA1000000762
05/31      63.64 ELECTRONIC DEP    HARRIS & ASSOCIA PAYROLL   053106 HAA1000000762
06/09     882.77 ELECTRONIC DEP    HARRIS & ASSOCIA PAYROLL   060906 HAA1000000762
06/13      90.00 BANK CREDIT 6963048
        DATE........AMOUNT          DATE........AMOUNT              DATE........AMOUNT
        06/06      50.00

WITHDRAWALS
DATE........AMOUNT.TRANSACTION DESCRIPTION
05/22     100.00 DEBIT CARD POS    V SHANNON HAYNES DDS      WALNUT CREEK      CA ON 060522
05/23      30.00 PAID OVERDRAFT FEE
05/23      25.00 UNPAID ITEM FEE
05/30     246.00 DEBIT CARD POS    AIS - WALNUT CREEK       800-848-8148      CA ON 060528
05/30      55.25 POS PURCHASE      007617 NORDSTR 1285 MARINA BOULE SAN LEANDRO  CA
05/30      45.65 POS PURCHASE      848947 LONGS D 2511 SOMERSVILLE  ANTIOCH      CA
05/30      39.00 POS PURCHASE      921287 7-ELEVE 4600 CENTURY BLV  PITTSBURG    CA
05/30      33.85 DEBIT CARD POS    CHEVRON 0090336           CONCORD        CA ON 060528
05/31     251.21 DEBIT CARD POS    CONTRA COSTA WATER DIS    CONCORD        CA ON 060531
06/01      29.91 POS PURCHASE      339801 MACYS W 800 SOUTHLAND MAL HAYWARD      CA
06/02      12.05 DEBIT CARD POS    E & L DELI                OAKLAND        CA ON 060602
06/02       8.53 DEBIT CARD POS    SOUTHLAND GK              HAYWARD        CA ON 060602
06/02       5.60 DEBIT CARD POS    STARBUCKS USA 00069Q48    CONCORD        CA ON 060602
06/05      36.10 DEBIT CARD POS    CHEVRON 0090336           CONCORD        CA ON 060604
06/06       8.75 DEBIT CARD POS    THE POSH BAGELS           OAKLAND        CA ON 060606
06/07      39.55 DEBIT CARD POS    CHEVRON 0090336           CONCORD        CA ON 060607
06/07      15.00 CASH WD ATM       689-006619 BK WEST 3062 E 9TH ST.OAKLAND      CA
06/07       3.10 DEBIT CARD POS    STARBUCKS USA 00069Q48    CONCORD        CA ON 060607
06/08      41.55 DEBIT CARD POS    PIEDMONT GROCERY   SPI    OAKLAND        CA ON 060608
06/08       3.65 DEBIT CARD POS    STARBUCKS USA 00069Q48    CONCORD        CA ON 060608
06/08      90.00 PAID OVERDRAFT FEE

06/09      20.00 ELECTRONIC CHECK  CONVERTED PAID ITEM      CHECK #:       366

06/09       7.42 DEBIT CARD POS    E & L DELI                OAKLAND        CA ON 060609
06/09       3.65 DEBIT CARD POS    STARBUCKS USA 00069Q48    CONCORD        CA ON 060609



**For Your Protection:** Please examine this statement and report any discrepancy within 30 days.        MEMBER FDIC



# BANK OF THE WEST ®

## STATEMENT

PAGE      2 OF    3

CONCORD OFFICE
1969 DIAMOND BLVD.
CONCORD CA 94520 800-488-2265

STATEMENT PERIOD
05/20/06 THROUGH 06/21/06

SAYNYONOH DEE                        132

132-065244

------------------------------------------------------------

WITHDRAWALS
DATE......AMOUNT.TRANSACTION DESCRIPTION
06/09      90.00 PAID OVERDRAFT FEE
06/12      72.79 POS PURCHASE          624137 SAFEWAY 4309 CLAYTON RD    CONCORD         CA
06/12      37.85 DEBIT CARD POS        CHEVRON 0090336              CONCORD        CA ON 060611
06/12      35.67 DEBIT CARD POS        UP AGAINST THE WALL 26       CONCORD        CA ON 060612
06/12      13.42 DEBIT CARD POS        FOREVER 21 #42               CONCORD        CA ON 060612
06/12      10.86 DEBIT CARD POS        E & L DELI                   OAKLAND        CA ON 060612
06/13      96.00 DEBIT CARD POS        PRP WINE - CALI              ORANGE         CA ON 060613
06/13      34.20 DEBIT CARD POS        CHEVRON 0090336              CONCORD        CA ON 060613
06/13      16.98 POS PURCHASE          629080 SAFEWAY 4309 CLAYTON RD    CONCORD         CA
06/13       5.00 DEBIT CARD POS        PRP WINE - CALI              ORANGE         CA ON 060613
06/13       3.65 DEBIT CARD POS        STARBUCKS USA 00069Q48       CONCORD        CA ON 060613
06/13      25.00 UNPAID ITEM FEE
06/14      56.55 ELECTRONIC CHECK      CONVERTED PAID ITEM          CHECK #:        369

06/14      30.00 PAID OVERDRAFT FEE

06/21       1.00 POS CHARGE
06/21       1.00 ALTERNATE FORMAT

CHECKS
NUMBER..DATE........AMOUNT    NUMBER.DATE........AMOUNT    NUMBER..DATE.........AMOUNT
  365  06/09     315.09        367* 06/12     21.75



# BANK OF THE WEST®

**CustomerScan™**

**CHECKSCAN™**
STATEMENT

| CUSTOMER NAME | ACCOUNT NO | STATEMENT PERIOD | PAGE |
|---|---|---|---|
| SAYNYONOH DEE | 132-065244 | 5/20/06 – 6/21/06 | 3 OF 3 |





CHECK# 365, PAID 6/9/2006, AMOUNT $315.09

CHECK# 367, PAID 6/12/2006, AMOUNT $21.75

**For Your Protection:** Please examine this statement and report any discrepancy within 30 days.     **MEMBER FDIC**